## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## GREENBELT DIVISION

ROBERT FRAZIER,
13400 Dille Dr, Upper Marlboro, MD 20772

ANIBAL HERNANDEZ,
13400 Dille Dr, Upper Marlboro, MD 20772

D.P., a minor, by and through his next friend
and guardian K.P.,

CHRISTOPHER BUTLER,
13400 Dille Dr, Upper Marlboro, MD 20772

MIRAMBA WILLIAMS,
13400 Dille Dr, Upper Marlboro, MD 20772

DONNELL DAVIS,
3608 Rock Creek Church Road NW,
Washington, DC 20010

LESLIE SHARP,
653 E Capitol St. SE, Apt. B3, Washington,
DC, 20003

ELMER LAGUAN-SALINAS, and
3716 Jefferson St. Hyattsville, MD 20782

ADRIENNE WORTHINGTON
Address unknown

individually and on behalf of a class
of similarly situated persons,

        Plaintiffs,

    v.

PRINCE GEORGE'S COUNTY,
MARYLAND,
1301 McCormick Drive, Suite 4100,
Largo, MD 20774

Case No.   8:22-cv-1768

**JURY TRIAL DEMANDED**

CORENNE LABBÉ, in her official capacity as
Director of the Prince George's County
Department of Corrections,
13400 Dille Dr, Upper Marlboro, MD 20772

JEFFREY LOGAN, in his official capacity as
Division Chief of the Prince George's County
Population Management Division,
13400 Dille Dr, Upper Marlboro, MD 20772

KENNETH GRAY, in his official capacity as
Section Chief of the Prince George's County
Community Supervision Section,
13400 Dille Dr, Upper Marlboro, MD 20772

TANYA LAW, in her official capacity as Unit
Chief of the Prince George's County
Monitoring Services Unit,
13400 Dille Dr, Upper Marlboro, MD 20772

and

LAKEECIA ALLEN, BRYON BEREANO,
JOHN BIELEC, SCOTT CARRINGTON,
ADA CLARK-EDWARDS, STACEY COBB
SMITH, BRIAN DENTON, ROBERT
HEFFRON JR., DONNAKA LEWIS,
GREGORY POWELL, and CATHY
SERRETTE, in their personal capacities and
official capacities as District and Circuit Court
Judges for the District and Circuit Courts of
Maryland for Prince George's County,
14735 Main St, Upper Marlboro, MD 20772

                    Defendants.

---

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

---

## STATEMENT OF THE CASE

1.      Every night, hundreds of people are jailed awaiting trial in Prince George's County, Maryland, despite the absence of any legally sufficient order that they be detained.

2.      These unlawfully jailed people comprise approximately one-third of the entire population of the Prince George's County Jail.

3.      No court has found that they are too dangerous to be released. Nor has any court found that they would be a flight risk if released.

4.      In fact, the opposite is true. A judge has decided that each of these people could safely be released into the community with appropriate conditions.

5.      Nevertheless, each person remains in jail, in violation of their state and federal constitutional rights, because Prince George's County District and Circuit Court Judges have abdicated their responsibilities and instead referred to unaccountable non-judicial county officials the decision of whether, when, and under what conditions the presumptively innocent person will be released. These pretrial referrals often occur even when the judges ostensibly order the person to be released.

6.      The county officials, employed by the Population Management Division of the Prince George's County Department of Corrections ("the Pretrial Division"), make these critical decisions behind closed doors, without a hearing or the participation of the arrested person or the state, and based on the officials' own criteria unrelated to public safety or flight risk.

7.      Moreover, these county officials take weeks or months to reach a decision, during which time the jailed persons suffer the severe harms attendant to pretrial incarceration, including being cut off from their family, friends, and attorneys; losing their homes and jobs; and lacking adequate physical and mental healthcare.

8.      At the end of the lengthy processing time, the officials often decide not to release those who have been referred to the Pretrial Division. In many cases, no explanation is provided.

9.      Plaintiffs Robert Frazier, Anibal Hernandez, D.P.,[1] Christopher Butler, Miramba Williams, Donnell Davis, Leslie Sharp, Elmer Laguan-Salinas, and Adrienne Worthington are among those who have been—and in some cases, continue to be—illegally jailed through the referral process.

10.     In each Plaintiff's case, a judge determined during a bail review hearing that pretrial detention was unnecessary and authorized (or, in some cases, actually ordered) their release. But in each case, the judge delegated the decision about whether and when release would actually occur, and under what conditions, to unaccountable county officials in the Pretrial Division.

11.     Each Plaintiff then languished in the Jail for weeks or months as the Pretrial Division decided, behind closed doors, whether to release Plaintiffs.

12.     In some cases, the Pretrial Division decided not to release Plaintiffs at all, for arbitrary reasons not found by any judicial officer (and indeed, sometimes rejected by one)—not based on whether Plaintiffs posed a danger to the community or their likelihood of returning to court.

13.     Donnell Davis was detained for 90 days after a judge authorized his release. He was locked in his jail cell for 23 hours each day during the height of the COVID-19 pandemic. He was only released when, at trial, he was found not guilty of all charges against him.

---

[1] Because D.P. is a minor, only his initials are used. *See* Fed. R. Civ. P. 5.2. He brings this lawsuit by and through his next friend and guardian, K.P., who will be filing a Motion to Proceed Under Pseudonym in order to protect D.P.'s identity.

14.     Leslie Sharp was detained for 29 days after a judge ordered him released. He missed his best friend's funeral and was separated from his bedridden grandmother and 12-year-old daughter. He was released when the State dismissed all charges against him on the day of trial.

15.     Elmer Laguan-Salinas was detained for 92 days after a judge authorized his release. During this time, he lost his home and was separated from his 14-month-old daughter. He was housed in a cell with worms and black water. After three months of delays, he was finally released. He has not been convicted of any of the crimes of which he is accused.

16.     Adrienne Worthington was detained for more than a week after a judge authorized her release. She spent Christmas and New Year's in the Jail, separated from her children and grandchildren. While jailed, she fell behind on rent and lost her house. After she was released, the State dropped all charges against her. She remains unhoused to this day.

17.     Meanwhile, Plaintiffs Robert Frazier, Anibal Hernandez, D.P., Christopher Butler, and Miramba Williams remain illegally jailed at this moment.

18.     Robert Frazier was authorized for release on May 31, 2022. His mother died soon thereafter. He was not released in time to pay his respects. On June 21, the court ordered his release. He remains in the Jail 49 days after his release was authorized, and nearly a month after it was ordered.

19.     Anibal Hernandez was ordered released on June 25, 2022. His attorney has emailed the Jail no fewer than six times trying to effectuate this order. Three weeks later, Mr. Hernandez is still detained.

20.     D.P. is a 16-year-old boy. A judge authorized his release on June 21, 2022. Nearly a month later, he remains jailed, separated from his mother and seven-year-old twin sisters. Because he has been detained for so long, he will likely be held back in school.

5

21.     Christopher Butler was arrested on October 26, 2021, and ordered released on February 18, 2022. Five months later, he remains detained. He has not seen his 10-year-old daughter in the nine months since he was arrested, as the Jail does not permit children to visit.

22.     Miramba Williams was authorized for release on July 5, 2022. Nearly two weeks later, he remains incarcerated, locked in his cell for 23 hours each day.

23.     Every additional day that Plaintiffs are incarcerated—separated from their families, jobs, homes, medical treatment, and other crucial components of life—inflicts additional harm.

24.     On behalf of themselves, and all others similarly situated, Plaintiffs seek a declaration that Defendants' policies and practices violate their rights under the United States and Maryland Constitutions, an injunction against the continuation of these unconstitutional practices, and compensation for the harm they have suffered.

## JURISDICTION AND VENUE

25.     This is a civil rights action arising under 42 U.S.C. § 1983, 28 U.S.C. § 2201, *et seq.*, the Fourteenth Amendment to the United States Constitution, and Maryland state law. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1367 (supplemental jurisdiction), and 28 U.S.C. § 2201 (Declaratory Judgment Act).

26.     Venue is proper in this judicial district and division pursuant to 28 U.S.C. § 1391. A substantial part of the events giving rise to the claims take place at the Prince George's County District Courts in Hyattsville and Upper Marlboro, Maryland, and the Prince George's County Detention Center in Upper Marlboro, Maryland ("the Jail").

## THE LAW OF BAIL AND PRETRIAL RELEASE

27.     "In our society [pretrial] liberty is the norm, and detention prior to trial . . . is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).

28.     To ensure that pretrial detention remains a "carefully limited exception," the Fourteenth Amendment to the United States Constitution requires rigorous substantive and procedural protections before a person can be detained while awaiting trial.

29.     Substantively, the right to pretrial liberty is "fundamental." *Id.* at 750. Pretrial detention is only constitutionally permissible if a judicial officer has found that detention is *necessary* to protect the government's interests in reasonably assuring the safety of the community or guarding against the risk of flight by the arrested person. A person may not be detained before trial if *any* less restrictive means can serve the government's interests.

30.     Procedurally, orders of pretrial detention are only constitutionally adequate if they are the product of a "full-blown adversary hearing," which includes consideration of alternative conditions of release and recorded findings of fact and a statement of reasons for the decision to detain, among other protections. *Id.* at 750–52. Of significant relevance here, pretrial detention decisions must be made by a "neutral decisionmaker." *Id.* at 750.

31.     Interpreting the U.S. Constitution, the Maryland Court of Special Appeals has held that pretrial detention based on dangerousness "may not be ordered unless the judicial officer is persuaded by clear and convincing evidence that no condition or combination of conditions of pretrial release can reasonably protect against the danger that the defendant poses to the safety of an identifiable person or to the community at large." *Wheeler v. State*, 864 A.2d 1058, 1065 (Md. Ct. Spec. App. 2005).

32.     Maryland Rule of Criminal Causes 4-216.1, which governs pretrial release and incarceration, "is designed to promote the release of defendants" prior to trial. Md. Rule 4-216.1(b)(1).

33.     Rule 4-216.1 prohibits pretrial detention unless a "judicial officer" finds a "reasonable likelihood" that, if released, the arrested person will not re-appear in court or will be a danger to the community. The Rule requires "individualized consideration" of the "least onerous condition or combination of conditions . . . that will reasonably ensure (A) the appearance of the defendant, and (B) the safety of each alleged victim, other persons, and the community[.]" Md. Rule 4-216.1(b)(2)–(3).

34.     Rule 4-216.1 prescribes the list of factors that a judicial officer may consider in determining whether to release a person awaiting trial, among them "the recommendation of any pretrial release services program that . . . is willing to provide an acceptable level of supervision over the defendant during the period of release if so directed by the judicial officer." Md. Rule 4-216.1(f)(1). Importantly, although the Rule contemplates a pretrial services program making a *recommendation*, the ultimate decision about whether to detain or release a person pretrial must be made by a judicial officer.

## STATEMENT OF FACTS

**I.     The Policies and Practices Governing Pretrial Release in Prince George's County Violate Constitutional Requirements of Substantive and Procedural Due Process.**

35.     Every day, courts in Prince George's County violate substantive and procedural constitutional requirements. Thousands of people have been—and many continue to be—detained in violation of their constitutional and legal rights.

### The Initial Appearance

36.     After a person is arrested in Prince George's County, they are brought before a judicial commissioner for an initial appearance.

37.     Initial appearances take place in the judicial commissioner's office at the Jail, behind closed doors, generally within one day after arrest.

38.     At the initial appearance, the judicial commissioner can order the person released on recognizance or an unsecured bond, released upon payment of a secured cash bond, or held without bond.[2] If the commissioner grants release on recognizance or a cash bond, the commissioner may also specify additional conditions of release.

39.     No prosecutor is present to submit evidence as to whether ongoing detention is necessary. Nevertheless, many people remain detained after their initial appearance.

40.     Each initial appearance concludes within minutes.

41.     Persons given an unsecured bond or released on their own recognizance are released after their initial appearance.

42.     Persons given a secured cash bond may be released after their initial appearance if they are able to pay the bond amount. Those who cannot pay remain detained.[3]

### The Bail Review Hearing

43.     When a person remains detained after their initial appearance—either because they cannot afford the cash bond that was set, or because they were detained without bond—they appear for a bail review hearing before a District Court judge on the next day the court is in session.

---

[2] The judicial commissioner must hold certain people without bond under Maryland law. Only a judge can set bond or release these people. *See* Md. Code Ann., Crim. Proc. § 5-202.
[3] People regularly remain detained because they are unable to pay the cash bond that has been set.

44.     Because the District Court is not in session on weekends or holidays, bail review hearings regularly occur 48-72 hours after a person's initial appearance.

45.     Before an arrested person's bail review hearing, the Pretrial Division[4] compiles an "Intake Fact Sheet" for each person and provides it to the court.

46.     The Intake Fact Sheet is intended to provide the judge with information about the arrested person's criminal history, any prior failures to appear in court, residence, and employment.

47.     Intake Fact Sheets often contain significant errors and omissions.

48.     If at the bail review hearing, the detained person has not retained counsel, the District Court appoints counsel or defers the hearing until the person secures counsel.

49.     At the hearing, defense counsel is usually required to speak first and to make an affirmative argument as to why their client should be released pretrial on recognizance or conditions. The burden is effectively placed on defense counsel to present evidence as to why their client can be released.

50.     The Assistant State's Attorney ("ASA") is generally not asked to present evidence or even explain why continued detention is necessary. To the extent the ASA presents evidence at the hearing, it is typically limited to the statement of charges or criminal history. At some bail review hearings, the ASA does not make any argument at all.

51.     A representative from the Pretrial Division—often Defendant Jeffrey Logan—is usually present at bail review hearings but does not speak unless asked to by the judge.

52.     Bail review hearings generally only last a few minutes.

53.     At the conclusion of the hearing, the judge decides whether to leave the judicial commissioner's initial bail determination in place or change it. Possible outcomes include release

---

[4] Maryland does not have a statewide agency responsible for supervising people who are released awaiting trial. Each county decides whether it will establish such an agency.

on recognizance, release on an unsecured money bond, release on a secured money bond (payable at 10 percent or 100 percent), non-financial pretrial conditions, and detention without bond. As explained below, any of these outcomes may be paired with a referral to the Pretrial Division.

54.    After the hearing, if the person remains detained, the Court issues a written Commitment Pending Hearing order ("bail order").

55.    Bail orders are generally only a few lines long and contain little information.  If the court orders the person detained, it generally does not issue factual findings on the record explaining why detention is necessary or why less restrictive conditions will not suffice to protect the community and/or ensure return to court.

56.    If a person remains detained after their bail review hearing, their next court date will usually be at least 30 days later.

57.    What happens after the initial bail review hearing depends on the crimes with which the arrested person is charged. For offenses punishable by incarceration of less than three years or a fine of less than $2,500, the case typically remains with the District Court.

58.    All other cases must be adjudicated in Circuit Court. In such cases, if probable cause is found at a preliminary hearing or the hearing is waived, and the State's Attorney subsequently indicts the case, the case is transferred to Circuit Court. After the transfer, bail and pretrial release become a Circuit Court matter.

59.    If the detained person would like to have their bail reconsidered after their first bail review hearing, they must file a motion with either the District Court or Circuit Court, depending on whether their case has been transferred. As explained below, motions for subsequent bail review hearings are often denied without a hearing.

<u>Pretrial Referrals</u>

60.     In addition to whatever conditions of release they impose, District and Circuit Court judges frequently provide a "pretrial option" (also known as "authorizing pretrial") or a "pretrial order" (collectively, "pretrial referral" or "referral to pretrial").

61.     Pretrial referrals outsource one of the most important decisions in any criminal case—whether a presumptively innocent person will be jailed awaiting trial—to unelected, non-judicial employees in the County Department of Corrections.

62.     If a person is "held without bond with a pretrial option," (or, equivalently, "held without bond, pretrial authorized"), the judge has authorized the person's release; but the determination of whether, when, and on what conditions release actually occurs is delegated to the Pretrial Division. The arrested person will remain in the Jail until the Pretrial Division makes its decision, and thereafter if the Division decides not to release them.

63.     Similarly, if the court imposes a cash bond with a pretrial referral, the person can be released if they pay the cash bond; or, if they do not pay the cash bond, at the discretion of the Pretrial Division. If the person cannot afford the cash bond as set, the only way they can be released is if the Division elects to release them. Detained persons will necessarily wait in the Jail until the Division makes its decision.

64.     Sometimes instead of a pretrial option or authorization, the judge will issue a "pretrial order" of release. But a pretrial order is not treated as a true "order." Both judges and the Pretrial Division have interpreted "pretrial order" as an instruction merely to place to person at the front of the Pretrial Division's processing queue, functionally delegating to the Division authority to determine whether the person will be released. Pretrial options are more common than pretrial orders. Judges have in some cases refused to give pretrial orders, as opposed to pretrial options,

stating on the record that it is not fair to have someone "jump the line" of people waiting on a release decision from the Pretrial Division.

65.     In all cases, by issuing a pretrial referral—whether by "option" or "order"—the judge has determined that detention is not necessary and that the person may be released at the discretion of the Pretrial Division.[5] If the Pretrial Division decides to release a person given a referral, there is no further involvement of the court. The same is true if the Division decides not to release.

Post-Pretrial Referral Process

66.     If an arrested person is referred to pretrial, their case file is sent to the Pretrial Division after the bail review hearing. The Pretrial Division then processes the file and determines, in its sole discretion, whether, when, and on what conditions to release the person pretrial. There are no further findings or direction from the court.

A.   _The Pretrial Division Has Established Levels of Supervision._

67.     The Pretrial Division has established four fixed "levels of supervision."

68.     Each level has a set of criteria that a person must meet in order to be released and a set slate of conditions to be imposed once a person is released. The criteria and conditions are determined by the Pretrial Division, without judicial input or oversight.

69.     Level 1 is the least restrictive. Level 4, which amounts to home detention, is the most restrictive.

70.     When the court issues a pretrial referral to someone, it sometimes specifies a level. For example, if the Court "authorizes pretrial at Level 3," the Pretrial Division interprets this to

---

[5] At times, judges will combine a purported finding that detention is necessary by clear and convincing evidence with a pretrial referral. The referral, which permits release after processing by the Pretrial Division with no additional hearings, evidence, or findings, essentially negates the preceding finding.

mean that the detained person may only be considered for release at Level 3 or higher. If the Pretrial Division decides that the person is not eligible for release at Level 3 or 4, the person remains detained.

71.     When the court does not specify a level, the Pretrial Division considers itself to have discretion to determine what level of supervision, if any, at which to release the detained person. The Pretrial Division has determined that persons charged with certain crimes are only eligible for release at Level 4.

72.     Some cases are designated, by either the court or by the Pretrial Division, as "Admin Review" cases. This is generally understood to mean that Defendant Logan himself, as the Pretrial Division Chief, must sign off before the person can be released.

B.   *The Pretrial Division Delays Processing Pretrial Referrals.*

73.     When a judge issues a pretrial referral, they do not order a date or a timeline by which the Pretrial Division must render a release decision.

74.     The Pretrial Division regularly delays or defers its release decision for weeks or months without consequence.

75.     Defense attorneys who contact the Pretrial Division days or weeks after their client's bail review hearing are regularly informed that their client's case has not even begun to be processed.

76.     When people charged with crimes that must be adjudicated in Circuit Court are referred to pretrial, the Division often does not even begin to process their pretrial referral until after their preliminary hearing—which is generally 30 days after the bail review hearing at which the referral was made. In the interim, they remain jailed.

77. While the Pretrial Division has not made a release decision either way, defense attorneys are generally not permitted to seek reconsideration of their clients' bail orders.

78. Thus, during the Division's weeks or months of "processing," people given pretrial referrals remain in a state of purgatorial detention, not knowing when they will go home—or even if there will be a determination as to whether they can go home.

C. *The Pretrial Division's "Process" Is Opaque.*

79. The Pretrial Division's decision-making on each pretrial referral takes place at its offices in the Department of Corrections, behind closed doors.

80. The Pretrial Division proceeds without notice to or any communication with the detained person and without an adversarial hearing in which counsel is present and either side can present argument and evidence to a neutral decision-maker charged with issuing recorded findings.

81. During the weeks or months that a referral sits with the Pretrial Division, Division staff provide no affirmative notice to the person or their counsel regarding what investigation (if any) is happening or where the person is in the queue.

82. The only way for a detained person to obtain a status update is to call or email the Pretrial Division. Because detained persons are often unable to contact the Division directly, an attorney, family member, or friend must reach out on their behalf.

83. People who contact the Pretrial Division on behalf of a detained person rarely receive a response. When they do, they are regularly given inconsistent or incorrect information.

84. When defense attorneys do manage to reach someone at the Division, they are often told that the Division has not yet assigned a case manager to their client or that Division staff has not yet reviewed the client's file.

85.     Regularly calling and emailing the Pretrial Division is not only the sole means to remain informed, it is also often necessary to effectuate release. Defense attorneys who have time and are familiar with the Pretrial Division regularly make repeated phone calls and send repeated emails to provide the Division with additional information to facilitate release or to ask why a decision has not been made. Often, it is pressure and information from defense attorneys that eventually achieves release by the Division.

D.   _The Pretrial Division Makes Unauthorized and Arbitrary Detention Decisions._

86.     In many cases, the Division never explicitly refuses to release a person. Instead, the person remains in purgatorial pretrial detention until the pending criminal case is resolved.

87.     In many other cases, the Pretrial Division declines to release persons whom the court has referred. In these instances, the person remains detained until their criminal case is resolved or they are able to convince a judge to modify their bail.

88.     When the Pretrial Division decides to detain someone despite a pretrial referral, the only notice it (sometimes) provides of its decision is a letter sent to the court, often weeks after it has made its determination. The arrested person, their counsel, and their family are not otherwise proactively informed of the Division's decision. On the occasions the Division sends out a letter, it rarely offers an explanation for its detention decision.

89.     In many cases, the letter to the court is never sent, and there is no way to know that the Division has outright refused release to a person other than to call the Division.

90.     When it deigns to explain its decisions, the Pretrial Division often justifies itself using criteria that were known to the court at the time it made the pretrial referral.

91.     For example, the Pretrial Division often refuses to release due to the "nature of the charged offense"—effectively overruling the court's referral for pretrial release, which the court issued after reviewing that same information.

92.     The Pretrial Division also often refuses to release people based on their criminal history, which is listed on the Intake Fact Sheet that the Division itself prepares ahead of bail review hearings, and which the court in turn presumably considered before making the pretrial referral.

93.     Similarly, the Pretrial Division refuses to release people because of the alleged victim's objections, even in cases where the alleged victim appeared and was heard at the bail review hearing that resulted in the court issuing a pretrial referral.

94.     Moreover, the Pretrial Division often declines to release persons awaiting trial because the alleged victim purportedly cannot be reached—after little or no effort by the Pretrial Division to contact the alleged victim.

95.     The alleged victim's approval of release is considered necessary by the Division even where the charges were privately instituted by the same person filing a citizen's complaint.[6] Accordingly, in Prince George's County, any person may institute criminal charges against another person and then, if the arrested person is issued a pretrial referral, also ensure they are detained pending trial.

96.     The Pretrial Division also regularly declines to release persons awaiting trial based on criteria that are largely arbitrary and/or not related or only vaguely related to the safety of the community or flight risk.

---

[6] Maryland permits civilians to institute criminal complaints against other civilians.

97.     For example, the Pretrial Division has refused to release persons awaiting trial because it says it "cannot verify" a home address. This often means that detained people who live alone cannot be released because there is no one else living at their home who can "verify" the address while they sit in jail.

98.     This also means that people who are unhoused and are issued a pretrial referral are denied pretrial release.

99.     For people who are only eligible for release on Level 4 (i.e., home detention)— either by the court's order or by the Pretrial Division's own criteria—the Pretrial Division will not release unless the person has a "verified" Prince George's County address to reside at, a "cooperative" person to reside with, and, in some instances, a landline.[7]

100.     The Pretrial Division declines to release persons awaiting trial due to "institutional behavior," a term that the Division has not defined.

101.     The Pretrial Division declines to release persons awaiting trial for reasons the Division itself has caused. For example, the Pretrial Division has refused to release people who have warrants for failures to appear at court dates in other jurisdictions, even when those warrants were only issued because the person was detained in Prince George's County on their court date awaiting processing by the Division.

102.     The Pretrial Division's release and detention policies are ever evolving and inconsistent. For example, the Pretrial Division has declined to release some people because they have an additional open case but has, in other instances, agreed to release other people with additional open cases.  This discrepancy in treatment is not readily apparent and has not been explained by the Division.

---

[7] The Pretrial Division applies these requirements even when the court knew at the time it authorized release on Level 4 that the person resides outside Prince George's County.

103.    Similarly, the Pretrial Division has sometimes accepted utility bills as a means of address verification. But in other cases, it has insisted on a copy of the lease or mortgage—with no explanation for the inconsistent conduct.

104.    The Pretrial Division regularly shifts its goalposts. People referred to pretrial are often denied release for reasons which are not listed on the Pretrial Division's own published eligibility criteria. Defense attorneys who help the Division clear a purported roadblock to a client's release—for example, by providing contact information for the client's family—are often then told that the Division will not release the client for another, unrelated reason.

E.   _Judges Do Not Enforce or Require the Division to Abide by the Judicial Determinations Made in the Pretrial Referrals._

105.    If the Pretrial Division declines to release a person even though they have been referred to pretrial, the only way to challenge this decision is to file a new motion with the court.

106.    Judges regularly decline to hear motions for bail reconsideration that have been filed by persons for whom the Pretrial Division is delaying or denying release.

107.    When follow-up bail review hearings are granted, they regularly are not scheduled for more than a week after the motion was filed. By the time such a hearing takes place, the person often has been detained for weeks or months after the court referred them for release.

108.    When follow-up bail review hearings are held, judges typically do not inquire into the Pretrial Division's delay or refusal to release the person. When they do ask, judges usually accept the Pretrial Division's explanations without question.

109.    Judges have indicated that they agree with the Pretrial Division's interpretation of "pretrial order," i.e., that these "orders" do not actually bind the Division to release the person.

110.    Judges typically require defense counsel to show "changed circumstances" in order to entertain a motion for bail reconsideration. There is no law requiring "changed circumstances"

in order to receive reconsideration of one's bail. Judges typically do not accept the Pretrial Division's delay or refusal to release the referred person as a qualifying changed circumstance.

111.    When defense attorneys have filed *habeas corpus* petitions seeking to have their client's pretrial referrals reviewed by a higher court, they are usually sent back to the bail-setting court for a *de novo* bail review hearing.

112.    The Pretrial Division's delay—or, in some instances, outright refusals—in executing pretrial referrals has been repeatedly and openly discussed in District and Circuit Courts. Judges have indicated that they are aware of the Division's delays and refusals. Nevertheless, judges regularly shrug off their constitutional responsibility to determine whether, when, and on what conditions people charged with crimes will be released before trial.

113.    The differences between a constitutionally compliant bail system and the system as it functions in Prince George's County are captured by the following illustration:

## A Constitutionally Compliant Bail System



## The Prince George's County Bail System



II.  **Defendants' Practices are Persistent, Widespread, and Have Led to Overcrowding of the Prince George's County Jail.**

114.   The population of the Prince George's County Jail has, in recent months, consistently stood at more than 900 people. In March 2020, at the onset of the pandemic, the population was reduced from its regular count of more than 700 people, to fewer than 600 people. It then quickly returned to its pre-pandemic levels and has since skyrocketed far beyond those.

115.   Approximately 80 percent of people detained at the Jail are Black.

116.   Almost everyone detained at the Jail is awaiting trial and remains presumptively innocent.

117.   A substantial proportion of those detained at the Jail have received pretrial referrals to the Pretrial Division.

118.   Defendant Logan has estimated that approximately one-third of people at the Jail remain detained despite having received a pretrial referral.

119.   The Department of Corrections has represented that, from December 1, 2018, to February 28, 2021, 1,208 people were given pretrial referrals. This is about 50 referrals per month.

120.   Over 20 percent of those referred—246 people—were never released pursuant to their pretrial referral. The other 962 people were released days, weeks, or months after the Pretrial Division received their files, and in many cases only after requesting and appearing at subsequent bail review hearings.

121.   In May 2020, a comprehensive review of the Jail population identified 127 people out of a total population of 503 who had received pretrial referrals to the Pretrial Division. That is, over one quarter of the people in the Jail remained detained even though no judge had determined that they could not be safely released. Eighty of those people had been referred to pretrial more

than one month prior and 48 had been referred to the Pretrial Division more than three months prior, making up about one out of every ten people in the Jail.

122.    A recent review of bail review hearings found that 27 percent of bail review hearings in Prince George's County from January to May 2022 resulted in a pretrial referral. But only about half of those referred to pretrial during this period had actually been released on pretrial supervision by July 15, 2022.[8] Those people waited an average of 38 day after their bail review hearings to be released. About 20 percent of them waited more than 60 days.

123.    The other half of people referred to pretrial during that period remained incarcerated or on home detention as of July 15, 2022. Of those who remained detained, 44 percent had been detained for more than 60 days since their bail review hearing.

124.    One third of those who were ordered released on pretrial supervision in the first five months of 2022 remained in the Jail as of July 15, 2022.

125.    For people whose cases were in Circuit Court, the data was even more startling: Only about a quarter of people referred to the Pretrial Division in the first five months of the year had been released by July 15. People whose cases are in Circuit Court spent, on average, 83 days in jail after being referred for pretrial release.

**III.    Defendants' Practices Harm Arrested People and Their Communities.**

126.    The pretrial referral process is particularly jarring because it gives detained persons and their families false hope. When judges announce at bail review hearings that they are "authorizing pretrial release," arrested people and their families regularly cheer. They then become devastated once they learn from defense counsel that an authorization of pretrial release does not, in fact, result in pretrial release—at least not any time soon.

---

[8] This does not include people "released" on home detention, as public jail data refers to these people as detained.

127.    Pretrial incarceration harms detained peoples' lives beyond loss of liberty. People who are detained awaiting trial endure degrading and life-threatening conditions in jail.

128.    For instance, people who are subjected to pretrial incarceration experience an worsening of existing—or a higher likelihood of developing—mental illness; a high likelihood of assault, including sexual assault, especially in the first few days of incarceration; exposure to communicable diseases; inability to exercise; deprivation of sunlight and fresh air; and forcible separation from children and family.

129.    The harmful effects of pretrial incarceration are particularly acute at the Prince George's County Jail, which was sued for its deliberate indifference to the needs of those it incarcerated during the COVID-19 pandemic. *See* Complaint, *Seth v. McDonough*, No. 20-CV-01028 (D. Md. Apr. 21, 2020), ECF No. 2.

130.    In issuing a temporary restraining order against the Prince George's County Department of Corrections, the court in *Seth* found that the Jail had "recklessly disregarded the health and safety of detainees exposed to COVID-19, particularly those at high-risk of complications if infected," thereby putting them in "serious jeopardy." *Seth v. McDonough*, 461 F. Supp. 3d 242, 262–63 (D. Md. 2020); *see also id.* at 261–62.

131.    The Department of Corrections' failure to safeguard the health and safety of those incarcerated in the Jail continued throughout the *Seth* lawsuit. In late 2021, post-settlement jail inspections found rampant disregard of requests for medical attention, "an absolute lack of any mental health care," insufficient drinking water, blood on cell walls, visible colonies of mold, cold food and showers, and a lack of heat in the winter.

132.    The Prince George's County Jail has not allowed children to visit detained people for more than two years. This means that some parents detained at the Jail have not seen their children for as long as they have been detained, in some cases more than two years.

133.    Pretrial incarceration has a domino effect on arrested people and their communities. Common consequences of pretrial incarceration include loss of employment, loss of housing, missed payments on utilities and other bills, and loss of physical and/or legal custody of children.

134.    Being detained also has a significant impact on the legal outcome of a person's case. People who are detained awaiting trial are more likely to plead guilty than people who await trial at home, even if they are innocent.[9] Incarcerated people have a harder time preparing their defenses; studies show that people who are detained pretrial face worse outcomes at trial and sentencing than those released pretrial, even when charged with the same offense and controlling for all other factors.[10] A person's pretrial detention thus has an irreparable impact on the outcome of their criminal case, and on the person's life for years afterward.

135.    Pretrial detention also makes communities less safe. Several studies have shown that just two or three days in pretrial detention increases the likelihood that a person will commit

---

[9] *See* Arpit Gupta et al., *The Heavy Costs of High Bail: Evidence from Judge Randomization*, 45 J. LEGAL STUD. 471, 471–72 (2016) ("Many defendants who are detained on money bail before trial eventually choose to plead guilty in exchange for release rather than risk continued detention or an uncertain trial outcome.").

[10] *See* Christopher Lowenkamp et al., *Investigating the Impact of Pretrial Detention on Sentencing Outcomes*, LAURA & JOHN ARNOLD FOUND. 12, 14 (Nov. 2013), https://bit.ly/3PjDgbO (those detained for the entire pretrial period are more likely to be sentenced to jail and prison—and receive longer sentences—than those who are released at some point before trial or case disposition); Megan T. Stevenson, *Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes*, 34 J.L. ECON. & ORG. 511, 535–36 (2018) ("Pretrial detention leads to an expected increase of 124 days in the maximum days of the incarceration sentence, a 42% increase over the mean.").

a crime in the future and increases the future risk level of even low-risk persons.[11] People who are detained for a few days following arrest are more likely to miss court dates in the future because of the destabilizing effects of short periods in jail.[12] In other words, detention for just a few days increases recidivism.

136.    Detaining fewer people pretrial benefits the community as a whole. For example, under a consent decree approved by a federal court in November 2019, Harris County, Texas, has been releasing most people arrested for misdemeanors promptly and modified procedures at bail hearings to comply with the Constitution. Since the consent decree has been in place, the number of persons arrested for misdemeanors who had a new charge filed within a year has decreased, while the percentage of misdemeanor cases resulting in conviction has dropped by more than 50 percent and the share of cases dismissed or resulting in acquittal has nearly doubled.[13]

137.    Releasing more people before trial is fiscally prudent as well, as pretrial detention is enormously expensive.

---

[11] *See* Timothy R. Schnacke, *Fundamentals of Bail: A Resource Guide for Pretrial Practitioners and a Framework for American Pretrial Reform*, NAT'L INST. OF CORR. 15–16 (Sept. 2014), https://goo.gl/jr7sMg; Christopher T. Lowenkamp et al., Laura & John Arnold Found., *The Hidden Costs of Pretrial Detention* 3 (2013), https://bit.ly/2u0Lj5d (studying 153,407 people and finding that low-risk arrested persons detained 2–3 days were almost 40 percent more likely to commit new crimes before trial than persons held no more than 24 hours); Paul Heaton et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 STAN. L. REV. 711, 768 (2017) ("While pretrial detention clearly exerts a protective effect in the short run, for misdemeanor defendants it may ultimately serve to compromise public safety," and finding that in a representative group of 10,000 misdemeanor offenders, pretrial detention would cause an additional 600 misdemeanors and 400 felonies compared to if the same group were released).
[12] *See also* Gupta et al., *supra* note 10, at 494.
[13] Brandon L. Garrett et al., *Monitoring Pretrial Reform in Harris County: Fourth Report of the Court-Appointed Monitor*, ODONNELL V. HARRIS COUNTY DECREE (Apr. 18, 2022), https://bit.ly/3PG3rt8.

138.     Thus, every day of pretrial detention inflicts additional, irreparable harm against both detained persons and their communities. Where no Court has determined that pretrial detention is necessary, that harm is especially unjustifiable.

## PARTIES

### Robert Frazier

139.     Plaintiff Robert Frazier is 40 years old. Until recently, he worked in construction and lived with his fiancée and their four-year-old daughter in Washington, D.C. He also has three other living children, including a five-year-old son.

140.     Mr. Frazier was arrested on May 28, 2022. Due to the Memorial Day holiday, he did not appear for a bail review hearing until May 31. At that hearing, Judge Bryon Bereano reviewed Mr. Frazier's Intake Fact Sheet—which stated, *inter alia*, that Mr. Frazier had an outstanding traffic detainer—and issued a pretrial referral authorizing Mr. Frazier's release at Level 4.

141.     On June 21, after Mr. Frazier's attorney filed a motion for bail reconsideration, Judge Ada Clark-Edwards again referred Mr. Frazier to pretrial, this time ordering that he be released at Level 4. Nevertheless, Mr. Frazier remained detained.

142.     Shortly after he was referred for pretrial release, Mr. Frazier's mother passed away. Mr. Frazier was not released in time to see his mother's body before she was put to rest.

143.     Mr. Frazier had a seizure while at the Jail. He was transferred a cell in the medical unit with feces, bugs, and worms. He has yet to see a doctor. He has open wounds and ulcers in his mouth, and he broke a tooth trying to eat solid food because the Jail refused to give him soft food until recently. He has yet to see a dentist. The Jail confiscated his toothbrush.

144.     As the Jail does not permit children to visit, Mr. Frazier has not seen his four-year-old daughter or five-year-old son since he was arrested.

145.     To date, Mr. Frazier has not been contacted by anyone at the Pretrial Division. He does not know why he remains detained or when he might be released.

146.     Jail officers have given Mr. Frazier inconsistent explanations as to why he remains detained. One officer told him that the head of the Pretrial Division did not want Mr. Frazier released for an unknown reason. Another officer told him that his ongoing detention is unrelated to any individualized assessment, but instead is a consequence of the Pretrial Division's general refusal to release people in order to "make up" for revenue lost from COVID-19 jail releases.

147.     Meanwhile, Defendant Logan has suggested to Mr. Frazier's attorney that the Division does not want to release Mr. Frazier because of the Virginia traffic detainer. At the same time, Defendant Logan has acknowledged that the court knew about the detainer when it authorized, then ordered, Mr. Frazier's release—but expressed concern about the court's decision.

148.     Forty-nine days since the court authorized Mr. Frazier's release, and 28 days since the court ordered his release, Mr. Frazier remains in the Jail, with no idea if or when he will go home.

<u>Anibal Hernandez</u>

149.   Plaintiff Anibal Hernandez is 29 years old. Until recently, he worked in construction and lived in Hyattsville, Maryland with his wife, one-year-old daughter, parents, and other family.

150.   Mr. Hernandez was arrested on June 22, 2022, and appeared before Judge LaKeecia Allen for a bail review hearing on June 24.

151.    The Intake Fact Sheet prepared by the Pretrial Division stated that Mr. Hernandez had no prior failures to appear in the court and that he had only a brief and dated criminal record. Judge Allen issued a pretrial referral ordering Mr. Hernandez released at any level.

152.    That same day, Mr. Hernandez's attorney emailed Defendant Logan the statement of charges, Intake Fact Sheet, and contact information for Mr. Hernandez's family.

153.    Yet Mr. Hernandez remained in the Jail. Every few days—a total of five more times—Mr. Hernandez's attorney emailed Defendant Logan requesting an update or explanation. He received no substantive responses. Meanwhile, when Mr. Hernandez's family called the Pretrial Division, they were told that the Division did not even know why Mr. Hernandez remained in the Jail. Mr. Hernandez has not seen his one-year-old daughter since he was arrested.

154.    On July 12, Mr. Hernandez's attorney filed a motion seeking to require Defendant Labbé to show cause why Mr. Hernandez's pretrial referral had been ignored or be held in contempt of court.

155.    Finally, the following day, July 13, Defendant Logan responded to Mr. Hernandez's attorney and stated that the Pretrial Division would not release Mr. Hernandez because the Division could not "verify" an address for him. Defendant Logan did not explain what efforts (if any) the Division had made to identify and verify an address for Mr. Hernandez, or whether it had contacted Mr. Hernandez's family—whose information his attorney had provided the day of his bail review hearing. Mr. Hernandez's show-cause motion was denied that same day.

156.    Mr. Hernandez remains in the Jail, 25 days after the court ordered him released. He does not know if or when he will go home.

<u>D.P.</u>

157.   Plaintiff D.P. is a 16-year-old boy. He lives with his mother and seven-year-old twin sisters, whom he sometimes babysits, in Oxon Hill, Maryland. He is finishing the 10th grade. He likes to read, play video games, and eat his favorite foods, pizza and chicken.

158.   D.P. was arrested on Thursday, June 16, 2022. Due to the Juneteenth court holiday, he did not appear before a judge until the following Tuesday, June 21.

159.   At that bail review hearing, Judge Ada Clark-Edwards issued a Level 4 pretrial referral authorizing D.P.'s release to his mother's house on home detention. But the Division did not release him.

160.   At a subsequent hearing on June 28, Judge Brian Denton again authorized D.P.'s release. After that hearing, D.P.'s attorney sent the Division the statement of charges, Intake Fact Sheet—which states that D.P. has never been convicted of any crime or failed to appear in court—and a copy of his mother's lease.

161.   To this date, the Division has taken no action on his case.

162.   D.P.'s mother and attorneys have called and emailed the Pretrial Division, requesting D.P.'s release or at least an explanation as to why he has not been released. The Division has provided neither. No one at the Division has ever returned his mother's calls.

163.   While he was in the Jail, D.P. was placed on suicide watch in the adult medical unit. He was allowed out of his cell for one hour per day,[14] usually between midnight and 1 A.M.

---

[14] *See* U.S. Dep't of Justice, Report and Recommendations Concerning the Use of Restrictive Housing – Final Report 1–3 (Jan. 2016), https://www.justice.gov/archives/dag/file/815551/download (defining "solitary confinement" or "restrictive housing" as being locked in one's cell for 22 or more hours per day and detailing the "serious, long-lasting harm" that restrictive housing causes).

164.    D.P. was in the Jail for three weeks before being transferred to a juvenile facility. Even after his transfer, he retains his pretrial referral. The Division can release him at any time.

165.    As a result of his prolonged pretrial detention, D.P. has been unable to complete online summer school and will likely be held back from the 11th grade. His mother has had to quit her weekend job—she relies on D.P. to babysit—and has had difficulty securing the childcare necessary to visit him, as the Jail does not permit D.P.'s seven-year-old sisters to visit with her.

166.    Nearly a month since the court authorized his release, D.P. remains detained, with no idea if or when he will go home.

<u>Christopher Butler</u>

167.    Plaintiff Christopher Butler is 32 years old. Until he was arrested in October 2021, he worked at FedEx Field stadium, lived with his mother in Capitol Heights, Maryland, and saw his now-10-year-old daughter every day.

168.    At a bail hearing in his case on February 18, 2022, Judge Cathy Serrette issued a pretrial referral ordering Mr. Butler released. Judge Serrette read and acknowledged the seriousness of the charges against Mr. Butler before giving this order.

169.    But to this date, the Pretrial Division refuses to release Mr. Butler—purportedly because of the nature of the charges against him.

170.    For the nine months that Mr. Butler has been detained at the Jail, he has not been permitted to see his daughter. He missed her 10th birthday.

171.    At a hearing on June 29, the court affirmed that it had ordered Mr. Butler released, but did not actually effect his release. Instead, the court set a subsequent hearing for July 25.

172.    Five months and one day after the court ordered his release, Mr. Butler remains jailed, with no idea if or when he will go home.

<u>Miramba Williams</u>

173.    Plaintiff Miramba Williams is 27 years old. Until his arrest last month, he was taking classes at the University of the District of Columbia, training to work in the HVAC business, and living with his father in Suitland, Maryland.

174.    Mr. Williams was arrested on June 30, 2022. Due to the Fourth of July holiday, did not appear before a judge for a bail review hearing until July 5.

175.    At that hearing, Judge Gregory Powell issued Mr. Williams a pretrial referral.

176.    Mr. Williams, however, remains in the Jail. When his parents called the Pretrial Division and asked when he might be released, or why he remains jailed, none was provided.

177.    At the Jail, Mr. Williams is locked in his cell for 23 hours per day due to a COVID-19 case on his unit. He has not been able to see or even speak to his three young children.

178.    Two weeks since the court authorized his release, Mr. Williams remains detained, with no idea if or when he will go home.

<u>Donnell Davis</u>

179.    Plaintiff Donnell Davis is 28 years old. He was born in Washington, D.C. and has lived in the District of Columbia/Prince George's County area for his entire life. He lives with his aunt and grandfather and works as a cook at a local barbecue restaurant.

180.    Mr. Davis was arrested on October 8, 2020. He appeared for a bail review hearing the next day.

181.    Mr. Davis's Intake Fact Sheet stated that Mr. Davis had no prior convictions or failures to appear at court dates. At the hearing, Judge Robert Heffron Jr. issued Mr. Davis a pretrial referral at Level 4.

182.     After the hearing, Mr. Davis remained in the Jail, waiting for the Pretrial Division to process his referral. On October 28, 2020, after almost three weeks of inaction, the Division filed a notice with the court stating that Mr. Davis was not eligible for pretrial release. The notice contained no explanation of why the Pretrial Division had found Mr. Davis ineligible for release, or why the Division had taken three weeks to reach this determination. It simply suggested that anyone who wanted an explanation should call the Division.

183.     At Mr. Davis's preliminary hearing on November 9, the State dismissed the felony charge against him, leaving only a misdemeanor charge. Judge Heffron left his pretrial referral in place. He did not indicate whether he had reviewed the Pretrial Division's notice that it considered Mr. Davis ineligible for release or order the Division to re-consider Mr. Davis's eligibility.

184.     On December 3, 2020, nearly a month later, the Pretrial Division filed a copy of its October 28 notice with the court—it did not even bother to change the date—stating again that Mr. Davis was ineligible for pretrial release. Once again, the notice provided no explanation. By this time, Mr. Davis had spent nearly two months in the Jail after the court authorized his release.

185.     Mr. Davis made repeated calls to the Pretrial Division, trying to secure his release or at least an explanation for why he remained in the Jail. No one from the Division ever called him back. Family members who called the Division on Mr. Davis's behalf were given inconsistent information about why Mr. Davis was not being released. He languished in the Jail, with no idea why he was being detained or whether or when he would be released or next appear in front of a judge.

186.     On December 10, 2020, Mr. Davis filed a handwritten, *pro se* motion requesting reconsideration of his bond. A hearing on his motion was held on December 16. At that hearing,

Judge Stacey Cobb Smith kept the no-bond order in place but expanded the prior pretrial referral to allow for pretrial release at any supervision level.

187.    Still, Mr. Davis was not released. He spent Christmas and New Year's in the Jail awaiting trial. Meanwhile, COVID-19 raged inside the Jail, placing Mr. Davis at elevated risk.

188.    At trial on January 7, 2021, Mr. Davis was found not guilty on his remaining charge.

189.    While he was detained, Mr. Davis was locked in his cell for 23 hours each day and given food to which he was allergic. Because the Jail phones were malfunctioning, he went a week without being able to speak to his friends or family.

190.    Mr. Davis was detained for 91 days, 90 of those after a judge had authorized his release, on charges of which he was ultimately acquitted.

<u>Leslie Sharp</u>

191.    Plaintiff Leslie Sharp is 35 years old. He has lived in the District of Columbia/Prince George's County area for his entire life. He has extensive family in the area, including his wife, two-month-old son, 13-year-old daughter, father, and grandmother. He works as a cook at a local restaurant.

192.    Mr. Sharp was arrested on Friday, June 11, 2021, and appeared for a bail review hearing the following Monday, June 14.

193.    At this hearing, Judge Brian Denton reviewed Mr. Sharp's Intake Fast Sheet— which stated, *inter alia*, that Mr. Sharp was on supervised release in D.C. and had no prior failures to appear in court—and ordered Mr. Sharp to be detained without bond.

194.    On June 16, Mr. Sharp's attorney filed a motion for reconsideration of his bail. The motion noted, among other facts, that the alleged victim had contacted Mr. Sharp's attorney and

told him that they did not want Mr. Sharp in jail, did not fear Mr. Sharp, did not believe Mr. Sharp was a danger to the community, and did not intend to press charges against Mr. Sharp.

195.    A hearing on this motion was held on June 24. At the hearing, Judge Scott Carrington received Mr. Sharp's Intake Fast Sheet and subsequently issued a pretrial referral ordering release for Mr. Sharp at Level 4.

196.    On June 29, nearly a week later, the Division had not made progress on Mr. Sharp's case. His attorney had provided the Pretrial Division with an address where Mr. Sharp could reside if released, a copy of the lease at that property, and contact information for the complaining witness (whom the Intake Fact Sheet stated the Pretrial Division had been unable to contact).

197.    On June 30, 2021, the Pretrial Division filed a notice with the court stating that it would not release Mr. Sharp because his D.C. probation agent had "requested a warrant" for his arrest. Notably, the notice did not state that a warrant had issued—in the District of Columbia, probation agents must ask the parole board to issue warrants; agents do not have the power to do so themselves—just that one had been requested. Mr. Sharp remained detained.

198.    On July 7, after Mr. Sharp had been jailed for nearly one month, his attorney filed another motion for a bail review hearing. During a hearing on the motion a week later, Judge Donnaka Lewis called Judge Carrington, who stated via phone that he did not intend by his "pretrial order" to "force" the Pretrial Division to release Mr. Sharp. Judge Lewis responded by changing the form of Mr. Sharp's pretrial referral from an "order" to an "option."

199.    Still, no one from the Pretrial Division reached out to Mr. Sharp, or explained directly to him why he remained in jail.

200. On July 22, the day of trial, the State dropped all charges against Mr. Sharp.[15]

201. While Mr. Sharp was detained, his best friend passed away. He missed the funeral while in jail. He was also separated from his then-12-year-old daughter and missed out on a promotion that would have significantly increased his earnings and ability to support his family.

202. Mr. Sharp was detained at the Prince George's County Jail for 42 days, 29 of those after a judge had ordered his release, until the State dropped all charges against him.

Elmer Laguan-Salinas

203. Plaintiff Elmer Laguan-Salinas is 32 years old. He lives in Hyattsville, Maryland. He has lived in Maryland for more than a decade and has extensive family in the area, including a 14-month-old daughter. He works in construction. He attends church every Sunday and plays soccer with friends.

204. On July 8, 2021, Mr. Laguan-Salinas was charged with crimes regarding an incident that had occurred some nine months prior. Mr. Laguan-Salinas was arrested on these charges on March 15, 2022. He was also charged in a second case with two misdemeanors.

205. At his initial appearance, the judicial commissioner held Mr. Laguan-Salinas without bond in the first case and set $2,500 bond, payable at 10 percent, in the second.

206. The Pretrial Division prepared an Intake Fact Sheet, which stated, among other things, that Mr. Laguan-Salinas had two open cases and that he had never before failed to appear in court. The sheet also stated that the Pretrial Division had been "unable to interview" Mr. Laguan-Salinas regarding his residence and employment, presumably because he does not speak English.

---

[15] Mr. Sharp was released to the District of Columbia jail. Four days later, D.C. found that his arrest (and subsequent non-prosecution) in Maryland was not a violation of supervised release and released him. As such, D.C. threatened to revoke Mr. Sharp's supervised release because he was charged with a crime in Prince George's County, while Prince George's County detained Mr. Sharp because he was on supervised release in D.C. (even after the court had found this to be a non-issue). As soon as the Maryland charges were dropped, D.C. released Mr. Sharp.

207.    On March 17, 2022, at Mr. Laguan-Salinas's bail review hearing on both cases, Judge Stacey Cobb Smith left the commissioner's orders in place, issued a pretrial referral authorizing Mr. Laguan-Salinas's release at Level 4 in the first case.

208.    Nevertheless, Mr. Laguan-Salinas remained in jail. The Pretrial Division took no action in his case. Instead, the Division, specifically Tanya Law, told his attorney it would not consider Mr. Laguan-Salinas for pretrial release in the first case until he had paid the money bond in his second case. At no point did the Pretrial Division file a notice with the court indicating that it was not considering Mr. Laguan-Salinas even though he had been authorized for release. Judges Scott Carrington, in April, and John Bielec, in May, issued orders continuing to detain him.

209.    On May 25, more than two months after Mr. Laguan-Salinas had been authorized for release, the State dropped Mr. Laguan-Salinas's second case. This left him with only the first case open, on which he had a pretrial option.

210.    Mr. Laguan-Salinas's attorney again asked the Pretrial Division to consider his pretrial option. This time, the Division stated that it would not release Mr. Laguan-Salinas unless he provided a verifiable Prince George's County address at which he could reside. Mr. Laguan-Salinas had lost his housing as a result of his arrest, so he had to find a friend living in the County whom he could live with if released. But even after he found such a friend, and his attorney gave her contact information to the Division, Mr. Laguan-Salinas remained detained.

211.    Three months passed. Mr. Laguan-Salinas remained in jail. His attorney moved for reconsideration of bail. At a hearing on the motion on June 17, Judge Patrice Lewis released Mr. Laguan-Salinas as on an unsecured bond. In so doing, Judge Lewis found that pretrial detention was not necessary to maintain the safety of the community or guard against flight risk.

212.    Mr. Laguan-Salinas's District Court trial is set for August 18, 2022. He has not been convicted of any crimes of which he was accused.

213.    Mr. Laguan-Salinas was housed in a cell at the Jail with black water and worms flowing out of the toilet. As the Jail does not permit children to visit, he was separated from his baby daughter for three months.

214.    Mr. Laguan-Salinas was ultimately detained at the Prince George's County Jail for 94 days, 92 days after a judge had authorized his pretrial release.

Adrienne Worthington

215.    Plaintiff Adrienne Worthington is 54 years old. She has three children and fifteen grandchildren. She has lived in the Prince George's County area for about two decades.

216.    Ms. Worthington was arrested on December 23, 2021. At her initial appearance on Christmas Eve, a judicial commissioner ordered her held without bond.

217.    Ms. Worthington spent Christmas in jail. She did not appear in front of a judge for a bail review hearing until five days after her arrest.

218.    At the hearing on December 28, Ms. Worthington's attorney pointed out that the Intake Fact Sheet prepared by the Pretrial Division stated that Ms. Worthington's last conviction was more than a decade prior and that she had never been convicted of a "violent" crime. Judge John Bielec left the commissioner's order in place but issued a pretrial referral authorizing release on Level 4, home detention.

219.    Ms. Worthington spent New Year's in the Jail, waiting for the Pretrial Division to act. She was informed that the Division would not release her unless she could provide a verifiable address in Prince George's County. But because she had been living alone before she was arrested, there was no one living at her address who could verify it.

220.   Ms. Worthington's attorney secured the name, address, and phone number of a neighbor Ms. Worthington could reside with if released and sent this information as well as a copy of the neighbor's identification and lease to the Division. Still, Ms. Worthington was not released.

221.   Finally, more than a week after the court had her release, the Pretrial Division released Ms. Worthington on home detention to her neighbor's house. After the State dropped the single felony charge against her, the court converted her bail to an unsecured bond. On April 5, the State dropped the remaining charge against her.

222.   Ms. Worthington was never convicted of any of the crimes of which she was accused. Nevertheless, her arrest and prolonged detention had had devastating impacts on her life.

223.   Ms. Worthington missed a rental assistance appointment while she was in the Jail, and as a result lost her housing. She has become homeless.

224.   She also lost her car. It was towed while she was in jail. Each day her car sat in the towing lot, it accumulated more fees. By the time Ms. Worthington was released, she could not afford the $1,000+ dollar in fees it would have cost to get it back.

225.   While in the Jail, Ms. Worthington received the wrong medication for her depression. The medication she received prevented her from sleeping and caused suicidal thoughts.

226.   While in the Jail, Ms. Worthington contracted COVID-19.

227.   All in all, Ms. Worthington was detained at the Jail for more than a week after a judge had authorized her release. All charges against her were ultimately dropped.

<u>Defendants</u>

228.   Defendant Prince George's County, Maryland (the "County") is a municipal corporation formed under the laws of Maryland. The County is sued for declaratory, injunctive, and monetary relief.

229.     Defendants LaKeecia Allen, Bryon Bereano, John Bielec, Scott Carrington, Ada Clark-Edwards, Stacey Cobb Smith, Brian Denton, Robert Heffron Jr., Donnaka Lewis, Gregory Powell, and Cathy Serrette (collectively, the "Judge Defendants") are District and Circuit Court Judges in Prince George's County. People who are arrested in the County regularly appear before the Judge Defendants for bail review hearings. At these hearings, instead of making the findings constitutionally required to justify detention or finding that the State cannot meet its burden to justify detention and releasing on recognizance or conditions, the Judge Defendants follow a policy and practice of abdicating their legal duties to decide whether a person will be released pretrial, and if so when and on what conditions, to the non-judicial officers in the Pretrial Division. They do this by issuing a pretrial referral on top of whatever bond order is in place. The Judge Defendants are sued in their personal and official capacities for declaratory relief.

230.     Defendant Jeffrey Logan is the Division Chief of the Pretrial Division.

231.     Defendant Kenneth Gray is the Section Chief of the Community Supervision Section within the Pretrial Division.

232.     Defendant Tanya Law is the Unit Chief of the Monitoring Services Unit within the Pretrial Division's Community Supervision Section.

233.     When an arrested person is given a pretrial referral, the Pretrial Division determines whether, and if so when and on what conditions, to release the person pretrial. The Pretrial Division has a policy and practice of taking weeks or months to "process" persons referred to it, and of regularly declining to release persons who have been referred to pretrial for arbitrary reasons not based on factual findings made by a judicial officer, and not based on clear and convincing evidence that detention is necessary. The Pretrial Division has a small handful of staff members who make pretrial release decisions under the supervision of Defendants Logan, Gray, and/or Law,

pursuant to policies and/or practices adopted by the Pretrial Division and the Department of Corrections. The number of staff members has decreased significantly in recent years. Upon information and belief, the County does not employ a sufficient number of employees to process the referrals within a constitutionally compliant time period. Defendants Logan, Gray, and/or Law have final policymaking authority with respect to pretrial release decisions. Defendants Logan, Gray, and Law are sued in their official capacities for declaratory, injunctive, and monetary relief.

234.    Defendant Correne Labbé is the Director of the Prince George's County Department of Corrections. The Department of Corrections operates the Jail, which detains people facing criminal charges in the County. Many of these people are detained despite having been referred to pretrial. Defendant Labbé has delegated decision-making authority regarding pretrial release conditions to Defendants Logan, Gray, and Law, and acquiesces to their decisions thereto. The Department of Corrections sets policies and procedures and maintains policy and procedure manuals regarding pretrial detention and release. Defendant Labbé is sued in her official capacity for declaratory, injunctive, and monetary relief.

235.    Defendants Prince George's County, Logan, Gray, Law, and Labbé will collectively be referred to as the "County Defendants."

### THE COUNTY DEFENDANTS ARE ON NOTICE OF THE TIME, PLACE, AND CIRCUMSTANCES UNDERLYING PLAINTIFFS' INJURIES

236.    In accordance with the requirements of Maryland's Local Government Tort Claims Act, Md. Code Ann., Courts & Judicial Proceedings § 5-304 (2020), Plaintiffs provided notice of

their claims to the Prince George's County Attorney by certified mail on July 5, 2022. A copy of that notice is attached as Exhibit 1.

237.    Furthermore, as stated in Plaintiffs' notice, the County Defendants have been on constructive notice of Plaintiffs' injuries as pleaded therein, and the circumstances which led to those injuries, in Defendant Logan's words, "for decades."

**CLASS ACTION ALLEGATIONS**

238.    Plaintiffs bring the claims in this action, on behalf of themselves and all others similarly situated, as a class action under Federal Rules of Civil Procedure 23(a)(1)–(4) and 23(b)(2)–(3).

239.    Pursuant to the Rules, Plaintiffs seek to certify two classes of similarly situated people defined as follows:

- **Equitable Class:** The Equitable Class consists of all people who are now or will be in the future (1) still detained more than 48 hours after arrest and (2) having been issued a "pretrial option" or "pretrial order" by the Prince George's County District or Circuit Court. Plaintiffs seek certification of this class under Rule 23(b)(2).

- **Damages Class:** The Damages Class consists of all people who, at any time since July 19, 2019, were (1) still detained more than 48 hours after arrest and (2) having been issued a "pretrial option" or "pretrial order" by the Prince George's County District or Circuit Court. Plaintiffs seek certification of this class under Rule 23(b)(3).

240.    The class allegations and law are set forth in detail in the accompanying Motion for Class Certification.

241.    A class action is the only practicable means by which Plaintiffs and class members can challenge Defendants' unconstitutional policies, practices, and procedures. The population of the Prince George's County Jail is nearly 1,000. Defendant Logan has estimated that one-third of people detained in the Jail have a pretrial referral. The Department of Corrections itself has stated that, between December 1, 2018 and February 28, 2021, 1,208 people were given a pretrial referral,

and 246 of those people were never released on that referral. Hundreds of people who have a pretrial referral remain detained at the Jail to this date.

242.    There are questions of law and fact common to all class members, including:

- Whether Judge Defendants give pretrial referrals knowing that class members will be detained while the Pretrial Division processes them.

- Whether Judge Defendants give pretrial referrals granting the Pretrial Division the discretion to make release or detention decisions based on the Division's own criteria.

- Whether the Pretrial Division is a "neutral decisionmaker" constitutionally permitted to make pretrial detention decisions.

- What procedural protections and substantive standards the Pretrial Division applies in deciding whether to exercise a pretrial referral.

- Whether Defendants' policy/practice of giving pretrial referrals violates the due process rights of arrested class members.

- Whether Defendants' policy/practice of detaining class members for days, weeks, or even months after they have received pretrial referrals violates their due process rights.

- Whether Defendants' policy/practice of detaining class members for days, weeks, or even months after they have received pretrial referrals violates the separation-of-powers command of the Maryland Constitution.

- Whether Defendants' policy/practice of declining to release class members who have been given a pretrial referral violates their due process rights.

- Whether Defendants' policy/practice of declining to release class members who have been given a pretrial referral violates the separation-of-powers command of the Maryland Constitution.

- How much money members of the Damages Class should be compensated for each day of unconstitutional pretrial detention.

243.    Plaintiffs' claims are typical of the claims of the classes. That typicality stems from the fact that Defendants have detained every class member in violation of the same constitutional

and legal rights. Additionally, Plaintiffs, like every other class member, are injured by the same unconstitutional policies and practices maintained by Defendants.

244.    Defendants have acted and failed to act in a manner that applies generally to the classes as a whole, rendering class-wide relief appropriate.

245.    Plaintiffs will fairly and adequately represent the interests of the classes. Plaintiffs do not have any conflicts with the unnamed members of the proposed classes.

246.    Plaintiffs are represented by attorneys from Civil Rights Corps, the Institute for Constitutional Advocacy and Protection, and Wilmer Cutler Pickering Hale and Dorr, who have experience litigating complex civil rights matters in federal court and extensive knowledge of both the details of Defendants' practices and the relevant law. Plaintiffs' counsel have the resources, expertise, and experience to prosecute this action.

## CLAIMS FOR RELIEF

### COUNT I:
### Fourteenth Amendment Right to Substantive Due Process
*All Plaintiffs Against All Defendants*

247.    Plaintiffs re-allege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

248.    Plaintiffs have a fundamental right to pretrial liberty that may be infringed only where the government establishes by clear and convincing evidence that detention is necessary to protect the government's interests in ensuring the safety of the community and the appearance of the accused in court, and that no less restrictive alternatives will suffice to protect these interests.

249.    Defendants maintain policies and practices that violate Plaintiffs' fundamental right to pretrial liberty by subjecting them to pretrial detention without the substantive findings required by the Constitution.

250.     The Judge Defendants issue pretrial referrals knowing that Plaintiffs will be detained at length while the Pretrial Division processes the referral, or indefinitely if the Division refuses to release. They do so having necessarily found that Plaintiffs may be released by granting the Division authority to release without further judicial involvement.

251.     The County Defendants detain Plaintiffs while they delay processing pretrial referrals, and refuse to release Plaintiffs, despite no judicial finding justifying detention.

252.     The Equitable Class seeks an injunction requiring Defendants Law, Gray, Logan, and Labbé to adopt constitutionally sufficient policies and practices.

253.     The Damages Class seeks a declaration that Defendants' policies and practices violate their rights under the Fourteenth Amendment.

254.     Additionally, the Damages Class seeks compensation from the County, on behalf of Defendants Law, Gray, Logan, and Labbé, for every day of unconstitutional detention that they have suffered.

**COUNT II:**
**42 U.S.C. § 1983**
**Fourteenth Amendment Right to Procedural Due Process**
*All Plaintiffs Against All Defendants*

255.     Plaintiffs re-allege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

256.     Procedural due process requires procedures sufficient to protect Plaintiffs' substantive right to pretrial liberty. *See Mathews v. Eldridge*, 424 U.S. 319 (1976). These procedures include, but are not limited to: a timely individualized hearing; notice of the issues to be determined; representation by counsel; the opportunity to present and confront evidence and make arguments; findings on the record explaining the basis for any condition of release imposed and the evidence relied on; and, if such conditions will result in pretrial detention, a finding by

clear and convincing evidence that pretrial incarceration is necessary because no alternative conditions or combination of conditions would reasonably ensure the safety of the community and the person's future court appearance.

257.    Defendants maintain policies and practices that violate Plaintiffs' right to procedural due process by subjecting Plaintiffs to pretrial detention without constitutionally sufficient procedures.

258.    The Judge Defendants issue pretrial referrals granting the County Defendants the power to make release decisions, which the Judge Defendants know will not involve any of the procedural safeguards the Constitution requires.

259.    The County Defendants detain Plaintiffs while pretrial referrals are processed without any of the procedures required by due process and refuse release without providing those procedures.

260.    The Equitable Class seeks an injunction requiring Defendants Law, Gray, Logan, and Labbé to adopt constitutionally sufficient policies and practices.

261.    The Damages Class seeks a declaration that Defendants' policies and practices violate their rights under the Fourteenth Amendment.

262.    The Damages Class seeks compensation from the County, on behalf of Defendants Law, Gray, Logan, and Labbé, for every day of unconstitutional detention that they have suffered.

**COUNT III:**
**Maryland Constitution**
**Declaration of Rights, Article 24 Right to Substantive Due Process**
*All Plaintiffs Against All Defendants*

263.    Plaintiffs re-allege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

264.    The liberty interests available under Article 24 of the Maryland Declaration of Rights are at least co-extensive with, if not broader than, the liberty interests recognized under the Fourteenth Amendment to the U.S. Constitution.[16]

265.    As described above, Defendants' policies and practices violate Plaintiffs' substantive due process rights and harm them via unlawful pretrial detention.

266.    The Equitable Class seeks an injunction requiring Defendants Law, Gray, Logan, and Labbé requiring to adopt constitutionally sufficient policies and practices.

267.    The Damages Class seeks a declaration that Defendants' policies and practices violate their rights under Article 24.

268.    The Damages Class seeks compensation from the County, on behalf of Defendants Law, Gray, Logan, and Labbé, for every day of unconstitutional detention that they have suffered.

## COUNT IV:
### Maryland Constitution
### Declaration of Rights, Article 24 Right to Procedural Due Process
*All Plaintiffs Against All Defendants*

269.    Plaintiffs re-allege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

270.    The liberty interests available under Article 24 of the Maryland Declaration of Rights are at least co-extensive with, if not broader than, the liberty interests recognized under the Fourteenth Amendment to the U.S. Constitution.

271.    As described above, Defendants' policies and practices violate Plaintiffs' procedural due process rights and harm them via unlawful pretrial detention.

272.    The Equitable Class seeks an injunction requiring Defendants Law, Gray, Logan, and Labbé to adopt constitutionally sufficient policies and practices.

---

[16] *See Koshko v. Haining*, 921 A.2d 171, 194 & n.22 (Md. 2007).

273.     The Damages Class seeks a declaration that Defendants' policies and practices violate their rights under Article 24.

274.     The Damages Class seeks compensation from the County, on behalf of Defendants Law, Gray, Logan, and Labbé, for every day of unconstitutional detention that they have suffered.

### COUNT V:
### Maryland Constitution
### Declaration of Rights, Article 8 Separation of Powers
*Damages Class Against All Defendants*

275.     Plaintiffs re-allege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

276.     The Maryland Constitution states that "the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other."[17]

277.     The Maryland Constitution and laws explicitly assign the power to set bail and determine conditions of pretrial release to judicial actors.[18] This is in line with the historical principle that bail falls within the providence of the judiciary and may not be delegated absent explicit statutory authorization.[19]

278.     By delegating their authority regarding pretrial release and detention to the Pretrial Division, the Judge Defendants abdicate their constitutional duties.

---

[17] Md. Decl. of Rights, art. 8.

[18] *See* Md. Rule 4-216.1 (assigning bail and pretrial detention determinations to a "judicial officer"); Md. Code Ann., Crim. Proc. § 5-205(a) (allowing District Justices to set bail); Md. Const. art. 4, § 41G (allowing judicial commissioners to set bail).

[19] *Cf. Whittlesey v. State*, 665 A.2d 223, 250 (Md. 1995) (delegating decision about whether to shackle criminal defendant in courtroom to security personnel violates due process), *cert. denied*, 516 U.S. 1148 (1996).

279. By assuming the power to determine whether and when people should be released before trial and if so on what conditions, Defendants Law, Gray, Logan, and Labbé exceed their constitutional authorities.

280. By subjecting Plaintiffs to pretrial detention in violation of their constitutional rights, Defendants' policies and practices harm Plaintiffs.

281. The Damages Class seeks a declaration that Defendants' policies and practices violate their rights under Article 8 of the Maryland Declaration of Rights.

## REQUEST FOR RELIEF

282. WHEREFORE, on the basis of the foregoing, Plaintiffs request that this Court enter judgment in their favor and issue the following relief:

- Class certification as described in the accompanying Motion for Class Certification under Rule 23 of the Federal Rules of Civil Procedure;

- A declaration that Defendants violate Plaintiffs' rights under the United States and Maryland Constitutions by detaining people pretrial without meeting the substantive and procedural standards required for pretrial detention;

- A declaration that Defendants violate Plaintiffs' rights under the Maryland Constitution by allowing bail decisions to be made by non-judicial officers;

- Preliminary and permanent injunctions as to Defendants Labbé, Logan, Gray, and Law, requiring them to promptly release all persons who have been given a pretrial referral and who have not received the due process necessary to justify their ongoing detention;

- Compensatory damages as determined at a jury trial;

- Reasonable attorneys' fees, expenses, and costs of litigation pursuant to 42 U.S.C. § 1988 and other applicable law; and

- Such other relief as the Court deems just and proper.

Respectfully submitted this 19th day of July, 2022.

/s/ Ellora Thadaney Israni
Ellora Thadaney Israni*
Ryan Downer*
Jeremy D. Cutting*
CIVIL RIGHTS CORPS
1601 Connecticut Ave. NW, Suite 800
Washington, D.C. 20009
(202) 894-6132
ellora@civilrightscorps.org


/s/ Seth Wayne
Seth Wayne*
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY AND PROTECTION
GEORGETOWN UNIVERSITY LAW CENTER
600 New Jersey Ave. NW
Washington, D.C. 20001
(202) 662-9042
sw1098@georgetown.edu


*  *pro hac vice* application forthcoming
†  entry of appearance forthcoming

*Counsel for Plaintiffs*

/s/ Edward Williams
Edward Williams (D. Md. Bar 20944)†
Matthew Martens*
Thomas Bredar (D. Md. Bar 21635) †
Ellen Connell*
Donna Farag*
Ayana Williams*
Sonika Data*
Yoseph Desta*
Britany Riley-Swanbeck (D. Md. Bar 21843)†
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
(202) 663-6487
ed.williams@wilmerhale.com
matthew.martens@wilmerhale.com

Robert Boone*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
robert.boone@wilmerhale.com

Timothy Perla*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
timothy.perla@wilmerhale.com


(*Signed by Edward Williams with the permission of Ellora Thadaney Israni and Seth Wayne)