# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION**

ROBERT FRAZIER, *et al.*, individually and
on behalf of a class of similarly situated
persons,

                     Plaintiffs,

           v.

PRINCE GEORGE'S COUNTY,
MARYLAND, *et al.*,

                    Defendants.

Case No.  8:22-cv-01768-AAQ

---

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

PROPOSED CLASSES ................................................................................................. 2

BACKGROUND ............................................................................................................ 3

      A.    Defendants' Unconstitutional Policies and Practices Result in the Unlawful Detention of Hundreds of People in Prince George's County at Any Moment .......................................................................................... 3

      B.    The Named Plaintiffs Are or Were Subjected to Defendants' Unlawful Policies and Practices .......................................................................... 4

ARGUMENT ................................................................................................................. 6

    I.    The Proposed Classes Meet the Rule 23(a) Requirements .................................. 7

      A.    Numerosity Is Satisfied ......................................................................... 8

      B.    Commonality Is Satisfied .................................................................... 11

      C.    Typicality Is Satisfied ......................................................................... 13

      D.    Adequacy is Satisfied .......................................................................... 15

    II.    The Proposed Classes Meet the Requirements of Rule 23(b) .............................. 16

      A.    The Equitable Class Satisfies the Requirements of Rule 23(b)(2) .......... 17

      B.    The Damages Class Satisfies the Requirements of Rule 23(b)(3) ........... 19

    III.    The Proposed Classes Are Readily Ascertainable ................................................ 24

    IV.    Plaintiffs' Counsel Should be Appointed Class Counsel ..................................... 26

    V.    Class Certification Is Particularly Appropriate Because Plaintiffs Assert Civil Rights Claims That Are Transitory in Nature ....................................................... 27

CONCLUSION ............................................................................................................. 28

i

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Am. Sales Co., LLC v. Pfizer, Inc.*,
  No. 2:14-CV-361, 2017 WL 3669604 (E.D. Va. July 28, 2017)......................................10, 11

*Amaya v. DGS Constr., LLC*,
  326 F.R.D. 439 (D. Md. 2018).........................................................................................24

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)..................................................................................................6, 17

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013)..................................................................................................6, 19

*Barnes v. D.C.*,
  278 F.R.D. 14 (D.D.C. 2011) (Lamberth, C.J.) ..................................................................22

*Berry v. Schulman*,
  807 F.3d 600 (4th Cir. 2015) ...........................................................................................6

*Betances v. Fischer*,
  No. 11-CV-3200, 2022 WL 765963 (S.D.N.Y. Mar. 14, 2022)...........................................22

*Braggs v. Dunn*,
  317 F.R.D. 634 (M.D. Ala. 2016)......................................................................................10

*Brasko v. Howard Bank*,
  No. 1:20-CV-3489-SAG, 2022 WL 951771 (D. Md. Mar. 29, 2022)....................................15

*Brown v. Nucor Corp.*,
  576 F.3d 149 (4th Cir. 2009), (Oct. 8, 2009)..................................................................11, 13

*Buffin v. San Francisco*,
  No. 15-CV-04959, 2018 WL 1070892 (N.D. Cal. Feb. 26, 2018) ....................................11, 12

*Bumgarner v. NCDOC*,
  276 F.R.D. 452 (E.D.N.C. 2011) ......................................................................................17

*Calderon v. GEICO Gen. Ins. Co.*,
  279 F.R.D. 337 (D. Md. 2012)..........................................................................................23

*Caliste v. Cantrell*,
  No. 17-CV-6197, 2018 WL 1365809 (E.D. La. Mar. 16, 2018) ..........................................28

ii

*Carnegie v. Household Int'l, Inc.*,
376 F.3d 656 (7th Cir. 2004) ............................................................................................23

*Carriuolo v. Gen. Motors Co.*,
823 F.3d 977 (11th Cir. 2016) ............................................................................................6

*Cent. Wesleyan Coll. v. W.R. Grace & Co.*,
143 F.R.D. 628 (D.S.C. 1992) ..........................................................................................11

*Cent. Wesleyan Coll. v. W.R. Grace & Co.*,
6 F.3d 177 (4th Cir. 1993) ..................................................................................................9

*Clarkson v. Coughlin*,
145 F.R.D. 339 (S.D.N.Y. 1993) ......................................................................................10

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)..............................................................................................................21

*Daves v. Dallas County*,
No. 3:18-CV-0154, 2018 WL 4537202 (N.D. Tex. Sept. 20, 2018) ...........................12, 18, 28

*Deiter v. Microsoft Corp.*,
436 F.3d 461 (4th Cir. 2006) ............................................................................................14

*DeLoach v. Philip Morris Cos., Inc.*,
206 F.R.D. 551 (M.D.N.C. 2002) ....................................................................................23

*Dixon v. City of St. Louis*,
No. 4:19-CV-0112, 2019 WL 2437026 (E.D. Mo. June 11, 2019) ..................................13, 28

*Doe v. Charleston Area Med. Ctr., Inc.*,
529 F.2d 638 (4th Cir. 1975) ..............................................................................................9

*Donaldson v. Primary Residential Mortg.*,
No. ELH-19-1175, 2021 WL 2187013 (D. Md. May 28, 2021)..........................................8

*Ealy v. Pinkerton Gov't Servs. Inc.*,
514 F. App'x 299 (4th Cir. 2013) ....................................................................................14

*Edwards v. Cofield*,
No. 3:17-CV-321, 2018 WL 4323920 (M.D. Ala. Sept. 10, 2018) ....................................28

*Epps v. Levine*,
457 F. Supp. 561 (D. Md. 1978)........................................................................................12

*EQT Prod. Co. v. Adair*,
764 F.3d 347 (4th Cir. 2014) ......................................................................................11, 24

*Fangman v. Genuine Title, LLC,*
   No. CV RDB-14-0081, 2016 WL 6600509 (D. Md. Nov. 8, 2016) ..................................8

*Fant v. City of Ferguson, Missouri,*
   No. 4:15-CV-00253, 2022 WL 2072647 (E.D. Mo. June 9, 2022) ..............................27

*Foucha v. Louisiana,*
   504 U.S. 71 (1992) ..........................................................................................................3

*Gerstein v. Pugh,*
   420 U.S. 103 (1975) ......................................................................................................27

*Gratz v. Bollinger,*
   539 U.S. 244 (2003) ......................................................................................................27

*Guill v. Allen,*
   No. 1:19-CV-1126 (M.D.N.C. Oct. 25, 2021) ......................................................27, 28

*Gunnells v. Healthplan Servs., Inc.,*
   348 F.3d 417 (4th Cir. 2003) ...................................................................6, 15, 21, 24

*Gwiazdowski v. Cnty. Of Chester,*
   263 F.R.D. 178 (E.D. Pa. 2009) ..................................................................................15

*Heastie v. Cmty. Bank of Greater Peoria,*
   125 F.R.D. 669 (N.D. Ill. 1989) .............................................................................19, 20

*Holmes v. Cont'l Can Co.,*
   706 F.2d 1144 (11th Cir. 1983) ....................................................................................18

*Int'l Woodworkers of Am. AFL-CIO, CLC v. Chesapeake Bay Plywood Corp.,*
   659 F.2d 1259 (4th Cir. 1981) ......................................................................................11

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.,*
   No. 19-MD-2879, 2022 WL 1396522 (D. Md. May 3, 2022) ...............................20, 22

*In re Mills Corp. Sec. Litig.,*
   257 F.R.D. 101 (E.D. Va. 2009) .....................................................................................7

*In re Safety–Kleen Corp. Bondholders Litig.,*
   2004 WL 3115870 (D.S.C. 2004) ...................................................................................7

*In re TD Bank, N.A. Debit Card Overdraft Fee Litig.,*
   325 F.R.D. 136 (D.S.C. 2018) .............................................................................20, 23, 24

*In re Veneman,*
   309 F.3d 789 (D.C. Cir. 2002) ......................................................................................18

iv

*In re Zetia (Ezetimibe) Antitrust Litig.*,
   7 F.4th 227 (4th Cir. 2021) ...............................................................................8

*J.D. v. Azar*,
   925 F.3d 1291 (D.C. Cir. 2019) ....................................................................9, 10

*J.O.P. v. United States Dep't of Homeland Sec.*,
   338 F.R.D. 33 (D. Md. 2020) ..........................................................................11

*Johnson v. Jessup*,
   381 F. Supp. 3d 619 (M.D.N.C. 2019) ...........................................................9, 12

*Jones v. Murphy*,
   256 F.R.D. 519 (D. Md. 2009).................................................................. *passim*

*Baby Neal ex. rel. Kanter v. Casey*,
   43 F.3d 48 (3d Cir. 1994) ............................................................................11, 17

*Kornberg v. Carnival Cruise Lines, Inc.*,
   741 F.2d 1332 (11th Cir. 1984) ......................................................................14

*Krakauer v. Dish Network, L.L.C.*,
   925 F.3d 643 (4th Cir. 2019) ..........................................................................24

*Minter v. Wells Fargo Bank, N.A.*,
   279 F.R.D. 320 (D. Md. 2012)..........................................................................6

*Noble v. 93 Univ. Place Corp.*,
   224 F.R.D. 330 (S.D.N.Y. 2004) ....................................................................23

*ODonnell v. Harris County*,
   No. CV H-16-1414, 2017 WL 1542457 (S.D. Tex. Apr. 28, 2017) ....................28

*Olson v. Brown*,
   594 F.3d 577 (7th Cir. 2010) ..........................................................................27

*Parsons v. Ryan*,
   289 F.R.D. 513 (D. Ariz. 2013) ......................................................................18

*Peoples v. Wendover Funding, Inc.*,
   179 F.R.D. 492 (D. Md. 1998)..........................................................................8

*Rodger v. Elec. Data Sys. Corp.*,
   160 F.R.D. 532 (E.D.N.C. 1995) ....................................................................11

*United States v. Salerno*,
   481 U.S. 739 (1987).........................................................................................3

*U.S. Parole Comm'n v. Geraghty*,
  445 U.S. 388 (1980).....................................................................................................27

*Scott v. Clarke*,
  61 F. Supp. 3d 569 (W.D. Va. 2014) ....................................................................9, 10

*Senne v. Kansas City Royals Baseball Corp.*,
  934 F.3d 918 (9th Cir. 2019) ..................................................................................20

*Soutter v. Equifax Info. Servs., LLC*,
  307 F.R.D. 183 (E.D. Va. 2015) .......................................................................16, 24

*Spotswood v. Hertz Corp.*,
  No. RDB-16-1200, 2019 WL 498822 (D. Md. Feb. 7, 2019) .............................25, 26

*Stay the Course W. Va. v. Tennant*,
  2013 WL 209479 (S.D. W. Va. 2013) ......................................................................15

*Swisher v. Brady*,
  438 U.S. 204 (1978)..................................................................................................27

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
  445 F.3d 311 (4th Cir. 2006) ....................................................................................19

*Torres v. Collins*,
  No. 2:20-CV-00026 (E.D. Tenn. May 5, 2021)........................................................28

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011).................................................................................6, 11, 13, 17

*Walker v. City of Calhoun*,
  No. 4:15-CV-170, 2016 WL 361580 (N.D. Ga. Jan. 28, 2016)...............................28

*Ward v. Dixie Nat'l Life Ins. Co.*,
  595 F.3d 164 (4th Cir. 2010) ....................................................................................15

*West v. Prince George's County*,
  No. CV TDC-21-0863, 2022 WL 125936 (D. Md. Jan. 13, 2022).........................23

**Federal Statutes**

Fed. R. Civ. P. 23 ............................................................................................... *passim*

**State Statutes**

Maryland Constitution ...................................................................................3, 4, 12, 13

**Other Authorities**

Akela Lacy, *Conservatives Only Care About the Incarcerated When it Comes to the Capitol Rioters*, INTERCEPT (Sept. 21, 2021) .......................................................................8

Alexi Jones & Wendy Sawyer, *Arrest, Release, Repeat*, PRISON POL'Y INITIATIVE (Aug. 2019)..........................................................................10

Arpit Gupta, Christopher Hansman, & Ethan Frenchman, *The Heavy Costs of High Bail: Evidence from Judge Randomization* (May 2, 2016)...........................................21

Department of Justice, National Institute of Corrections, *Fundamentals of Bail* (2014)..........................................................................21

Megan T. Stevenson, *Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes*, 34 J.L. ECON. & ORG. 511 (2018)...........................................21

Paul Heaton *et al.*, *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 STAN. L. REV. 711 (2017) ...........................................21

PGSAO Monthly Report (Mar. 15, 2021) .......................................................................8

PGSAO Monthly Report (Dec. 15, 2020).......................................................................8

United States Dep't of Justice, Office of Access to Justice.......................................................................10

**INTRODUCTION**

Every night, hundreds of people are jailed awaiting trial in Prince George's County in violation of their federal and state constitutional rights. None of these people have been convicted of the crimes of which they are accused. No court has found, as both federal and state law require, that their detention is necessary to satisfy compelling government interests. Nor has any court found that alternatives to detention will not suffice to protect the community and ensure the arrested person returns to court. In fact, in each case, a court has determined that the person in question may be released. Nevertheless, these people remain incarcerated, as a result of Defendants' unconstitutional policies and practices. Due process does not permit detention under these circumstances.

Specifically, Defendants Judges LaKeecia Allen, Bryon Bereano, John Bielec, Scott Carrington, Ada Clark-Edwards, Stacey Cobb Smith, Brian Denton, Robert Heffron, Jr., Gregory Powell, Cathy Serrette, and Donnaka Lewis (collectively, the "Judge Defendants") issue "pretrial options" and "pretrial orders" (collectively, "pretrial referrals") to arrested persons at their bail review hearings. These pretrial referrals authorize an arrested person's release, but permit unaccountable non-judicial officials in the Prince George's County Department of Corrections to decide when, whether, and on what conditions release actually occurs. These officials—Defendants Corenne Labbé, Jeffrey Logan, Kenneth Gray, and Tanya Law, acting on behalf of Defendant Prince George's County (collectively, "County Defendants")—in the absence of a lawful basis to detain putative class members, have delayed release for days, weeks, or even months, and in some instances refused to release at all. Hundreds of putative class members remain detained to this day as a result of Defendants' practices. Each passing day of illegal incarceration subjects them to serious and widely recognized harms.

1

Plaintiffs seek to represent two classes of persons who are currently, were in the past, or will in the future be unlawfully detained prior to trial. First, Plaintiffs who are currently incarcerated seek equitable relief on behalf of a class of persons who are currently, or will in the future be unlawfully detained prior to trial. Second, all Plaintiffs seek compensatory relief on behalf of a class of persons who are currently or were in the past unlawfully detained as a result of Defendants' challenged policies and practices. Each member of both putative classes has been or will be detained absent adequate constitutional protections.

On behalf of themselves and all others who have suffered these harms or will suffer these harms in the future, Plaintiffs challenge Defendants' unconstitutional policies and practices and move for class certification under Federal Rules of Civil Procedure 23(a) and 23(b).

## PROPOSED CLASSES

Plaintiffs seek to certify two classes of similarly situated people defined as follows:

1. **Equitable Class:** The Equitable Class consists of all people who are now or will be in the future (1) still detained more than 48 hours after arrest and (2) having been issued a "pretrial option" or "pretrial order" by the Prince George's County District or Circuit Court. Plaintiffs seek certification of this class under Rule 23(b)(2).

2. **Damages Class:** The Damages Class consists of all people who, at any time since July 19, 2019, were (1) still detained more than 48 hours after arrest and (2) having been issued a "pretrial option" or "pretrial order" by the Prince George's County District or Circuit Court. Plaintiffs seek certification of this class under Rule 23(b)(3).

As explained in their Complaint, Plaintiffs seek to halt the ongoing irreparable harm of illegal detention and deter similar conduct in the future. First, named Plaintiffs Robert Frazier, Anibal Hernandez, D.P, Christopher Butler, and Miramba Williams, on behalf of the Equitable Class, seek an injunction against the County Defendants commanding them to adopt constitutionally adequate standards and procedures, and a declaratory judgment against all Defendants that their current practices violate constitutional requirements. Second, all named

Plaintiffs, on behalf of the Damages Class, seek money damages from the County Defendants for the harm Plaintiffs have suffered due to Defendants' unlawful policies and practices. (ECF 1 ¶¶ 212–47.)

**BACKGROUND**

A.    **Defendants' Unconstitutional Policies and Practices Result in the Unlawful Detention of Hundreds of People in Prince George's County at Any Moment.**

"In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Indeed, "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) (citing *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982). As such, the Constitution demands that rigorous substantive standards must be met, and procedural protections must be given, before a person may be deprived of their "fundamental" right to pretrial liberty. *Salerno*, 481 U.S. at 750.

As set out more fully in Plaintiffs' memorandum in support of their Motion for a Preliminary Injunction, Defendants' policies and practices fly in the face of these strict requirements and function to detain Plaintiffs in violation of their substantive and procedural due process rights under the federal and state constitutions, as well as the separation-of-powers command of the Maryland Constitution. Defendants' unconstitutional policies and practices, which all of the putative class members have been subjected to, include the following:

1.    The policy/practice of not making final pretrial release decisions at bail review hearings, and instead referring to the Prince George's County Department of Corrections Population Management Division (the "Pretrial Division") as to whether, when, and on what conditions arrested individuals should be released pretrial. This is referred to as giving a "pretrial option" or "pretrial order" (collectively, "pretrial referrals").

2.  The policy/practice of detaining individuals who have been referred to pretrial for days, weeks, or even months while the Pretrial Division processes their case file and determines whether, when, and on what conditions to release them pretrial.

3.  The policy/practice of declining to release individuals who have been given a pretrial referral on any conditions or combination of conditions of release.

Defendants have violated the constitutional rights of the named Plaintiffs and putative class members by detaining them without legal justification, causing them additional irreparable harm with each day they sit in jail. Plaintiffs sue for injunctive and declaratory relief and money damages under the United States and Maryland constitutions.

**B.     The Named Plaintiffs Are or Were Subjected to Defendants' Unlawful Policies and Practices.**

Named Plaintiffs Robert Frazier, Anibal Hernandez, D.P, Christopher Butler, Miramba Williams, Donnell Davis, Leslie Sharp, Elmer Laguan-Salinas, and Adrienne Worthington were each arrested and issued a pretrial referral, yet each remained detained for days, weeks, or months, suffering serious harms due to Defendants' unconstitutional policies and practices. At the time of filing this motion, Plaintiffs Frazier, Hernandez, D.P., Butler, and Williams are still incarcerated, despite a judge having determined in each of their cases that they may be released to await trial at home with their loved ones.

- Robert Frazier received a pretrial referral authorizing his release on May 30, 2022. Several days later, Mr. Frazier's mother died, yet he was unable to say goodbye as he waited to be released. On June 21, a judge issued him another pretrial referral ordering his release. Over six weeks since he was authorized for release, and three weeks since he was ordered released, he remains in jail. *See* Exhibit 1, Declaration of Robert Frazier ("Frazier Decl.") ¶¶ 9–14; Exhibit 2, Declaration of Jeffrey Campbell ("Campbell Decl.") ¶¶ 35–53.

- Anibal Hernandez received a pretrial referral ordering his release on June 25, 2022. Twenty-five days later, he is still in jail. His public defender has emailed the County no fewer than six times, trying to effectuate this order. *See* Exhibit 3, Declaration of Anibal Hernandez ("Hernandez Decl.") ¶¶ 7, 9; Exhibit 4, Declaration of Brandon Ruben ("Ruben Decl.") ¶¶ 10–22.

4

- D.P., a 16-year-old boy, received a pretrial referral authorizing his release on June 21, 2022. Nearly a month later, he remains detained, separated from his mother and 7-year-old sisters. Every day he is not released makes it more likely he will be held back a year in school. Neither D.P. nor his mother has received any explanation as to why he has not been released. *See* Exhibit 5, Declaration of K.P. ("K.P. Decl.") ¶¶ 3, 8–10, 18; Exhibit 6, Declaration of Christina Meiring ("Meiring Decl.") ¶¶ 32–33; Exhibit 7, Declaration of Maria Hughes ("Hughes Decl.") ¶¶ 8–11.

- Christopher Butler received a pretrial referral ordering his release on February 18, 2022. A judge issued him a second referral in June. Yet five months since he was first authorized for release, he remains detained. He has not seen his 10-year-old daughter since she was arrested, as the jail does not allow children to visit. *See* Exhibit 8, Declaration of Christopher Butler ("Butler Decl.") ¶¶ 9, 12, 21; Exhibit 9, Declaration of Allison Heldreth ("Heldreth Decl.") ¶¶ 57–60.

- Miramba Williams received a pretrial referral authorizing his release on July 5, 2022. Two weeks later, he remains in jail, separated from his three young children. When his parents called the Pretrial Division to ask why he remains detained, they received no explanation. *See* Exhibit 10, Declaration of Miramba Williams ("Williams Decl.") ¶¶ 7–8, 11–12.

- Donnell Davis remained jailed for 90 days after he was authorized for release. Mr. Davis received a pretrial referral on October 9, 2020. He remained in jail until January 7, 2021, when he went to trial and was acquitted of all charges. *See* Exhibit 11, Declaration of Donnell Davis ("Davis Decl.") ¶¶ 9–14, 23–24; Exhibit 12, Declaration of Peter Im ("Im. Decl.") ¶ 41.

- Leslie Sharp remained detained for 29 days after he was referred for release. Mr. Sharp received a pretrial referral ordering his release on June 23, 2021. Mr. Sharp remained in the jail until, on July 22, the day he was scheduled for trial, the State dropped all charges against him. *See* Exhibit 13, Declaration of Leslie Sharp ("Sharp Decl.") ¶¶ 9–18; Im. Decl. ¶ 34.

- Elmer Laguan-Salinas was detained for 90 days after he was authorized for release. Mr. Laguan-Salinas received a pretrial referral authorizing his release on March 17, 2022. Over the next three months, two other judges affirmed the pretrial referral but Mr. Laguan-Salinas remained in jail. On June 17, a judge finally released him on unsecured bond. *See* Exhibit 14, Declaration of Elmer Laguan-Salinas ("Laguan-Salinas Decl.") ¶¶ 10–17; Im. Decl. ¶ 49.

- Adrienne Worthington was jailed for over a week after she was authorized for release. Ms. Worthington received a pretrial referral authorizing her release on December 28, 2021. She remained in jail, separated from her children and grandchildren, over Christmas and New Year's before she was eventually released. The State subsequently dropped the charges against her. *See* Exhibit 15, Declaration of Adrienne Worthington ("Worthington Decl.") ¶¶ 16–25; Im Decl. ¶ 35.

5

## ARGUMENT

A plaintiff seeking class certification must satisfy each of the requirements of Rule 23(a) of the Federal Rules of Civil Procedure, and at least one of the three criteria for certification under Rule 23(b). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614–15 (1997); *Berry v. Schulman*, 807 F.3d 600, 608 (4th Cir. 2015).

"Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* The Fourth Circuit has instructed district courts to give Rule 23 "a liberal rather than a restrictive construction" in order to "best serve the ends of justice for the affected parties" and "promote judicial efficiency." *Minter v. Wells Fargo Bank, N.A.*, 279 F.R.D. 320, 326 (D. Md. 2012) (quoting *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003) (internal citation omitted)). Class certification must be addressed "[a]t an early practicable time" after the complaint is filed. Fed. R. Civ. P. 23(c)(1)(A). Because an order granting class certification is "always provisional in nature," it may be amended in light of later developments in a case, if needed. *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 988 (11th Cir. 2016); Fed. R. Civ. P. 23(c)(1)(C).

The propriety of class certification in this case is clear from the evidence presented in support of Plaintiffs' Motion for a Preliminary Injunction. Each of the material facts concerning class certification—including numerosity, the impracticability of joinder, and the commonality of the putative class members' claims—can be readily determined based on facts about the uniformity of Defendants' policies and the number of people detained despite having been issued a pretrial

6

referral. The hundreds of people who are, and thousands of people who have been, detained in violation of their constitutional rights cannot practicably be joined individually in a single action, and the answers to the questions of law and fact at issue in this case will determine, with respect to each Plaintiff and class member, whether Defendants' policies and practices violate state and federal law. Likewise, Defendants have acted or refused to act in a manner that applies generally to the Equitable Class as a whole, rendering classwide injunctive and declaratory relief appropriate. For the Damages Class, common questions predominate, and liability and damages are subject to generalized proof applicable to the class as a whole. A class suit will be a superior method of managing litigation. Furthermore, the proposed classes are readily ascertainable and will be adequately represented by Plaintiffs' counsel. Therefore, the Court should grant Plaintiffs' motion for class certification.[1]

## I.      The Proposed Classes Meet the Rule 23(a) Requirements.

A plaintiff seeking class certification must meet four requirements under Rule 23(a): (1) the class must be so numerous that joinder of all members is impracticable; (2) there must be questions of law or fact common to the class; (3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class; and (4) the representative parties must be able to fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). These prerequisites, known respectively as numerosity, commonality, typicality, and adequacy, are easily satisfied in this case.

---

[1] While the Fourth Circuit has not specified what quantum of evidence is required under Rule 23, district courts have used a preponderance-of-the-evidence standard in evaluating motions for class certification. *See, e.g.*, *In re Mills Corp. Sec. Litig.*, 257 F.R.D. 101, 104 (E.D. Va. 2009); *In re Safety–Kleen Corp. Bondholders Litig.*, 2004 WL 3115870, at *2 (D.S.C. 2004).

## A.       Numerosity Is Satisfied

Rule 23(a)(1) requires that "the class is so numerous that joinder of all its members is impracticable." Fed. R. Civ. P. 23(a)(1). "Impracticability refers only to difficulty, not impossibility." *Peoples v. Wendover Funding, Inc.*, 179 F.R.D. 492, 497 (D. Md. 1998). "The Fourth Circuit has held that '[n]o specified number is needed to maintain a class action.'" *Fangman v. Genuine Title, LLC*, No. CV RDB-14-0081, 2016 WL 6600509, at *8 (D. Md. Nov. 8, 2016) (quoting *Brady v. Thurston Motor Lines*, 726 F.2d 136, 145 (4th Cir. 1984)). Nevertheless, "'[a]s a general guideline, . . . a class that encompasses fewer than 20 members will likely not be certified . . . while a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone.'" *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir. 2021) (quoting 1 Newberg on Class Actions § 3:12 (5th ed. 2021)); *see also Donaldson v. Primary Residential Mortg.*, No. ELH-19-1175, 2021 WL 2187013, at *14 (D. Md. May 28, 2021) ("[a] class consisting of as few as 25 to 30 members raises the presumption that joinder would be impractical." (citation omitted)).

Joinder is impracticable here for at least three reasons. First, the number of people in each class greatly exceeds the minimum necessary for class certification. As of July 15, 2022, there were 926 people incarcerated at the Prince George's County Jail. Exhibit 16, Email from Andrew Cephas (July 15, 2022). Over the past three years, the jail's population has typically exceeded 700, dipping lower during the onset of the pandemic before returning to—and then surpassing—its old levels.[2] Defendant Logan has estimated that approximately one-third of the people in custody at

---

[2] *See, e.g.*, PGSAO Monthly Report (Dec. 15, 2020) at 4, https://bit.ly/3uvEqss (avg. daily pop. 791 in Sept. 2019; 733 in Feb. 2020; 530 in July 2020; 772 in Dec. 2020); PGSAO Monthly Report (Mar. 15, 2021) at 2, https://bit.ly/3nL7EzN (avg. daily pop. 782); Akela Lacy, *Conservatives Only Care About the Incarcerated When it Comes to the Capitol Rioters*, INTERCEPT (Sept. 21, 2021), https://bit.ly/3bZbqTc (pop. 853).

the jail have been given a pretrial option or order. Im Decl. ¶ 22; *accord* Exhibit 17, Declaration of Claire Glenn (2020) ¶¶ 5–8 (reviewing the cases of 503 persons then detained at the jail and finding that at least 127 had a pretrial referral); Exhibit 18, Letter from Courtwatch PG (July 18, 2022) (finding referrals in 27 percent of observed hearings between January and May 2022). And the County Defendants have stated that, between December 2018 and February 2021, pretrial referrals were given to 1,208 people. *See* Exhibit 19, Pretrial Division Response to Md. Public Information Act Request (Mar. 30, 2021) (hereinafter "2021 MPIA Response").

Making "commonsense assumptions" from this data, *Johnson v. Jessup*, 381 F. Supp. 3d 619, 633–34 (M.D.N.C. 2019) (quoting 1 William B. Rubenstein, *Newberg on Class Actions* § 3:13 (5th ed. 2018)), the Equitable Class likely consists of hundreds of members, and the Damages Class thousands. *See Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 183 (4th Cir. 1993) (noting without dispute district court's finding "that some 480 potential class members would easily satisfy the numerosity requirement"). Under these circumstances, "[w]here the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied." *Scott v. Clarke*, 61 F. Supp. 3d 569, 584 (W.D. Va. 2014) (quoting 1 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 3:3 at 225 (4th ed. 2002)).

Second, traditional joinder is not practicable because there is an indeterminate future stream of class members who will suffer the same injury. "[W]hen it is difficult to immediately identify all class members, joinder is *more* impractical." *Doe v. Charleston Area Med. Ctr., Inc.*, 529 F.2d 638, 645 (4th Cir. 1975) (emphasis added). Every day, more people are arrested and detained pretrial in Prince George's County despite being authorized for pretrial release. "[C]lasses including future claimants generally meet the numerosity requirement due to the impracticality of counting such class members, much less joining them." *J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C.

Cir. 2019) (internal citation & quotation omitted). This is especially true in the context of jails and prisons, whose populations are "inherently fluid." *Clarkson v. Coughlin*, 145 F.R.D. 339, 348 (S.D.N.Y. 1993); *accord Braggs v. Dunn*, 317 F.R.D. 634, 653 (M.D. Ala. 2016) ("the fluid nature of a plaintiff class—as in the prison-litigation context—counsels in favor of certification of all present and future members." (quotation omitted)); *see also Scott*, 61 F. Supp. 3d at 584 (collecting cases where the fact that class members were detained favored certification).

Finally, the ability of the class members to bring individual lawsuits is dramatically impaired, if not eliminated, by their status as arrested individuals. "Fear of retaliation—in, for example, civil rights . . . cases— . . . counsels in favor of relaxing the numerosity requirement." 1 Newberg on Class Actions § 3:12 (6th ed. 2022). The Equitable Class is, by virtue of its definition, comprised primarily of people who are in Defendants' custody and thus who rely on Defendants to meet their most basic needs. Members of the Damages Class who are not presently detained are nevertheless at Defendants' mercy to the extent they still have open criminal cases in Prince George's County, many before the very judges named as Defendants; their bodily liberty is in Defendants' hands. It is hard to imagine any situation with greater potential for retaliation. Furthermore, people who are arrested are disproportionately poor,[3] and poor people are disproportionally barred from access to justice in the courts.[4] Class certification will ensure that they are able to pursue relief for the violation of their constitutional rights "where they might otherwise be financially prevented from doing so." *Am. Sales Co., LLC v. Pfizer, Inc.*, No. 2:14-

---

[3] *See* Alexi Jones & Wendy Sawyer, *Arrest, Release, Repeat*, PRISON POL'Y INITIATIVE (Aug. 2019), https://www.prisonpolicy.org/reports/repeatarrests.html (finding that people who are arrested are disproportionately likely to have annual incomes under $10,000).
[4] *See* United States Dep't of Justice, Office of Access to Justice, https://www.justice.gov/atj.

CV-361, 2017 WL 3669604, at *17 (E.D. Va. July 28, 2017); *see also Rodger v. Elec. Data Sys. Corp.*, 160 F.R.D. 532, 536 (E.D.N.C. 1995).

### B. Commonality Is Satisfied

Rule 23(a)(2) requires that "there [be] questions of law *or* fact common to the class." Fed. R. Civ. P. 23(a)(2) (emphasis added). This "threshold requirement[]" is "not high." *Brown v. Nucor Corp.*, 576 F.3d 149, 153 (4th Cir. 2009), *as amended* (Oct. 8, 2009) (internal citation omitted). "This subsection does not require that all, or even most issues be common, nor that common issues predominate, but only that common issues exist." *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 143 F.R.D. 628, 636, (D.S.C. 1992), *aff'd*, 6 F.3d 177 (4th Cir. 1993); *see also EQT Prod. Co. v. Adair*, 764 F.3d 347, 366 (4th Cir. 2014) ("That the defendants engaged in numerous common practices may be sufficient for commonality purposes."). "[E]ven a single common question will do," if "determination of its truth or falsity will resolve an issue that is central" to the case. *Wal-Mart*, 564 U.S. at 350, 359. Furthermore, "factual differences among the class members' cases will not preclude certification if the class members share the same legal theory." *J.O.P. v. United States Dep't of Homeland Sec.*, 338 F.R.D. 33, 55 (D. Md. 2020) (citation omitted); *see also Int'l Woodworkers of Am. AFL-CIO, CLC v. Chesapeake Bay Plywood Corp.*, 659 F.2d 1259, 1270 (4th Cir. 1981) ("Rule 23 does not require precise, mirror-image identity respecting the injuries caused by a single practice or policy.").

Civil rights cases often easily meet the commonality requirement because the defendant's actions are "central to the claims of all class members[,] irrespective of their individual circumstances and the disparate effects of the conduct." *Baby Neal ex. rel. Kanter v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994) (internal citation omitted). In cases challenging pretrial detention policies specifically, "resolution of one question"—that is, whether defendants' policies and practices regarding pretrial detention violate the Constitution—"will resolve in one stroke all class

members' claims." *Buffin v. San Francisco*, No. 15-CV-04959, 2018 WL 1070892 (N.D. Cal. Feb. 26, 2018) (internal citations & quotations omitted); *see also Daves v. Dallas County*, No. 3:18-CV-0154, 2018 WL 4537202, at *2 (N.D. Tex. Sept. 20, 2018) (finding class was "sufficiently cohensive" because "[e]very arrestee is exposed to the same procedures that allegedly result in [unconstitutional] detention" and "[t]he process [of decision-making regarding pretrial detention], not the result, is the origin of this dispute"). Accordingly, courts in the Fourth Circuit have repeatedly certified class actions in cases challenging policies and practices regarding detention. *See, e.g.*, *Johnson v. Jessup*, 381 F. Supp. 3d 619, 637 (M.D.N.C. 2019); *Jones v. Murphy*, 256 F.R.D. 519, 523 (D. Md. 2009); *Epps v. Levine*, 457 F. Supp. 561, 563 (D. Md. 1978).

While only a *single* common question of law *or* fact is required, each of the two classes presents numerous examples of both:

(1) Whether Judge Defendants give pretrial referrals knowing that class members will be detained while the Pretrial Division processes them.

(2) Whether Judge Defendants give pretrial referrals granting the Pretrial Division the discretion to make release or detention decisions based on the Division's own criteria.

(3) Whether the Pretrial Division is a "neutral decisionmaker" constitutionally permitted to make pretrial detention decisions.

(4) What procedural protections and substantive standards the Pretrial Division applies in deciding whether to exercise a pretrial referral.

(5) Whether Defendants' policy/practice of giving pretrial referrals violates the due process rights of arrested class members.

(6) Whether Defendants' policy/practice of detaining class members for days, weeks, or even months after they have received pretrial referrals violates their due process rights.

(7) Whether Defendants' policy/practice of detaining class members for days, weeks, or even months after they have received pretrial referrals violates the separation-of-powers command of the Maryland Constitution.

(8) Whether Defendants' policy/practice of declining to release class members who have been given a pretrial referral violates their due process rights.

(9)   Whether Defendants' policy/practice of declining to release class members who have been given a pretrial referral violates the separation-of-powers command of the Maryland Constitution.

(10)  How much money members of the Damages Class should be compensated for each day of unconstitutional pretrial detention.

Resolving these questions will unquestionably "drive the resolution" of the case by yielding "common answers" to Plaintiffs' claims. See *Wal-Mart Stores*, 564 U.S. at 350, 351. And Plaintiffs' injuries are "capable of classwide resolution," *id.* at 350, because this Court can issue a single declaration finding that Defendants' pretrial detention policies and practices violate the federal and state constitutions and awarding appropriate relief, *cf. Dixon v. City of St. Louis*, No. 4:19-CV-0112, 2019 WL 2437026, at *5 (E.D. Mo. June 11, 2019), *vacated and remanded on other grounds*, 950 F.3d 1052 (8th Cir. 2020), *as corrected* (Mar. 23, 2020) (certifying class because the "individualized" bail hearings plaintiffs sought were an "entirely systemic" form of relief). Therefore, there are factual and legal questions in this case whose resolution will advance the legal claims of all class members. *See, e.g., Jones*, 256 F.R.D. at 522 (certifying overdetention class where common issues included "whether the defendants implemented or were deliberately indifferent to a particular policy, practice, or custom that offends the Constitution and was uniformly applied to all class members").

## C.    Typicality Is Satisfied

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This "threshold requirement[]" is also "not high." *Brown*, 576 F.3d at 153. "A plaintiff's claim is typical if it arises from the same event, practice, or course of conduct that gives rise to the claims of other class members and if his or her claims are based on the same legal theory." 1 Newberg on Class Actions § 3:29 (6th ed.

13

2022). The class representative's claims "need not be 'perfectly identical or perfectly aligned'" with other class members' claims. *Ealy v. Pinkerton Gov't Servs. Inc.*, 514 F. App'x 299, 305 (4th Cir. 2013) (quoting *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006)). Nor will differences in the amounts of damages due to each class member defeat typicality. *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984). Rather, "the representative's pursuit of his own interests 'must simultaneously tend to advance the interests of the absent class members.'" *Ealy*, 514 F. App'x at 305 (quoting *Deiter*, 436 F.3d at 466). "The essence of the typicality requirement is captured by the notion that as goes the claim of the named plaintiff, so go the claims of the class." *Deiter*, 436 F.3d at 466 (quotation omitted).

Plaintiffs' claims are typical of those of the classes for the same reasons that the class claims rely on common questions of law and fact: the claims operate on the same legal theories and seek the same relief to remedy the same injury. Each Plaintiff, like every other member of the Damages Class, was given a pretrial referral at their bail review hearing rather than an outright order of release or detention. Like every other member of the Damages Class, each of the Plaintiffs waited in custody for days, if not weeks or months, while the Pretrial Division decided whether to exercise the pretrial referral. *See* Frazier Decl. ¶¶ 9–14; Hernandez Decl. ¶¶ 7–9; K.P. Decl. ¶¶ 8–9; Butler Decl. ¶¶ 10–12; Williams Decl. ¶¶ 7–8; Davis Decl. ¶ 24; Sharp Decl. ¶ 20; Laguan-Salinas Decl. ¶ 17; Worthington Decl. ¶ 25.  And Plaintiffs Hernandez, D.P., Frazier, Butler, and Williams, like every other member of the Equitable Class, remain detained absent the substantive and procedural protections that the state and federal constitutions demands. *See* Frazier Decl. ¶ 14; Hernandez Decl. ¶¶ 10–11; K.P. Decl. ¶ 9; Butler Decl. ¶ 12; Williams Decl. ¶ 8. That is, the same policies and practices by Defendants which give rise to Plaintiffs' claims also give rise to every other class member's claims, and if Plaintiffs are granted the relief they seek, that relief will also

14

benefit every other class member. *See* Exhibit B, Proposed Order Granting Class Certification ("Proposed Order"); *see also Gwiazdowski v. Cnty. Of Chester*, 263 F.R.D. 178, 187 (E.D. Pa. 2009) ("If the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences.") (quotation omitted). Plaintiffs therefore satisfy the typicality requirement.

### D.     Adequacy Is Satisfied

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The "two basic guidelines" of adequate representation are "1) the absence of conflict between the representative and members of the class and 2) the assurance that the representative will vigorously prosecute the matter on behalf of the class." *Stay the Course W. Va. v. Tennant*, 2013 WL 209479, *3 (S.D. W. Va. 2013); *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010) ("For a conflict of interest to defeat the adequacy requirement, that conflict must be fundamental." (citation and internal quotation marks omitted)). "[I]n a complex lawsuit, such as one in which the defendant's liability can be established only after a great deal of investigation and discovery by counsel against a background of legal knowledge, the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 430 (4th Cir. 2003). All that is required of Plaintiffs is "a general knowledge of what the action involves and a desire to prosecute the action vigorously." *Brasko v. Howard Bank*, No. 1:20-CV-3489-SAG, 2022 WL 951771, at *9 (D. Md. Mar. 29, 2022) (internal citations and quotations omitted).

Regarding the first inquiry, the named Plaintiffs have no interests at odds with the proposed class members and do not seek any individual benefit from this litigation beyond that which would inure to the class as a whole. Plaintiffs Frazier, Hernandez, D.P., Butler, and Williams, like all

other members of the Equitable Class, have a strong interest in not being detained absent constitutional protections, and the declaratory and injunctive relief they seek will benefit the entire class in the same way. *See* Proposed Order. More broadly, each of the named Plaintiffs who represent the Damages Class share an interest with each of the class members in receiving compensation for identical injuries: detention absent constitutionally adequate protections. There are no known conflicts of interest among members of the proposed classes, all of whom have a similar interest in vindicating their constitutional and statutory rights in the face of their unlawful treatment by Defendants.

Regarding the second inquiry, the named Plaintiffs also meet the requirement that they will adequately prosecute the action. As Plaintiffs' declarations explain, they are familiar with the issues underlying this action from personal experience and want to seek redress on behalf of themselves and those similarly situated. *See, e.g.*, Davis Decl. ¶ 27 ("I want to serve in this role so that people who suffered the same injustices that I did are compensated for their harms, and so that these injustices do not happen to anyone else."); Hernandez Decl. ¶¶ 7–11; K.P. Decl. ¶ 20; Butler Decl. ¶ 23; Sharp Decl. ¶ 29. They are represented in this case by experienced civil rights attorneys who are able and willing to conduct this litigation on behalf of the class.[5] *See* Section IV, *infra*. Plaintiffs are thus adequate class representatives.

## II.   The Proposed Classes Meet the Requirements of Rule 23(b).

The proposed classes also qualify for certification under Rule 23(b). First, certification of the Equitable Class is merited under Rule 23(b)(2) because Defendants have violated each class

---

[5] "Although questions concerning the adequacy of class counsel were traditionally analyzed under the aegis of the adequate representation requirement of Rule 23(a)(4) of the Federal Rules of Civil Procedure, those questions have, since 2003, been governed by Rule 23(g)." *Souter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 212 (E.D. Va. 2015) (internal citations omitted).

member's constitutional rights in an identical manner. Second, certification of the Damages Class

is merited under Rule 23(b)(3) because common issues predominate, liability and damages are

susceptible to proof that applies general to the class, and a class suit will be a superior method of

managing litigation.

### A.      The Equitable Class Satisfies the Requirements of Rule 23(b)(2)

Rule 23(b)(2) provides for class certification when "the party opposing the class has acted

or refused to act on grounds that apply generally to the class, so that final injunctive relief or

corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P.

23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory

remedy warranted—the notion that  the conduct is such that it can be enjoined or declared unlawful

only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360 (citation and

internal quotation marks omitted). The requirements of Rule 23(b)(2) are "almost automatically

satisfied" in actions seeking injunctive relief for common legal claims. *Baby Neal v. Casey*, 43

F.3d 48, 58 (3d Cir. 1994). Every class member need not have suffered precisely the same injury,

so long as "defendants' conduct . . . is based on policies and practices applicable to the entire

class." *See Bumgarner v. NCDOC*, 276 F.R.D. 452, 457–58 (E.D.N.C. 2011). Civil-rights class

actions are "prime examples" of cases appropriate for certification under Rule 23(b)(2).[6] *Amchem*

*Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997).

---

[6] Rule 23(b)(2) arose out of experience "in the civil rights field," *Amchem*, 521 U.S. at 614 (citation
omitted), in which the government typically treats a class in an unconstitutional manner based on
a single law or government policy. "Rule 23(b)(2) was promulgated in 1966 essentially as a tool
for facilitating civil rights actions." Moore's Federal Practice § 23.43 (3d. ed. 2022); *see also*
Newberg on Class Actions § 1:3 (6th ed. 2022) ("Rule 23(b)(2) . . . is typically employed in civil
rights and other cases where monetary relief is not the primary remedy. The (b)(2) class action is
often referred to as a 'civil rights' or 'injunctive' class suit.").

In this case, Defendants have violated each class member's constitutional rights in an identical manner: by detaining them through a process that delegates to unaccountable nonjudicial County officials the decision of whether to detain or release, which then proceeds to detain class members absent a substantive determination that detention is necessary; and denying their procedural rights to, for example, notice, a hearing, and the opportunity to present evidence during the Pretrial Division's process. That is, each member of the Equitable Class is suffering an identical injury: pretrial detention absent adequate constitutional protections. A single injunction or declaratory judgment commanding Defendants to adopt constitutionally adequate standards and procedures will address this group-wide injury and provide relief to every member of the Equitable Class. *See, e.g.*, *Daves v. Dallas County*, No. 3:18-CV-0154, 2018 WL 4537202, at *2 (N.D. Tex. Sept. 20, 2018) (certifying class of people detained pretrial because plaintiffs were requesting a "universally applicable set of procedures" and not a substantive outcome in any particular case).

Because the putative Equitable Class challenges Defendants' scheme as unconstitutional and seeks declaratory and injunctive relief that would benefit every member of the class in the same way, certification under Rule 23(b)(2) is plainly appropriate. *See In re Veneman*, 309 F.3d 789, 792 (D.C. Cir. 2002) ("Rule 23(b)(2) certification is appropriate where plaintiffs seek declaratory or injunctive relief for class-wide injury."); *Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1155 (11th Cir. 1983) (stating that Rule 23(b)(2) applies to "claims resting on the same grounds and applying more or less equally to all members of the class"); *Parsons v. Ryan*, 289 F.R.D. 513, 524 (D. Ariz. 2013), *aff'd*, 754 F.3d 657 (9th Cir. 2014) ("This case is a paradigm of the type of class suitable for certification under Rule 23(b)(2) because injunctive relief for some prisoners would necessarily result in injunctive relief for all." (cleaned up)).

## B.      The Damages Class Satisfies the Requirements of Rule 23(b)(3)

Rule 23(b)(3) requires that (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The proposed Damages Class meets both requirements.

### 1.      Predominance

Before a class is certified under Rule 23(b)(3), a district court must find that common questions—those "susceptible to generalized, classwide proof"—predominate over individual questions, which require "evidence that varies from member to member." *Tyson Foods*, 577 U.S. at 453. The rule "does *not* require a plaintiff seeking class certification to prove that each element of their claim is susceptible to classwide proof." *Amgen*, 568 U.S. at 469 (emphasis in original) (cleaned up).

Instead, "[t]he predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods*, 577 U.S. at 453 (quotation and citations omitted).[7] Accordingly, class certification is appropriate when "one or more of the central issues in the action are common to the class . . . even though other important matters will have to be tried separately." *Id.* at 453-54 (citation omitted); *Heastie v. Cmty. Bank of Greater Peoria*, 125 F.R.D. 669, 675 (N.D. Ill. 1989) ("The necessity of answering individual questions after answering common questions will not prevent a class action."). As a result, "Rule 23(b)(3) is normally satisfied where there is an

---

[7] Predominance is a more stringent" and qualitative version of Rule 23(a)'s commonality requirement. *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006). Thus, if Rule 23(b) predominance is satisfied, Rule 23(a) commonality is necessarily satisfied as well. Plaintiffs nevertheless analyze these factors independently for the Court's convenience.

essential common factual link, such as standardized documents and practices, even though the nature and amount of damages may differ among class members." *In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 325 F.R.D. 136, 154 (D.S.C. 2018) (citing *Talbott v. GC Servs. Ltd. P'ship*, 191 F.R.D. 99, 106 (W.D. Va. 2000)); *see also Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 944 (9th Cir. 2019) ("predominance is 'rarely' defeated" where, as here, the harms alleged stem from "uniform policies" (citation omitted)).

Here, both liability and damages are predominantly susceptible to classwide proof. The liability determination is the same across the Damages Class because Plaintiffs have sued Defendants in their official capacities and named Prince George's County itself as a Defendant. That is, Plaintiffs challenge Defendants' official policies and practices governing the procedural protections they do (and do not) provide and the substantive standards they do (or do not) employ, as opposed to the outcome in any individual case. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, No. 19-MD-2879, 2022 WL 1396522, at *17 (D. Md. May 3, 2022) (predominance satisfied where defendants' policies and practices formed "the glue binding this putative class action").[8] Furthermore, the legal issues presented in each claim—whether Defendants' policies and practices are unconstitutional—are identical across the Damages Class because the federal and state constitutions apply equally to each class member. *See Jones v. Murphy*, 256 F.R.D. 519, 523 (D. Md. 2009) (predominance satisfied where classwide issues included "whether the defendants held the class members more than 48 hours without presentment or release, whether the defendants oversaw a practice of allowing presentment delays, and whether

---

[8] To the extent evidence regarding any individual case is presented, that evidence is only to illustrate Defendants' policies and procedures regarding pretrial detention writ large.

these alleged overdetentions violate the Constitution"). Each of these questions is susceptible to generalized, classwide proof.

Damages are also "capable of management on a classwide basis." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). The relevant inquiry is not whether every individual will receive the same amount of damages—Rule 23(b)(3) "explicitly envisions . . . individualized damage determinations," *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 428 (4th Cir. 2003)—but rather whether there is "a single or common *method* that can be used to measure and quantify the damages of each class member," 4 Newberg on Class Actions § 12:4 (6th ed. 2022); *see also Gunnells*, 348 F.3d at 428 (stating that "if common questions predominate over individual questions as to liability," "individualized [damages] inquiries" do not destroy predominance). Here, Plaintiffs seek general damages on a per diem basis, at a rate set by the fact-finder and not based on any individual characteristics of class members; thus, each class member can use the same method of proving damages. The harms of pretrial detention are well documented;[9] an expert witness could easily testify as to the appropriate per diem monetary compensation, developed through empirical methods, which could then be distributed formulaically among the class without extensive or individualized proof.[10] And, as explained below, *see* Section III, *infra*, the number of days each

_____

[9] *See, e.g.*, Arpit Gupta, Christopher Hansman, & Ethan Frenchman, *The Heavy Costs of High Bail: Evidence from Judge Randomization* 15, 18–19 (May 2, 2016), https://goo.gl/OW5OzL; CHRISTOPHER LOWENKAMP ET AL., INVESTIGATING THE IMPACT OF PRETRIAL DETENTION ON SENTENCING OUTCOMES, LAURA AND JOHN ARNOLD FOUNDATION 12, 14 (2013); Megan T. Stevenson, *Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes*, 34 J.L. ECON. & ORG. 511, 535-36 (2018); Paul Heaton *et al.*, *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 STAN. L. REV. 711, 786-87 (2017); Department of Justice, National Institute of Corrections, *Fundamentals of Bail*, 15–16 (2014), https://goo.gl/jr7sMg.
[10] Plaintiffs would likely ask the Court to adopt "the *Dellums* method" to determine classwide damages, wherein a small subset of class members would offer "factual testimony that will help the jury understand the conduct." *Barnes v. D.C.*, 278 F.R.D. 14, 22 (D.D.C. 2011) (Lamberth, C.J.) (citing *Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977)). From that testimony, the jury

member of the Damages Class spent detained after being referred to pretrial is readily ascertainable via Defendants' records. *Jones v. Murphy*, 256 F.R.D. 519, 523 (D. Md. 2009). Thus, damages are also susceptible to classwide proof, and common issues predominate.[11]

### 2.   Superiority

Rule 23(b)(3) sets forth several factors to be considered in deciding whether a class action is superior to other methods of adjudicating the controversy: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions;" (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members;" (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum;" and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)–(D).[12]

Here, first, there is no evidence that individual class members have an interest in bringing separate actions. To the contrary, each class member's claims are "so closely related" that class action litigation will "achieve [each member's] ends without the need for their involvement." 2 Newberg on Class Actions § 4:69 (6th ed. 2022). This lack of interest is perhaps best evinced by the fact that, to the best of undersigned counsel's knowledge, no class member has brought an independent lawsuit based on these claims even though the alleged constitutional violations have

---

would then "assign damages based on a matrix keyed to the length of overdetentions." *Id.* at 20; *accord Betances v. Fischer*, No. 11-CV-3200, 2022 WL 765963, at *12 (S.D.N.Y. Mar. 14, 2022) (applying *Dellums* method to class action involving unlawful detention).

[11] Alternatively, if the Court concludes that differences in the damages calculations for individual putative class members warrants non-certification of the Damages Class, Plaintiffs seek certification of the Damages Class as an issues class under Rule 23(c)(4) for the purpose of determining Defendants' liability. *See In re Marriott Int'l, Inc. Customer Data Security Breach Litig.*, No. 19-MD-2879, 2022 WL 1396522, at *25 & n.51 (D. Md. May 3, 2022) (noting court's ability to bifurcate liability and damages and relying on Rule 23(c)(4)).

[12] "While Rule 23 states that these factors are pertinent to the assessment of predominance and superiority, most courts analyze the Rule 23(b)(3)(A) to (D) factors solely in determining whether a class suit will be a superior method of litigation." 2 Newberg on Class Actions § 4:47 (6th ed. 2022).

been occurring for years.[13] As such, second, the extent and nature of already ongoing litigation is non-existent. Third, because of the centrality of questions about Defendants' widespread policies and practices to this litigation, *see* Sections I.B (commonality) and II.A.1 (predominance), *supra*, it will promote judicial efficiency to concentrate thousands of potential claims in a single forum, and in particular where Defendants reside and operate, *see Calderon v. GEICO Gen. Ins. Co.*, 279 F.R.D. 337 (D. Md. 2012).

Finally, the "likely difficulties" of managing a class action pale in comparison to the alternative. *See DeLoach v. Philip Morris Cos., Inc.*, 206 F.R.D. 551, 567, (M.D.N.C. 2002) ("[D]ismissal for management reasons, in view of the public interest involved in class actions, should be the exception rather than the rule." (internal citations and quotations omitted)). The alternative to a class action lawsuit in this instance is likely not a slew of individual lawsuits— which would themselves be difficult to manage—but no litigation at all. *See Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (Posner, J.) (the "realistic alternative to a class action is not 17 million individual suits, but zero individual suits"). The members of the Damages Class are a particularly vulnerable population, who are economically disadvantaged and uniquely vulnerable to retaliation by Defendants. *See* Section I.A, *supra*; Section V, *infra*; *Noble v. 93 Univ. Place Corp.*, 224 F.R.D. 330, 346 (S.D.N.Y. 2004) (finding class action superior because "there is reason to believe that class members may fear reprisal and lack familiarity with the legal system, discouraging them from pursuing individual claims"). Put simply, because "[a] class action is the only realistic way Plaintiffs' claims can be adjudicated," it is necessarily "the

---

[13] Counsel is aware of one related lawsuit against overlapping defendants. *See West v. Prince George's County*, No. CV TDC-21-0863, 2022 WL 125936, at *3 (D. Md. Jan. 13, 2022). But *West* challenged a different policy—the Department of Corrections' policy of detaining people solely because they had COVID-19—than the ones challenged here.

23

superior means." *In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 325 F.R.D. 136, 162
(D.S.C. 2018) (quotation omitted); *see also Gunnells*, 348 F.3d at 426 (finding superiority satisfied
because "in the absence of class certification, very few claims would be brought").

## III.     The Proposed Classes Are Readily Ascertainable.

While it does not appear in the text of the federal rules, the Fourth Circuit has read "an
implicit threshold requirement" into Rule 23: "the members of a proposed class [must] be readily
identifiable" "in reference to objective criteria." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th
Cir. 2014) (internal citations and quotations omitted). This requirement, known in some circuits as
"ascertainability," exists "to ensure that there will be some 'administratively feasible [way] for the
court to determine whether a particular individual is a member' at some point." *Krakauer v. Dish
Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir. 2019) (quoting *EQT Prod. Co.*, 764 F.3d at 358). [14]

The proposed classes here are readily ascertainable because it will be a simple matter to
identify class members. *See, e.g.*, *Amaya v. DGS Constr., LLC*, 326 F.R.D. 439, 448 (D. Md. 2018)
(finding classes ascertainable where members could be identified "without a significant
administrative burden"). Each proposed class is defined in terms of clear and objective criteria:
The Damages Class consists of all people who, since July 18, 2019, were detained for longer than
48 hours after arrest and were given a pretrial referral by the Prince George's County District or
Circuit Court. The Equitable Class is simply the subset of the Damages Class who are presently
detained.

Defendants possess documents which allow for ready identification of the members of each
class. For example, the Prince George's County Department of Corrections maintains a database

---

[14] While manageability is analyzed as part of the Rule 23(b)(3) analysis "in relation to the
manageability of adjudication by other means," ascertainability is not a relative term. *Souter v.
Equifax Info. Servs., LLC*, 307 F.R.D. 183, 197 (E.D. Va. 2015) (cleaned up).

with the date and time of arrest for each person in its custody as well as the length of time each individual has been in custody, and is required by law to report some of that information to the courts on a weekly basis.[15] That data also includes whether any given person has received a pretrial referral. *See* Exhibit 20, Declaration of Jeffrey Logan (May 18, 2020) at 1 (noting the PGDOC database includes "[w]hether pretrial release was ordered or authorized"). Additionally, each time a court issues a pretrial referral, that information is recorded on a Commitment Pending Hearing order issued to the County and added to the referred person's case file. *See, e.g.*, Exhibit 21, Case Documents, Miramba Williams, at 2. Indeed, the County Defendants have already acknowledged that they have ready access to such information about pretrial referrals. *See* 2021 MPIA Response (stating that 1,208 people were given a pretrial referral between December 2018 and February 2021).

Using these existing records, the members of the Damages Class can be ascertained by: (1) pulling a list of all people given pretrial referrals during the relevant time period; and (2) cross-referencing each referred person against the County's custody records to compile a list of people who remained detained with a referral more than 48 hours after arrest. *Compare, e.g.*, *Jones v. Murphy*, 256 F.R.D. 519, 523 (D. Md. 2009) ("The plaintiffs present sufficient evidence that determining who was detained more than 48 hours is a fairly straightforward factual inquiry that can be culled from the [defendant's] own information."), *with Spotswood v. Hertz Corp.*, No. RDB-16-1200, 2019 WL 498822, at *6 (D. Md. Feb. 7, 2019) (class not ascertainable because "plaintiff . . . merely identif[ed] a mass of data which could aid the process of identifying class

---

[15] "In order to eliminate unnecessary detention, the court shall exercise supervision over the detention of defendants pending trial. It shall require from the sheriff, warden, or other custodial officer a weekly report listing each defendant within its jurisdiction who has been held in custody in excess of seven days pending preliminary hearing, trial, sentencing, or appeal. The report shall give the reason for the detention of each defendant." Md. Crim. Causes 4-216.3(c),

25

members" without also "provid[ing] an efficient method of using this information"). The same records will readily demonstrate how long each individual was unlawfully detained after the pretrial referral was issued, and thus how much in damages is owed. Once the Damages Class is identified, the Equitable Class can be ascertained by reference to Defendants' custody records to see who is currently detained. Given the relatively straightforward task of identifying class members, ascertainability poses no barrier to class certification.

## IV.   Plaintiffs' Counsel Should be Appointed Class Counsel.

Rule 23(g)(1) requires the court appoint class counsel who can "fairly and adequately represent the interests of the class," considering (1) the work counsel has done in identifying or investigating the potential claims, (2) counsel's experience in handling similar cases, (3) counsel's knowledge of the applicable law, and (4) the resources counsel will commit to representing the class.

Plaintiffs' counsel satisfy these four requirements. Plaintiffs are represented by attorneys from Civil Rights Corps, the Institute for Constitutional Advocacy and Protection at Georgetown University Law Center, and Wilmer Cutler Pickering Hale and Dorr LLP, all of whom have experience litigating complex class action lawsuits, and specifically civil rights lawsuits, in federal court. Exhibit C, Declaration of Ryan Downer ¶¶ 4–14; Exhibit D, Declaration of Seth Wayne ¶¶ 5–7; Exhibit E, Declaration of Edward Williams ¶¶ 5–6. Counsel have investigated Defendants' policies and interviewed members of the proposed classes, and therefore have extensive knowledge of the relevant facts. Counsel are also well-versed in the relevant law, having litigated numerous class action lawsuits regarding the constitutional requirements attendant to pretrial detention in state and federal courts across the country. *Id.* Therefore, Plaintiffs' counsel will fairly and adequately represent the proposed classes.

**V.      Class Certification Is Particularly Appropriate Because Plaintiffs Assert Civil Rights Claims That Are Transitory in Nature.**

Class-action treatment is "particularly important" in cases where membership in the proposed class is by definition short-lived. *Gratz v. Bollinger*, 539 U.S. 244, 268 (2003). "[T]he length of incarceration in a county jail generally cannot be determined at the outset and is subject to a number of unpredictable factors, thereby making it inherently transitory." *Olson v. Brown*, 594 F.3d 577, 582 (7th Cir. 2010). As such, mootness concerns make it difficult or impossible for people who are arrested to litigate issues regarding pretrial detention outside of the class context. *See U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 398–99 (1980); *Swisher v. Brady*, 438 U.S. 204, 213 n.11 (1978); *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975). Furthermore, as explained above, people who have been detained in violation of their constitutional rights face unique barriers to litigation: They are at a heightened risk of retaliation from the jail custodians who they would sue, and they often lack the resources to pursue individual litigation. *See* Section I.A, *supra*. In light of these concerns, Rule 23(b)(2) was designed specifically for civil rights litigants. *See* Section II.A, *supra*.

Class certification is accordingly favored in cases alleging civil rights claims that are transitory in nature. Courts around the county have consistently certified classes that, similar to the proposed classes here, are composed of people who have been detained before trial absent constitutionally adequate protections, in violation of their substantive and procedural due process rights. Indeed, Plaintiffs' counsel have repeatedly obtained certification of such classes. *See, e.g.*, *Fant v. City of Ferguson, Missouri*, No. 4:15-CV-00253, 2022 WL 2072647, at *21 (E.D. Mo. June 9, 2022); Order Granting Motion to Certify Class, Doc. 67, *Guill v. Allen*, No. 1:19-CV-1126, at *4 (M.D.N.C. Oct. 25, 2021); Order Granting Motion to Certify Class, Doc. 116, *Torres v. Collins*, No. 2:20-CV-00026, at *14 (E.D. Tenn. May 5, 2021); *Dixon v. City of St. Louis*, No.

27

4:19-CV-0112, 2019 WL 2437026, at *15 (E.D. Mo. June 11, 2019); *Daves v. Dallas County*, No. 3:18-CV-0154-N, 2018 WL 4537202, at *4 (N.D. Tex. Sept. 20, 2018); *Edwards v. Cofield*, No. 3:17-CV-321, 2018 WL 4323920, at *2 (M.D. Ala. Sept. 10, 2018); *Caliste v. Cantrell*, No. 17-CV-6197, 2018 WL 1365809, at *2 (E.D. La. Mar. 16, 2018); *ODonnell v. Harris County*, No. CV H-16-1414, 2017 WL 1542457, at *8 (S.D. Tex. Apr. 28, 2017); *Walker v. City of Calhoun*, No. 4:15-CV-170, 2016 WL 361580, at *10 (N.D. Ga. Jan. 28, 2016).

## CONCLUSION

"It is difficult to imagine a class more similar than a group of people arrested in the same city by the same police agency, placed in the same jail, held for the same reason pursuant to the same procedures, and prosecuted in the same court." *Walker*, 2016 WL 361580, at *9. For all of the above reasons, the Court should certify this case under Rule 23(a), (b)(2), and (b)(3), and appoint all Plaintiffs' counsel of record as class counsel under Rule 23(g).

(signatures on following page)

Respectfully submitted this 19th day of July, 2022.

/s/ Ellora Thadaney Israni
Ellora Thadaney Israni*
Ryan Downer*
Jeremy D. Cutting*
CIVIL RIGHTS CORPS
1601 Connecticut Ave. NW, Suite 800
Washington, D.C. 20009
(202) 894-6132
ellora@civilrightscorps.org


/s/ Seth Wayne
Seth Wayne*
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY AND PROTECTION
GEORGETOWN UNIVERSITY LAW CENTER
600 New Jersey Ave. NW
Washington, D.C. 20001
(202) 662-9042
sw1098@georgetown.edu




* *pro hac vice* application forthcoming
† entry of appearance forthcoming

*Counsel for Plaintiffs*

/s/ Edward Williams
Edward Williams (D. Md. Bar 20944)†
Matthew Martens*
Thomas Bredar (D. Md. Bar 21635)†
Ellen Connell*
Donna Farag*
Ayana Williams*
Sonika Data*
Yoseph Desta*
Britany Riley-Swanbeck (D. Md. Bar 21843)†
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
(202) 663-6487
ed.williams@wilmerhale.com
matthew.martens@wilmerhale.com

Robert Boone*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
robert.boone@wilmerhale.com

Timothy Perla*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
timothy.perla@wilmerhale.com


  (*Signed by Edward Williams with the permission of Ellora Thadaney Isrami and Seth Wayne)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION**

|  |  |
|---|---|
| ROBERT FRAZIER, *et al.*, individually and on behalf of a class of similarly situated persons<br><br>                Plaintiffs,<br><br>       v.<br><br>PRINCE GEORGE'S COUNTY, MARYLAND, *et al.*,<br><br>              Defendants. | Case No. <u>8:22-cv-01768-AAQ</u> |

**INDEX OF EXHIBITS TO MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Exhibit 1      Declaration of Robert Frazier

Exhibit 2      Declaration of Jeffrey Campbell

Exhibit 3      Declaration of Anibal Hernandez

Exhibit 4      Declaration of Brandon Ruben

Exhibit 5      Declaration of K.P.

Exhibit 6      Declaration of Christina Meiring

Exhibit 7      Declaration of Maria Hughes

Exhibit 8      Declaration of Christopher Butler

Exhibit 9      Declaration of Allison Heldreth

Exhibit 10    Declaration of Miramba Williams

Exhibit 11    Declaration of Donnell Davis

Exhibit 12    Declaration of Peter Im

Exhibit 13     Declaration of Leslie Sharp

Exhibit 14     Declaration of Elmer Laguan-Salinas

Exhibit 15     Declaration of Adrienne Worthington

Exhibit 16     Email from Andrew Cephas (July 15, 2022)

Exhibit 17     Declaration of Claire Glenn (2020)

Exhibit 18     Letter from Courtwatch PG (July 18, 2022)

Exhibit 19     Pretrial Division Response to Maryland Public Information Act Request (March 2021)

Exhibit 20     Declaration of Jeffrey Logan (May 18, 2020)

Exhibit 21     Case Documents of Miramba Williams

# EXHIBIT 1

## Declaration of Robert Frazier IV

I, Robert Sylvester Frazier IV, solemnly affirm under penalty of perjury and upon personal knowledge that the contents of the foregoing paper are true:

1. I provided the information below in response to a standard set of questions read to me at a meeting with my attorneys on July 14, 2022. On July 15, 2022, I read my declaration and confirmed its accuracy based on my own knowledge and observations. I swore under the penalty of perjury as to the accuracy of that information.

2. My name is Robert Sylvester Frazier IV. I am 40 years old.

3. I live in Washington, DC with my fiancé and my fiancé's four-year-old daughter, who I see as my own.

4. I have lived in the Washington, DC area for my entire life. I have 4 children: daughters that are 24 and 18 years old, a 5-year-old son, and a 30-day-old baby girl who passed away.

5. I have family members in the Prince George's County area, including an elderly uncle in Temple Hills, who I care for in my free time and view as a father figure. My grandmother and oldest daughter live in Washington, DC.

6. I have worked in construction since 2013.

7. I spend my free time with my family. I care for my elderly uncle and spend time with my fiancé's daughter.

8. I was arrested on May 28, 2022 on charges including illegal possession of a firearm, and brought to the Prince George's County Jail.

1

9. At my first bail hearing in this case on May 31, 2022, the judge held me without bond, but gave me a "pretrial option" level 4.[1]

10. I thought that a pretrial option meant I would be released soon. But even after the judge gave me the option, I remained in jail.

11. I learned that my mother had passed away shortly after arriving at the jail. ~~[struck through text]~~
~~[struck through text]~~
Because I was detained, I was not able to see RF her and pay my respects.

12. My mother is being cremated against my wishes. She did not want to be cremated.

13. My public defender asked for a new bail hearing and, which took place about a month after my first hearing. At that second hearing, the judge gave me a pretrial order.

14. I thought that I would be released because of the judge's pretrial order. But it has been almost a month since that second hearing, and still I have not been released.

15. To this date, I have never directly spoken to anyone at the pretrial services agency. I have never received any official notices from the agency.

16. It is not clear to me why the agency is continuing to refuse to release me. One guard told me that the pretrial services agency is generally refusing to release people to make up revenue from the COVID jail releases. Another guard said that the head of the pretrial services agency for some reason does not want me, in particular, released.

17. Since I have been in jail, I have not seen my children because the jail does not allow children to visit. I also have not seen my uncle. My uncle tried to visit me, but the guards would not let him in because they said he came with too many other family members.

---

[1] At the time of my arrest, I had an arrest warrant in Virginia because of a traffic violation.

2

18. The conditions at the jail are harmful to my health and wellbeing.

19. About a month ago, I had a seizure while at the jail. I was taken to the medical unit and put into a room that had feces and water on the floor. The cot in that room was soaked with so much liquid that my clothes were wet from trying to sleep on it. I saw bugs and worms on the cot.

20. I never saw a doctor during or after my seizure. I am afraid of having more seizures while I am here.

21. I am experiencing serious dental problems. I broke my tooth trying to eat a hot dog while in the jail. I have blisters in my mouth that are filled with puss, and it is painful for me to speak. I did not receive the soft food that I need until about two weeks ago. That was after my lawyer and fiancé had been complaining to the jail. I have not seen a dentist.

22. I have felt chest pain and shooting pain at times and am worried about my health.

23. I have not been able to brush my teeth consistently because the guards took my toothbrush away.

24. I have spoken with my lawyer about what it means to be a plaintiff in a class action lawsuit. I want to serve in this role so that nobody suffers from the same injustices that I suffered from ever again.

7/15/22

DATE

Robert Frazier IV

3

# EXHIBIT 2

DocuSign Envelope ID: FDAC04ED-4E80-409E-8E14-82120F5C2E4A

## DECLARATION OF JEFFREY CAMPBELL

I, Jeffrey Campbell, pursuant to 28 U.S.C. § 1746 declare as follows:

1.      I am an Assistant Public Defender for the Maryland Office of the Public Defender ("OPD"). I work in District and Circuit Courts in Prince George's County. I have worked for OPD since September 2019.

2.      As an Assistant Public Defender, among my other duties, I represent indigent clients at bond review hearings in District Court and Circuit Court. In my nearly three years at OPD, I have represented hundreds of clients at bond review hearings.

3.      Through my work, I am familiar with the pretrial detention and release policies and practices of the Prince George's County District Court, the Prince George's County Circuit Court, and the Prince George's County Department of Corrections.

### A. Bond review hearings

4.      In Prince George's County, an individual who is arrested and detained following their initial appearance is entitled under Rule 4-216.1 to a bond review hearing in District Court "immediately" if the District Court is then in session and, if it is not, at the next session of the District Court. In practice this means that the bond review hearing almost always takes place the business day after their initial appearance.

5.      Before the bond review hearing, the Population Management Division of the Prince George's County Department of Corrections ("the Pretrial Division") prepares a "pretrial intake fact sheet" of information including the individual's address, employment situation, criminal history, previous failures to appear for court, and status on parole or probation. The fact sheet is supposed to be provided to the prosecutor, defense counsel, and the judge in advance of the bail review hearing; however, that is not always the case.

1

DocuSign Envelope ID: FDAC04ED-4E80-409E-8E14-82120F5C2E4A

6.      Furthermore, the fact sheets sometimes contain factual errors. One of the most common errors I see is a fact sheet where the Pretrial Division has misstated the offense to which someone previously pleaded guilty, overstating their record. In these cases, the fact sheet contains the most serious charge an individual was previously charged with, rather than the lesser charge they actually pleaded to. For instance, I recently discovered that the fact sheet for a detained client of mine falsely listed him as being previously convicted of robbery, when in fact his conviction in that matter was to a significantly less serious charge. Because defense counsel is regularly provided the Pretrial Division's fact sheets only a few minutes before the bond review hearing, we do not have time to uncover and challenge these errors.

7.      At the conclusion of the bond review hearing, the judge may order the individual released on personal recognizance, issue them an unsecured or secured bond, or order them detained without bond.

**B.  Pretrial options and orders**

8.      Judges are also in the habit of issuing dispositions that they refer to as a "pretrial option" or a "pretrial order" following a bond review hearing. Or a judge may state that they are "authorizing" pretrial release, which in my experience means the same thing as giving the individual a "pretrial option."

9.      In my experience, pretrial options and orders are fairly common. Since March 2020, I have myself represented roughly 86 clients who were issued a pretrial option at their bail review hearing and approximately 22 clients who received a pretrial order at their hearing. I am just one of about a dozen public defenders who represents indigent clients at bail review hearings.

10.      An individual with a pretrial option or pretrial order has been referred for pretrial release by a judge. However, through these options and orders, judges leave the actual decisions

DocuSign Envelope ID: FDAC04ED-4E80-409E-8E14-82120F5C2E4A

of whether, when, and under what conditions a person is released to the discretion of the Pretrial Division. The Division exercises that discretion to delay release of referred individuals for weeks or months, or even to deny it altogether. Even in the case of a pretrial order, where it appears that the judge is ordering an individual's release, the Pretrial Division regularly refuses to release the person.

11.     The practice of judges giving people pretrial options and orders, and thus deferring pretrial release and detention decisions to the Pretrial Division, has been ongoing for as long as I have been at OPD.

**C. The Pretrial Division's opaque and arbitrary decision-making criteria.**

12.     In my experience, when one of my clients receives a pretrial option, the Pretrial Division typically takes weeks or months to make a decision about whether to release them.  There is no hearing on the release decision, and the person being considered is typically not contacted at all during the process. If they are contacted, it is to request an address. The Division generally does not communicate anything about the timing or substance of its decision-making process to my clients as they wait for a decision.

13.     The Pretrial Division does not keep me updated on the status of my client's release consideration either. In my experience, the only way for me to determine if or when my clients will be released and to speed up the Pretrial Division's consideration process is to repeatedly email and call their office. My calls are rarely picked up and my emails are rarely answered. I would estimate that I only receive a response about one-third of the time I reach out. When I do reach someone at the Division, I am often told that the Division has not yet assigned a case manager to my client, or that they have not yet reviewed my client's file.

14.     The Pretrial Division exercises complete control over the release consideration process. The Division determines its own arbitrary criteria to evaluate people with pretrial options or orders for release, and then determines whether each person referred for release meets those criteria. The Division rarely consults the court or the referred individual as it considers someone for release and reaches its final determination.

15.     The Pretrial Division relies on criteria that are often unrelated to the safety of the community or the risk of flight from prosecution. For example, in my experience, the Division routinely declines to release individuals who are unable to identify an address in Prince George's County where they can reside, even if they have a verifiable address nearby in the District of Columbia or Montgomery County and have a way to get from that address to their court appearances.

16.     The Pretrial Division also requires an individual to provide a "verified" address before it will consider them for release. To "verify" an address, the Division requires a copy of the individual's lease or mortgage or similar documentation, and a photo ID for the person my client plans to stay with. Someone from the Division must also speak to that person to confirm that my client can stay with them. The Division's strict adherence to the "verified" address requirement makes it nearly impossible for some of our clients to earn release, despite there being no evidence that they are a threat to public safety or unlikely to return to court. The Division consistently denies release to my unhoused clients, and will not accept a shelter or a group home as a "verifiable" address. For example, a recent client of mine received a pretrial order, but the Division denied release because he was unhoused and was thus determined to have no "verifiable" address. As a result, my client remained detained for months.

4

17.     Another of the Pretrial Division's requirements involves individuals who are charged by civilian complaint, meaning that they were arrested as the result of a complaint filed by a private individual as opposed to a police report. These citizen complaints account for a large chunk of the clients detained pretrial on District-Court-triable (mostly misdemeanor) offenses; I would estimate they make up about half of them, though I have not studied it empirically. In those cases, the Division will not release an individual with a pretrial option or order unless they make contact with the alleged victim—the same person who initiated the charges—and that person does not oppose release. In effect, my client's pretrial release determination is delegated twice: first by the Court to the Division via a pretrial referral, and again by the Division to the alleged victim in the case.

18.     As the Division attempts to contact a complainant, a process which can take weeks, the person referred for release remains detained. In a hearing, Jeffrey Logan, Chief of the Pretrial Division, explained that the Division's "process" is to mail the alleged victim one letter each week for three weeks to seek their feedback on the release decision. Only after completing the entire process without a response do they consider moving forward without the complainant's input.  At that point, nearly a month has passed, at minimum, a period of time during which my clients remain detained.

19.     This "accuser's veto" has significantly delayed the release of several of my clients. For example, in the case of a recent client of mine, it was clear from the court's initial bond review hearing that the judge did not credit the allegations against my client. In my experience, if the allegations against my client were believed, any judge would have held him without bond.  Instead, the judge recognized the weakness of the case by giving my client a pretrial order. Following the hearing, I repeatedly followed up with the Pretrial Division about my client, however they would

DocuSign Envelope ID: FDAC04ED-4E80-409E-8E14-82120F5C2E4A

not tell me anything about their process and refused to release him. It was only when, three weeks later, I was able to obtain a new bond review hearing for my client, and the judge asked the Division representative what was happening, that I received an answer. At the hearing, Mr. Logan explained to the judge that the Division was having difficulty contacting the complainant to solicit her input. None of this had been conveyed to me or my client during the three weeks he had been detained, despite my repeated inquiries. Several days after that hearing, my client was finally released, just under a month after he received the pretrial order.

20.     The Pretrial Division has also frequently refused to release clients of mine who had another pending case in another county or state at the time of their arrest. That information will already have been submitted to the District Court through the Division's intake fact sheet, and is part of the Court's consideration when it chooses to issue a pretrial option or order, yet nevertheless, the Division often denies release to referred individuals on this basis.

21.     I asked the Pretrial Division for the list of criteria by which they determine someone's eligibility for pretrial release. They provided me with a partial list, which includes on it the verifiable address discussed above. Since receiving the list, however, Division staff have justified denying release to several of my clients by referring to new rules or sub-rules that are not on the list they gave me. For example, the purported list of criteria does not include whether someone has another pending case even though, as explained above, that information may play a decisive role in the Division's decision. It often appears to me that the Division's criteria and rules are being invented on the spot to prevent people with pretrial options and orders from being released.

**D.  The Pretrial Division's delayed processing of pretrial options and orders**

22.     Due to the delays described above, I tell each of my clients who receive a pretrial

option that it will take a minimum of three weeks before the Pretrial Division decides whether or

not they will be released, and on what conditions. I tell clients with a pretrial order that we may

get a decision within two weeks, but that there is no guarantee.

23.     The Pretrial Division regularly refuses to release people who have been judicially

referred for pretrial release. The only way I find out that a denial has been made is by continuing

to follow up with the Division.

24.     When the Pretrial Division does provide written notice to the court of its decision

to detain a person despite a pretrial option or order, the notice is not delivered until weeks or

months after the decision has been made. The notice of denied release contains minimal

reasoning—almost always just a checked box. There is no way to appeal the Division's decision;

my only recourse is to seek a new bond review hearing or file a habeas petition.

25.     When weeks have elapsed since my client was referred for release and I still have

not heard anything from the Pretrial Division, I may request a new bond review hearing. In my

motion for a hearing, I typically include a detailed account of my efforts to contact the Pretrial

Division and accelerate their process of considering my client for release.

26.     Some judges do not accept a delay by the Pretrial Division in processing pretrial

options as a change in circumstance justifying a review of the prior order, and will deny that motion

without a hearing.

27.     In the instances where a judge has granted a new bond review hearing based on the

Division's delay, Jeffrey Logan may appear in court on behalf of the Division. In my experience,

the judge usually asks Mr. Logan why the Division's process is taking so long and he typically

DocuSign Envelope ID: FDAC04ED-4E80-409E-8E14-82120F5C2E4A

responds that they are "working on it," without providing additional detail. The judge may encourage him and the Division to "keep working on it," but rarely takes further action. I have never seen or heard of a judge imposing a hard deadline by which the Division must complete its process.

**E.   A typical experience advocating for a client with a pretrial option**

28.     Thus, my typical experience trying to spur the Pretrial Division to release one of my referred clients might look like the following, a brief summary of my efforts in a real case. On October 1, 2021, the court gave my client a pretrial option. That same day, I emailed the statement of charges, verified address where client could stay, and phone number of the person he would stay with to the Pretrial Division and asked for them to confirm receipt.

29.     Ten days later, on October 11, I had not received any response, and I sent a follow up email to Mr. Logan. The following day, I received a call from the alleged victim, who informed me she would like to drop the charges.  I referred her to the State's Attorney's Office. On October 12, Mr. Logan confirmed receipt of my email and documents, but did not provide any substantive response.  On October 14, I again emailed the Pretrial Division asking for a status update.

30.     On October 15, I received a call from Tanya Law at the Pretrial Division asking for the statement of charges. I had already sent the statement of charges two weeks earlier, but I forwarded it once more to Ms. Law.

31.     On October 18, I emailed Ms. Law and Mr. Logan again asking for an update in my client's case. I received no response. The following day, I tried calling Mr. Logan. He picked up, but told me to call back in an hour. When I did, he said he would follow up on the status of my client's case and get back to me.

DocuSign Envelope ID: FDAC04ED-4E80-409E-8E14-82120F5C2E4A

32.     On October 21, I received an email from Ms. Flores at the Division telling me that "home detention is an option, I will look into it once I finish my orders." I was not told how long finishing the orders might take.

33.     On October 26, I called Mr. Logan again and left a voicemail. He did not return my call.

34.     On October 29, a preliminary hearing was held in my client's case. At the hearing, the judge set my client's bond at an amount his family was able to afford. My client was released. He had been authorized for pretrial release for nearly a month, and yet the Pretrial Division still had not informed me of a release decision in his case.  Ultimately, all charges against my client were dismissed.

**F.  Robert Frazier**

35.     One case that illustrates many of these failures is that of my client Robert Frazier.

36.     Mr. Frazier was arrested on May 29, 2022, on charges including illegal possession of a firearm. He was initially represented by one of my OPD colleagues.

37.     The Pretrial Division prepared an Intake Fact Sheet dated May 29 that did not contain any of Mr. Frazier's residence or employment information, noting they had been "unable to interview" him. The fact sheet noted that Mr. Frazier had a detainer out of Virginia. That fact sheet was given to the court in advance of Mr. Frazier's initial bond review hearing.

38.      At Mr. Frazier's first bond review hearing on May 31, the court gave him a pretrial option at level four. Around a week later, Mr. Frazier's attorney filed a bond motion asking the court to set a hearing and grant an unsecured bond. The court denied the motion without a hearing.

39.     I took over Mr. Frazier's case on June 6.

40.    Mr. Frazier's mother died in early June. Because he was detained, Mr. Frazier did not have an opportunity to see his mother before she was put to rest.

41.    On June 15, I filed a bond review motion explaining that the Pretrial Division would not release Mr. Frazier on a level four option because of his detainer, which I had established stemmed from a traffic violation, even though the court knew about the detainer at the time it gave the option. On June 21, the court held a second bond review hearing in Mr. Frazier's case and ordered his release on level four supervision.

42.    I emailed Mr. Logan that same day to ask whether the Pretrial Division would now agree to release Mr. Frazier. Mr. Logan said he would "look into it" and get back to me, "hopefully before COB Wednesday, June 22, 2022."

43.    Mr. Logan did not get back to me. On June 24, I emailed him a second time to ask for an update. Again, Mr. Logan did not respond. On June 27, still having heard nothing, I emailed Mr. Logan a third time asking for an update. He acknowledged receipt, and said he was "reaching back out now."

44.    On June 28, following Mr. Frazier's preliminary hearing, I was heard orally on the issue of bond, and asked the court to release Mr. Frazier on unsecured bond. The court denied my request, and kept in place the pretrial order at level four.

45.    On June 29, I emailed Mr. Logan a fourth time, noting that "it's not fair for Mr. Frazier for pretrial not to make a decision. If you say yes, great. If you say no, that allows me to at least file a habeas. But keeping him in limbo just keeps him in jail longer." Mr. Logan did not respond.

46.     On July 1, I emailed Mr. Logan a fifth time for an update. He responded to say "I forwarded your email chain to both Mr. Gray and Ms. Law earlier this week. I will check with them when I get a chance."

47.     On July 8, I filed a third motion for a bond review hearing. In it, I recounted that I had followed up with Mr. Logan five times and that, three weeks after my client was ordered released, he was still in the jail. That motion has not yet been ruled on.

48.     On July 13, I emailed Mr. Logan a sixth time. He responded to say "I responded back to the judge yesterday." He did not say what exactly he told the judge, and no response to the judge was shared with me. He told me in that email that the court had ordered Mr. Frazier's release "fully aware that had a detainer pending in Virginia," and expressed concern that "if he's signed out by us, on pretrial release, he'll be extradited to Virginia."

49.     On July 14, before my bond review motion was ruled on, the State's Attorney's Office charged the case in Circuit Court, divesting the District Court of jurisdiction. I plan to refile the motion in Circuit Court.

50.     I'm attaching the email chain referenced above to this declaration. *See* Exhibit A.

51.     Over six weeks since Mr. Frazier was first authorized for release, and over three weeks since he was ordered released, he remains in jail. He is dealing with serious medical issues, which he describes to me as including open wounds and ulcers in his mouth, missing and broken teeth, liver pain, and overall feelings of weakness.

52.     Mr. Frazier informs me that he is not getting the soft-food diet that he needs due to his severe dental needs. He further informs me that when he gets foods he cannot eat, he lets the jail staff know. They typically respond by saying things like "my mother has no teeth, and she can eat." CO Guzman called him a "piece of shit."

### G.  Circuit Court

53.     When a felony case (or sometimes, a misdemeanor case) is indicted or charged by information in Circuit Court, the accused person's bond order automatically transfers from the District Court to the Circuit Court. A client who is still detained at that point may then seek a subsequent bond review hearing in the Circuit Court.

54.     Pretrial options and orders work in largely the same fashion in Circuit Court as they do in District Court. At bond review hearings, Circuit Court judges may issue the same pretrial options or pretrial orders to refer my clients to the Pretrial Division.

55.     In my experience, the Pretrial Division treats pretrial options or pretrial orders from Circuit Court judges the same way it treats pretrial options or pretrial orders from District Court Judges. That is to say, the Division delays release of these referred individuals for weeks or months, and regularly denies release altogether based on arbitrary and opaque criteria.


I declare under penalty of perjury that this declaration is true and correct.


Executed on    7/15/2022
                _____.

DocuSigned by:

*Jeffrey Campbell*
B79CDD024B4E48F...

Jeffrey Campbell

12

# EXHIBIT A

DocuSign Envelope ID: FDAC04ED-4E80-409E-8E14-82120F5C2E4A

                                            **Cody Cutting <cody@civilrightscorps.org>**

---

## Fwd: Robert Frazier: mother's funeral arrangements

**Jeff Campbell** <jeffreyj.campbell@maryland.gov>                    Thu, Jul 14, 2022 at 11:47 AM
To: Cody Cutting <cody@civilrightscorps.org>

---------- Forwarded message ---------
From: **Jeff Campbell** <jeffreyj.campbell@maryland.gov>
Date: Wed, Jul 13, 2022 at 12:46 PM
Subject: Re: Robert Frazier: mother's funeral arrangements
To: Logan, Jeffrey E. <JELogan@co.pg.md.us>

Right.  So did you tell the Judge you won't release him, or you will, or something else?

On Wed, Jul 13, 2022 at 12:38 PM Logan, Jeffrey E. <JELogan@co.pg.md.us> wrote:

> I responded back to the judge yesterday.  The judge Court-Ordered the defendant fully aware that he had a detainer
> pending in Virginia; however, if he's signed out by us, on pretrial release, he'll be extradited to Virginia.
>
>
>
> Thanks,
>
>
> Jeff
>
> ---
>
> **From:** Jeff Campbell <jeffreyj.campbell@maryland.gov>
> **Sent:** Wednesday, July 13, 2022 10:53 AM
> **To:** Logan, Jeffrey E. <JELogan@co.pg.md.us>
> **Subject:** Re: Robert Frazier: mother's funeral arrangements
>
> ┌─────────────────────────────────────────────────────────────────────────────┐
> │ **CAUTION:** This email originated from an external email domain which carries the additional risk that it may be a │
> │ phishing email and/or contain malware.                                        │
> └─────────────────────────────────────────────────────────────────────────────┘
>
> Good morning, following up once again.  I'm at my wit's end here.
>
> On Fri, Jul 1, 2022 at 10:52 AM Logan, Jeffrey E. <JELogan@co.pg.md.us> wrote:
>
>> Good Morning .
>>
>> I forwarded your email chain to both Mr. Gray and Ms. Law earlier this week..   I will check with them when I get a
>> chance.

DocuSign Envelope ID: FDAC04ED-4E80-409E-8E14-82120F5C2E4A

Thanks,

Jeff

---

**From:** Jeff Campbell <jeffreyj.campbell@maryland.gov>
**Sent:** Friday, July 1, 2022 8:31 AM
**To:** Logan, Jeffrey E. <JELogan@co.pg.md.us>
**Subject:** Re: Robert Frazier: mother's funeral arrangements

> **CAUTION:** This email originated from an external email domain which carries the additional risk that it may be a
> phishing email and/or contain malware.

Good morning,

I'm following up on this again.

On Wed, Jun 29, 2022 at 11:59 AM Jeff Campbell <jeffreyj.campbell@maryland.gov> wrote:

> What is the decision?  I'm sorry to keep bothering you about this, but it's not fair for Mr. Frazier for
> pretrial not to make a decision.  If you say yes, great.  If you say no, that allows me to at least file a
> habeas.  But keeping him in limbo just keeps him in jail longer.

> On Mon, Jun 27, 2022 at 12:04 PM Logan, Jeffrey E. <JELogan@co.pg.md.us> wrote:

>> Received.

>> I'm reaching back out now.

>> Thanks,

>> Jeff

>> ---

>> **From:** Jeff Campbell <jeffreyj.campbell@maryland.gov>
>> **Sent:** Monday, June 27, 2022 11:31 AM

**To:** Logan, Jeffrey E. <JELogan@co.pg.md.us>
**Subject:** Re: Robert Frazier: mother's funeral arrangements

---

> **CAUTION:** This email originated from an external email domain which carries the additional risk that it may be a phishing email and/or contain malware.

---

Good morning,

Following up again about Mr. Frazier.  You were hoping to have an answer by last Wednesday?

On Fri, Jun 24, 2022 at 9:54 AM Jeff Campbell <jeffreyj.campbell@maryland.gov> wrote:

> What's the update?

> On Wed, Jun 22, 2022 at 10:18 AM Logan, Jeffrey E. <JELogan@co.pg.md.us> wrote:

>> Good Morning.  I'll look into it and get back to you hopefully before COB Wednesday, June 22, 2022.

>> ---

>> **From:** Jeff Campbell <jeffreyj.campbell@maryland.gov>
>> **Sent:** Tuesday, June 21, 2022 7:19 PM
>> **To:** Logan, Jeffrey E. <JELogan@co.pg.md.us>
>> **Subject:** Re: Robert Frazier: mother's funeral arrangements

>> ---

>> > **CAUTION:** This email originated from an external email domain which carries the additional risk that it may be a phishing email and/or contain malware.

>> ---

>> Good evening,

>> Today Judge Clark-Edwards heard a bond review in this case and changed Mr. Frazier's status to a level 4 <u>order</u>.  Will he be released to the detainer or will pretrial still refuse to release?

>> On Tue, Jun 7, 2022 at 9:38 AM Jeff Campbell <jeffreyj.campbell@maryland.gov> wrote:

>>> These are the search results for Robert Frazier in Arlington County.  None of these people are my client.

>>> *Arlington General District Court*

DocuSign Envelope ID: FDAC04ED-4E80-409E-8E14-82120F5C2E4A

[ ]

Case #: **GT18011490-00**

Defendant: **FRAZIER, DARRAN ROBERT**

Offense Date: **04/05/2018**

Hearing: **06/07/2018**

Charge: **IMPROPER PASSING ON RIGHT**

Code Section: **46.2-841**

*Arlington General District Court*

[ ]

Case #: **GT12053250-00**

Defendant: **FRAZIER, ROBERT ELVERT**

Offense Date: **12/03/2012**

Hearing: **06/27/2013**

Amended Charge: **NO VALID OL**

Amended Code Section: **46.2-300**

*Arlington General District Court*

[ ]

Case #: **GT19008736-00**

Defendant: **FRAZIER, ROBERT LAWSON**

Offense Date: **02/24/2019**

Hearing: **03/27/2019**

Charge: **44/25 SPEED**

Code Section: **G.46.2-878**

*Arlington General District Court*

[ ]

Case #: **GT20018810-00**

Defendant: **FRAZIER, ROBERT TUCKER**

Offense Date: **05/30/2020**

Hearing: **07/24/2020**

Charge: **64/45 SPEED**

Code Section: **G.46.2-878**

On Mon, Jun 6, 2022 at 4:46 PM Logan, Jeffrey E. <JELogan@co.pg.md.us> wrote:

> Good Evening,
>
> Please call me first thing tomorrow.
>
> Thanks,
>
> Jeff
>
> ---
>
> **From:** Jeff Campbell <jeffreyj.campbell@maryland.gov>
> **Sent:** Monday, June 6, 2022 4:25 PM
> **To:** Logan, Jeffrey E. <JELogan@co.pg.md.us>
> **Subject:** Robert Frazier: mother's funeral arrangements
>
> > **CAUTION:** This email originated from an external email domain which carries the additional risk that it may be a phishing email and/or contain malware.
>
> Good afternoon,
>
> Please see the attached order, Judge Heffron has ordered OPD to contact you to arrange a private viewing for Mr. Frazier to be able to pay his respects to his deceased mother. Please let me know what information you need to set that up.
>
> Thanks,
>
> **Jeff Campbell**
>
> Assistant Public Defender
>
> Prince George's County
>
> 14735 Main Street, Suite 272B
>
> Upper Marlboro, MD 20772

(301) 327-0717 (cell)

he/him/his

*CONFIDENTIALITY NOTICE: This message and any accompanying files contain information belonging to the sender which may be confidential and legally privileged. This information is for the sole use of the intended recipient(s). If you are not the intended recipient, any disclosure, copying, distribution, or action taken in reliance on the contents of the information contained in this message and any accompanying files is strictly prohibited. If you have received this message in error, please contact the sender immediately and delete the message. Thank you.*

This E-mail and any of its attachments may contain Prince George's County Government or Prince George's County 7th Judicial Circuit Court proprietary information or Protected Health Information, which is privileged and confidential. This E-mail is intended solely for the use of the individual or entity to which it is addressed. If you are not the intended recipient of this E-mail, you are hereby notified that any dissemination, distribution, copying, or action taken in relation to the contents of and attachments to this E-mail is strictly prohibited by federal law and may expose you to civil and/or criminal penalties. If you have received this E-mail in error, please notify the sender immediately and permanently delete the original and any copy of this E-mail and any printout.

*CONFIDENTIALITY NOTICE: This message and any accompanying files contain information belonging to the sender which may be confidential and legally privileged. This information is for the sole use of the intended recipient(s). If you are not the intended recipient, any disclosure, copying, distribution, or action taken in reliance on the contents of the information contained in this message and any accompanying files is strictly prohibited. If you have received this message in error, please contact the sender immediately and delete the message. Thank you.*

This E-mail and any of its attachments may contain Prince George's County Government or Prince George's County 7th Judicial Circuit Court proprietary information or Protected Health Information, which is privileged and confidential. This E-mail is intended solely for the use of the individual or entity to which it is addressed. If you are not the intended recipient of this E-mail, you are hereby notified that any dissemination, distribution, copying, or action taken in relation to the contents of and attachments to this E-mail is strictly prohibited by federal law and may expose you to civil and/or criminal penalties. If you have received this E-mail in error, please notify the sender immediately and permanently delete the original and any copy of this E-mail and any printout.

*CONFIDENTIALITY NOTICE: This message and any accompanying files contain information belonging to the sender which may be confidential and legally privileged. This information is for the sole use of the intended recipient(s). If you are not the intended recipient, any disclosure, copying, distribution, or action taken in reliance on the contents of the information contained in this message and any accompanying files is strictly prohibited. If you have received this message in error, please contact the sender immediately and delete the message. Thank you.*

This E-mail and any of its attachments may contain Prince George's County Government or Prince George's County 7th Judicial Circuit Court proprietary information or Protected Health Information, which is privileged and confidential. This E-mail is intended solely for the use of the individual or entity to which it is addressed. If you are not the intended recipient of this E-mail, you are hereby notified that any dissemination, distribution, copying, or action taken in relation to the contents of and attachments to this E-mail is strictly prohibited by federal law and may expose you to civil and/or criminal penalties. If you have received this E-mail in error, please notify the sender immediately and permanently delete the original and any copy of this E-mail and any printout.

*CONFIDENTIALITY NOTICE: This message and any accompanying files contain information belonging to the sender which may be confidential and legally privileged. This information is for the sole use of the intended recipient(s). If you are not the intended recipient, any disclosure, copying, distribution, or action taken in reliance on the contents of the information contained in this message and any accompanying files is strictly prohibited. If you have received this message in error, please contact the sender immediately and delete the message. Thank you.*

This E-mail and any of its attachments may contain Prince George's County Government or Prince George's County 7th Judicial Circuit Court proprietary information or Protected Health Information, which is privileged and confidential. This E-mail is intended solely for the use of the individual or entity to which it is addressed. If you are not the intended recipient of this E-mail, you are hereby notified that any dissemination, distribution, copying, or action taken in relation to the contents of and attachments to this E-mail is strictly prohibited by federal law and may expose you to civil and/or criminal penalties. If you have received this E-mail in error, please notify the sender immediately and permanently delete the original and any copy of this E-mail and any printout.

CONFIDENTIALITY NOTICE: This message and any accompanying files contain information belonging to the sender which may be confidential and legally privileged. This information is for the sole use of the intended recipient(s). If you are not the intended recipient, any disclosure, copying, distribution, or action taken in reliance on the contents of the information contained in this message and any accompanying files is strictly prohibited. If you have received this message in error, please contact the sender immediately and delete the message. Thank you.

This E-mail and any of its attachments may contain Prince George's County Government or Prince George's County 7th Judicial Circuit Court proprietary information or Protected Health Information, which is privileged and confidential. This E-mail is intended solely for the use of the individual or entity to which it is addressed. If you are not the intended recipient of this E-mail, you are hereby notified that any dissemination, distribution, copying, or action taken in relation to the contents of and attachments to this E-mail is strictly prohibited by federal law and may expose you to civil and/or criminal penalties. If you have received this E-mail in error, please notify the sender immediately and permanently delete the original and any copy of this E-mail and any printout.

CONFIDENTIALITY NOTICE: This message and any accompanying files contain information belonging to the sender which may be confidential and legally privileged. This information is for the sole use of the intended recipient(s). If you are not the intended recipient, any disclosure, copying, distribution, or action taken in reliance on the contents of the information contained in this message and any accompanying files is strictly prohibited. If you have received this message in error, please contact the sender immediately and delete the message. Thank you.

# EXHIBIT 3

### Declaration of Anibal Hernandez

I, Anibal Erick Hernandez, Jr. solemnly affirm under penalty of perjury and upon personal knowledge that the contents of the foregoing paper are true:

1.  I provided the information below in response to a standard set of questions read to me in person by my attorneys on July 7, 2022.  On July 12, 2022, I read my declaration and confirmed its accuracy based on my own knowledge and observations.  I swore under the penalty of perjury as to the accuracy of that information.

2.  My name is Anibal Erick Hernandez, Jr.  I am 29 years old.

3.  I was born in Los Angeles, California, but have lived in Maryland since around 2002.

4.  I live in Hyattsville, Maryland with my mom, dad, wife, brother, my brother's wife, and my one-year-old daughter.

5.  I worked in construction for two years before I was arrested, and before that I worked for three years at a recycling plant called Smith & Sons.

6.  I was arrested on June 23, 2022 on charges of drug possession and possession of a handgun.

7.  On June 24, 2022, I had my bail review hearing before Judge LaKeecia Allen. Judge Allen gave me a pretrial order at level 4.

8.  I understood that "pretrial order" to mean that the Judge had ordered me released to home detention and that I would be released soon after the hearing.  As of the date of this declaration, Pretrial has not said anything to me about when I will be released.

9. After my bail review hearing, I thought that I was going to spend a few nights at the Jail and that I would be released, but it has already been more than two weeks.

10. I was told that I could not be released back to the house where my family lives because of my case, but I do not have anywhere else to go. I do not understand why I cannot be released back to the house where my family lives.

11. My family has called Pretrial to try to find out when I will be released and my family was told that Pretrial does not know why I am still here.

12. At the Jail, I do not get enough to eat and I have not been able to see my family.

13. In my free time, I enjoy spending time with my family and look forward to doing that when I am released.


7-12-22
_____
DATE


_Anibal Erick Hernandez, Jr._
Anibal Erick Hernandez, Jr.

# EXHIBIT 4

DocuSign Envelope ID: 11460686-EF78-4D38-A520-6F3C859ED7D4

## DECLARATION OF BRANDON RUBEN

I, Brandon Ruben, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am an Assistant Public Defender for the Maryland Office of the Public Defender ("OPD"). I have worked for OPD since August 2019.

2. As an Assistant Public Defender, among other duties, I represent indigent clients at bail review hearings in Prince George's County District and Circuit Courts. During my time at OPD, I have represented hundreds of clients at initial and follow-up bail review hearings.

3. Through my work, I am familiar with the pretrial detention and release policies and practices of Prince George's County District Court, Prince George's County Circuit Court, and Prince George's County Department of Corrections.

**Pretrial Detention and Release**

4. The first time that people arrested in Prince George's County appear in front of a judge is at their bail review hearing. Bail review hearings are also the first point in a criminal case when people who qualify as indigent receive the assistance of an OPD attorney such as myself. At the conclusion of the bail review hearing, the judge decides whether to release on recognizance, set an unsecured or secured bond (payable at 10% or 100%), impose non-financial release conditions, or hold without bond.

5. In addition, the judge often imposes a "pretrial order" or grants a "pretrial option." Pretrial orders and options authorize the Prince George's County Department of Corrections Population Management Division ("the Pretrial Division") to release the arrested person, but do not cause the person to be released immediately. Instead, pretrial orders and options delegate the judge's discretion regarding whether, when, and on what conditions to release the person to the

DocuSign Envelope ID: 11460686-EF78-4D38-A520-6F3C859ED7D4

Pretrial Division, which in turn has ultimate discretion and decision-making authority over the matter.

6. Judges have been giving pretrial orders and options for as long as I have worked at OPD. I have represented hundreds of clients who have been given pretrial orders or options.

7. Very often, these clients are never released or remain detained for weeks or months following their bail review hearing. This is true even where a judge <u>orders</u> the Pretrial Division to release a client, as opposed to merely granting the Pretrial Division the option do so. During these weeks or months, I regularly follow up with the Pretrial Division and try to aid in the person's release. But the Pretrial Division rarely offers substantive responses to my messages.

8. Sometimes, the Pretrial Division will inform the court weeks or months after the bail review hearing that it has decided not to release a person who has been given a pretrial order or option. Sometimes the Pretrial Division will provide a reason. But often, the Division does not release my clients or even inform them or me definitively that they will not be released. My clients then remain detained pretrial until their criminal matter is resolved, even where the Judge has ordered them released

9. When my clients receive pretrial orders and options, it is my practice to immediately email Jeffrey Logan and inform him that the order or option has been given. In those emails, I include the Statement of Charges, Pretrial Intake Fact Sheet, and any information I have that might facilitate the client's release—for example, the phone number of a family member who can verify my client's address. Mr. Logan acknowledges my emails, but I rarely receive substantive responses.

**Anibal Hernandez**

10.     For example, I represented Anibal Hernandez at his bail review hearing on Friday, June 24, 2022. At the hearing, Judge LaKeecia Allen <u>ordered</u> the Pretrial Division to release Mr. Henandez at any level of supervision. Judge Allen also imposed several conditions of pretrial release, including that Mr. Hernandez live at a verifiable address and not own any weapons.

11.     After the hearing, I emailed Mr. Logan and provided Mr. Hernandez's statement of charges and intake fact sheet. The fact sheet stated, among other things, that Mr. Hernandez has never failed to appear in court, and that his criminal history is brief and dated. I also provided phone numbers for Mr. Hernandez's mother and girlfriend. Mr. Logan acknowledged that day that he had received my email, but did not respond substantively.

12.     I emailed Mr. Logan again the following Monday, June 27 and inquired into Mr. Hernandez's release. Mr. Logan responded and asked if I had heard from Tanya Law. I responded that I had not. Again, I received no substantive response.

13.     That Friday, July 1, I followed up a third time with Mr. Logan about Mr. Hernandez's case. Mr. Logan responded that he had forwarded my emails to Kenneth Gray and Tanya Law, two other officials in the Pretrial Division.

14.     I emailed Mr. Logan again on Wednesday, July 6 asking for an update on Mr. Hernandez's release. Mr. Logan responded that he would try to provide one, but one never came.

15.     I emailed Mr. Logan a fifth time on Friday, July 8 and again asked for an update on Mr. Hernandez's case. Mr. Logan responded that he would look into it and get back to me, but he never did. I emailed Mr. Logan on Monday, July 11 and requested a response to my prior message. Mr. Logan did not respond.

16.     I emailed Mr. Logan a sixth time on Tuesday, July 12 and again asked for an update on Mr. Hernandez's case.

17.     Also on July 12, I filed a request for show cause and for contempt on Mr. Hernandez's behalf against the Pretrial Division for the agency's failure to comply with Judge Allen's release order of June 24, 2022. A copy of that motion, which attaches my e-mail correspondence with Mr. Logan, is attached to this declaration as Exhibit A.

18.     The following day, July 13, 2022, I received an email from Mr. Logan informing me that the Division had found Mr. Hernandez ineligible for pretrial release. Mr. Logan also stated that he thought someone in his office had already informed me of this.

19.     Mr. Logan attached a Memorandum to his email. The Memorandum is a form notice used by the Pretrial Division, which lists a number of reasons why the Division might refuse to release someone. For Mr. Hernandez, the "No Verifiable Address" box was checked.

20.     I do not know what efforts the Division has made to verify an address for Mr. Hernandez. I do not know if they ever contacted his mother and girlfriend, whose contact information I provided them the day that the Court ordered him released.

21.     My show cause and contempt motion was also denied on July 13.

22.     Judge Allen <u>ordered</u> Mr. Hernandez's release at any level 20 days ago. As of today, he remains detained at the Prince George's County Jail.


I declare under penalty of perjury that this declaration is true and correct.


Executed on ___7/14/2022_____.

DocuSigned by:

*Brandon P. Ruben*

AF87C27F65734A8...

Brandon Ruben

4

# EXHIBIT A

**IN THE DISTRICT COURT OF MARYLAND**
**FOR PRINCE GEORGE'S COUNTY**

| | | |
|---|---|---|
| **STATE OF MARYLAND** | 2022 JUL 12  P 4: 04 | |
| | : | |
| **V.** | : | **5E00715391** |
| | : | |
| **ANIBAL ERICK HERNANDEZ JR.** | : | |

**REQUEST FOR SHOW CAUSE ORDER FOR CONTEMPT**
**PURSUANT TO MD. R. SPEC. P. 15-206**

       COMES NOW defendant Anibal Erick Hernandez Jr., by and through counsel, requests that this Honorable Court require Mary Lou McDonough, Director of the Prince George's County Department of Corrections, appear in Court and show cause why the Court should not find her in constructive civil contempt of the Court's order of June 24, 2022, which required that Mr. Hernandez be released under the supervision of the Pre-Trial Supervision Unit at Levels IV. In support whereof, Mr. Hernandez states as follows:

1. Mr. Hernandez is charged with possession with intent to distribute, possession of marijuana, possession of a firearm in relation to a drug trafficking crime, and other related drug charges. At Mr. Hernandez's initial bond hearing on June 24, 2022, the Honorable Judge Lakeisha Allen presiding, the Court ordered Mr. Hernandez be released on under the supervision of the Pre-Trial Supervision Unit at level IV.

2. On June 24, undersigned counsel sent an email to Jeffrey E. Logan, a Pre-Trial officer, informing him that the court had ordered pretrial release for Mr. Hernandez. *See* Ex. A. Undersigned counsel received an acknowledgment of the email but was provided no information as to whether Mr. Hernandez would be released.

3. Undersigned counsel proceeded to follow-up with Jeffrey E. Logan five more times. *See* Ex. A. (noting follow-up emails on June 27, 2022, July 1, 2022, July 6, 2022, July 8, 2022, and July 12, 2022).

4. To the date of this filing, Jeffrey E. Logan has not provided any information as to Mr. Hernandez's release status, aside from forwarding information to other Pretrial colleagues.

5. As of the date of this filing, Mr. Hernandez is still detained and has been detained for **19 days** after pretrial was ordered to release him.

6. The Pre-Trial Supervision Unit has been on actual notice of Judge Allen's order of June 24 since June 24, when it received undersigned counsel's email. Despite having actual knowledge of the order, the officials in the Unit have failed to comply.

7.  The Pretrial Supervision Unit is part of the Community Supervision Section in the Population Management Division of the Prince George's County Department of Corrections' Bureau of Operations. Corenne Labbé is the Acting Director of the Department of Corrections.

WHEREFORE, Mr. Hernandez asks the Court to require Corenne Labbé to appear in Court and show cause why the Court should not find her in constructive civil contempt of the Court's order of June 24, 2022, requiring that Mr. Hernandez be released on pretrial supervision.

Respectfully Submitted,


/s/ *Brandon Ruben*
Brandon Ruben, Esq.
Assistant Public Defender
4990 Rhode Island Avenue, Room 345
Hyattsville, MD 20781
(240) 324-6371
Brandon.ruben@maryland.gov

2

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of July, 2022, a copy of the foregoing motion

was delivered, via fax, on July 12, 2022, to:

Mary Lou McDonough
Director
Prince George's County Department of Corrections
13400 Dille Drive
Upper Marlboro, MD 20772
301-952-7159 (fax)

                                    /s/ Brandon Ruben
                                    Brandon Ruben, Esq.
                                    Assistant Public Defender
                                    4990 Rhode Island Avenue, Room 345
                                    Hyattsville, MD 20781
                                    (240) 324-6371
                                    Brandon.ruben@maryland.gov

3

## IN THE DISTRICT COURT OF MARYLAND
### FOR PRINCE GEORGE'S COUNTY

| | | |
|---|---|---|
| **STATE OF MARYLAND** | 2022 JUL 12 ꞮP 4 04 : | |
| **V.** | : | **5E00715391** |
| | : | |
| **ANIBAL ERICK HERNANDEZ JR.** | : | |

### SHOW CAUSE ORDER FOR CONTEMPT

UPON CONSIDERATION of the foregoing request for a show cause order,

IT IS HEREBY ORDERED that

Mary Lou McDonough
Director
Prince George's County Department of Corrections
13400 Dille Drive
Upper Marlboro, MD 20772

appear in person before this Court at _____

to show cause why this Court should not find her in constructive civil contempt of the Court's

order of June 24, 2022, which required that defendant Anibal Hernandez be released under the

supervision of the Pre-Trial Supervision Unit at Level IV.

A copy of this Request for a Show Cause Order and this Order shall be served on

Corenne Labbé on or before _____.

This _____ day of July, 2022.

_____
JUDGE

**NOTICE** If you fail to appear, an order may be issued resulting in your arrest and you may be
found in contempt of court.

4



**Maryland**

BRANDON RUBEN -OPD- <brandon.ruben@maryland.gov>

---

## Pretrial Ordered Any Level: Hernandez, 5E00715391

15 messages

*2022 JUL 12 P 4 09*

**BRANDON RUBEN -OPD-** <brandon.ruben@maryland.gov>      Fri, Jun 24, 2022 at 2:35 PM
To: "Logan, Jeffrey E." <JELogan@co.pg.md.us>

Mr. Logan:

Judge Allen today **ordered** Mr. Hernandez released at any level in 5E00715391. I attach the SOC and pretrial sheet.

His girlfriend is reached at (240) 743-6873 and his mom is reached at (240) 476-5846.

Please let me know if I might provide any further information.

Thank you,

Brandon Ruben
Assistant Public Defender
Maryland Office of the Public Defender
Prince George's County, District V
(240) 324-6371

---

**2 attachments**

📄 **Hernandez_SOC.pdf**
645K

📄 **Hernandez_Pretrial.pdf**
31K

---

**Logan, Jeffrey E.** <JELogan@co.pg.md.us>      Fri, Jun 24, 2022 at 4:07 PM
To: BRANDON RUBEN -OPD- <brandon.ruben@maryland.gov>

Received and thank you.

---

**From:** BRANDON RUBEN -OPD- <brandon.ruben@maryland.gov>
**Sent:** Friday, June 24, 2022 2:36 PM
**To:** Logan, Jeffrey E. <JELogan@co.pg.md.us>
**Subject:** Pretrial Ordered Any Level: Hernandez, 5E00715391

---

**CAUTION:** This email originated from an external email domain which carries the additional risk that it may be a phishing email and/or contain malware.

[Quoted text hidden]

*CONFIDENTIALITY NOTICE: This message and any accompanying files contain information belonging to the sender which may be confidential and legally privileged. This information is for the sole use of the intended recipient(s). If you are not the intended recipient, any disclosure, copying, distribution, or action taken in reliance on the contents of the information contained in this message and any accompanying files is strictly prohibited. If you have received this message in error, please contact the sender immediately and delete the message. Thank you.*

This E-mail and any of its attachments may contain Prince George's County Government or Prince George's County 7th Judicial Circuit Court proprietary information or Protected Health Information, which is privileged and confidential. This E-mail is intended solely for the use of the individual or entity to which it is addressed. If you are not the intended recipient of this E-mail, you are hereby notified that any dissemination, distribution, copying, or action taken in relation to the contents of and attachments to this E-mail is strictly prohibited by federal law and may expose you to civil and/or criminal penalties. If you have received this E-mail in error, please notify the sender immediately and permanently delete the original and any copy of this E-mail and any printout.

**BRANDON RUBEN -OPD-** <brandon.ruben@maryland.gov>                    Mon, Jun 27, 2022 at 2:58 PM
To: "Logan, Jeffrey E." <JELogan@co.md.us>

Morning, Jeff. Just circling back to check-in on Mr. Hernandez's release.

Brandon Ruben
Assistant Public Defender
Maryland Office of the Public Defender
Prince George's County, District V
(240) 324-6371

[Quoted text hidden]

**Logan, Jeffrey E.** <JELogan@co.pg.md.us>                    Mon, Jun 27, 2022 at 3:17 PM
To: BRANDON RUBEN -OPD- <brandon.ruben@maryland.gov>

Hi back. Did Ms. Law ever send you a response? I guess my interrogatory is rhetorical if you're reaching out to me.

[Quoted text hidden]
[Quoted text hidden]

**BRANDON RUBEN -OPD-** <brandon.ruben@maryland.gov>                    Mon, Jun 27, 2022 at 3:20 PM
To: "Logan, Jeffrey E." <JELogan@co.pg.md.us>

She hasn't yet.

Brandon Ruben
Assistant Public Defender
Maryland Office of the Public Defender
Prince George's County, District V
(240) 324-6371

[Quoted text hidden]

**Logan, Jeffrey E.** <JELogan@co.pg.md.us>                    Mon, Jun 27, 2022 at 3:35 PM
To: BRANDON RUBEN -OPD- <brandon.ruben@maryland.gov>

Gotcha...

[Quoted text hidden]
[Quoted text hidden]

---

**BRANDON RUBEN -OPD-** <brandon.ruben@maryland.gov>                    Fri, Jul 1, 2022 at 2:10 PM
To: "Logan, Jeffrey E." <JELogan@co.pg.md.us>

Jeff:

Hope you're well. Just following up on Mr. Hernandez's release at any level.

Thanks so much,

Brandon Ruben
Assistant Public Defender
Maryland Office of the Public Defender
Prince George's County, District V
(240) 324-6371

[Quoted text hidden]

---

**Logan, Jeffrey E.** <JELogan@co.pg.md.us>                    Fri, Jul 1, 2022 at 2:14 PM
To: BRANDON RUBEN -OPD- <brandon.ruben@maryland.gov>

Wishing the same for you too.

I've submitted your previous emails to Mr. Gray and Ms. Law.

I'll check again after bond hearing.

[Quoted text hidden]
[Quoted text hidden]

---

**BRANDON RUBEN -OPD-** <brandon.ruben@maryland.gov>                    Fri, Jul 1, 2022 at 2:14 PM
To: "Logan, Jeffrey E." <JELogan@co.pg.md.us>

Thank you sir.

Brandon Ruben
Assistant Public Defender
Maryland Office of the Public Defender
Prince George's County, District V
(240) 324-6371

[Quoted text hidden]

---

**BRANDON RUBEN -OPD-** <brandon.ruben@maryland.gov>                    Wed, Jul 6, 2022 at 8:40 AM
To: "Logan, Jeffrey E." <JELogan@co.pg.md.us>

Jeff:

Just checking in on Mr. Hernandez.

Thank you,

Brandon Ruben
Assistant Public Defender
Maryland Office of the Public Defender
Prince George's County, District V
(240) 324-6371

[Quoted text hidden]

---

**Logan, Jeffrey E.** <JELogan@co.pg.md.us>                    Wed, Jul 6, 2022 at 11:41 AM
To: BRANDON RUBEN -OPD- <brandon.ruben@maryland.gov>

Good Morning to you Brandon.  I'll try to check in on your client's status and provide you with some feedback.


Thanks,


Jeff

[Quoted text hidden]
[Quoted text hidden]

---

**BRANDON RUBEN -OPD-** <brandon.ruben@maryland.gov>          Fri, Jul 8, 2022 at 11:04 AM
To: "Logan, Jeffrey E." <JELogan@co.pg.md.us>

Mr. Logan:

Thank you. I am circling back to check on Mr. Hernandez's release status. He was ordered released on 6/24. Do you know when that order will be effectuated and if not why not?

Thank you,

Brandon Ruben
Assistant Public Defender
Maryland Office of the Public Defender
Prince George's County, District V
(240) 324-6371

[Quoted text hidden]

---

**Logan, Jeffrey E.** <JELogan@co.pg.md.us>                    Fri, Jul 8, 2022 at 11:27 AM
To: BRANDON RUBEN -OPD- <brandon.ruben@maryland.gov>


Good morning again.

I've sent a request to Home Detention for an update. I'll let you know what status I receive.

[Quoted text hidden]
[Quoted text hidden]

---

**BRANDON RUBEN -OPD-** <brandon.ruben@maryland.gov>
To: "Logan, Jeffrey E." <JELogan@co.pg.md.us>

Mon, Jul 11, 2022 at 9:35 AM

Thanks, Jeff. Looking forward to hearing.

Brandon Ruben
Assistant Public Defender
Maryland Office of the Public Defender
Prince George's County, District V
(240) 324-6371

[Quoted text hidden]

---

**BRANDON RUBEN -OPD-** <brandon.ruben@maryland.gov>
To: "Logan, Jeffrey E." <JELogan@co.pg.md.us>

Tue, Jul 12, 2022 at 9:20 AM

Jeff:

I hope you are well. I'm circling back for an update on Mr. Hernandez. The Court ordered him released on 6/24.

Thanks so much,

Brandon Ruben
Assistant Public Defender
Maryland Office of the Public Defender
Prince George's County, District V
(240) 324-6371

[Quoted text hidden]

# EXHIBIT 5

DocuSign Envelope ID: E8ECCA7E-7AEB-49F7-BAAC-E48DEA6A1B78

## DECLARATION OF K.P.

I, K.P., pursuant to 28 U.S.C. § 1746, declare as follows:

1.      My name is K.P.. I am 36 years old.

2.      I was born in Washington, D.C. I attended D.C. public schools through high school. After high school I moved to Prince George's County, Maryland, where I have lived ever since.

3.      I live in Oxon Hill, Maryland with my 7-year-old twin daughters and 16-year-old son. My daughters just finished 1st grade. My son is finishing 10th grade. I am a single mother.

4.      I work as an Administrative Assistant for the George Washington University Hospital Outpatient Center. I have held that job for approximately one year and two months. I work Monday through Friday, 8 A.M. to 5 P.M. Because I do not own a car, I use public transit and ridesharing to get to and from work, and to drop off and pick up my children from school.

5.      My father, brothers, aunt, and cousins all live in the District of Columbia or Prince George's County. My children and I are close to my family. We often all gather on weekends.

6.      My son D.P. was born in Washington, D.C. in 2005. He came home to Prince George's County and has lived here with me for his entire life. He likes to read books and play video games. His favorite foods are chicken and pizza. His favorite color is red. He helps me around the house; he walks our dog, takes out the trash, and babysits his sisters for me.

7.      D.P. was arrested on Thursday, June 16, 2022 at school. I was surprised, as D.P. has never been in trouble before. He had never been arrested or convicted of any crime.

8.      D.P. did not appear in front of a judge until the following Tuesday, June 21. I attended this hearing via Zoom. At that hearing, D.P.'s public defender told the court that he has no criminal record. I heard the judge gave D.P. a "pretrial option." I thought that meant that someone from the pretrial services agency would reach out to me, and that D.P. would soon be released.

9.      But more than 3 weeks later, my baby remains in jail. I do not know if or when he will be released, or why he is still in jail. To this date, no one from the pretrial services agency has even spoken to me or my son.

10.     D.P.'s lawyer asked me for a copy of my lease after his preliminary hearing on June 28, 2022. It is my understanding that she sent my lease to the Pretrial Division, but that she has not received any response. I have also personally tried calling the Pretrial Division several times. No one has picked up the phone or returned my messages.

11.     A few weeks ago, another person detained at the Prince George's County Jail called me to inform me that my son had been transferred to the medical unit and was on suicide watch. I was extremely scared. I called the jail and spoke to a lieutenant, who informed me that my son was in the medical unit because he had some scrapes on his arms. When I told this lieutenant that D.P. has a pretrial option and asked if he would be released, the lieutenant informed me that people given pretrial options are rarely actually released from the jail.

12.     When he was on the medical unit, D.P. could only call me in the middle of the night, usually between midnight and 1 A.M. This was the only time that they let him out of his cell to use the phones. Otherwise he was locked in his cell, 23 hours per day.

13.     D.P. has informed me that he did not receive proper medical attention in the medical unit. In particular, he was not receiving clean bandages for his wounds. Because I work in the medical field, I know how important clean bandages are to prevent infections.

14.     As a result of his arrest and indefinite detention, D.P. will likely be held back a year in school. He was supposed to finish a few 10th grade classes over the summer. Even if he were on house arrest, he could complete some of those classes online. But he has not been able to do them

in jail. The longer he remains jailed, the more likely it is that he will miss summer school entirely and be held back from the 11th grade.

15.     D.P.'s arrest has had a domino effect on our family. For example, in early May, I started working a weekend job as a building concierge. I talked to D.P. about taking a second job to save up for a car and to better provide for him and his sisters. He agreed to watch his sisters on weekends so I could work. I lost that childcare help with D.P. in jail. He has been detained for so long, I had to leave that job. Losing that income meant that I have fallen behind on expenses.

16.     On July 11, 2022, D.P. was transferred from the Prince George's County Jail to the Baltimore juvenile jail. It is my understanding that the Pretrial Division could still release him on his pretrial option, but has not yet.

17.     I have only been able to visit D.P. in jail one time. It is difficult for me to visit him because I do not have a car to travel to Baltimore, and because the Prince George's County Jail does not allow children to visit, so I had to find childcare for his sisters while visiting him.

18.     Every time D.P. calls, he asks me when he is going to be released, and why he is still in jail. He has not been given any explanation as to why he remains detained. Every night I have to tell him: I don't know.

19.     As a mother, I feel helpless. I cannot tell my son when he is coming home or what he can do to get home. It is just a waiting game.

20.     I have talked to Plaintiffs' counsel and to D.P. about this lawsuit. In talking to counsel, I learned how many people are experiencing the same injustices that D.P. is and how long it has been going on. D.P. and I understand the role of a class representative and want to serve in that role to bring attention to these injustices and make sure they do not happen to anyone else.

I declare under penalty of perjury that this declaration is true and correct.

Executed on 7/14/2022 _____.

_____
K.P.

# EXHIBIT 6

DocuSign Envelope ID: D2A7F1B5-0882-4B26-8C82-73212864D265

## DECLARATION OF CHRISTINA MEIRING

I, Christina Meiring, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am an Assistant Public Defender for the Maryland Office of the Public Defender ("OPD"). I have worked for OPD since 2012, and volunteered for OPD before that. All statements and recollections in this declaration are my own and do not necessarily represent the views of OPD.

2.      As an Assistant Public Defender, among other duties, I represent indigent clients at bail review hearings in District and Circuit Courts. Over the decade that I have worked at OPD, I have represented hundreds of clients at initial and follow-up bail review hearings.

3.      Through my work, I am familiar with the pretrial detention and release policies and practices of Prince George's County District Court, Prince George's County Circuit Court, and Prince George's County Department of Corrections.

4.      People who are arrested in Prince George's County first appear in front of a judicial commissioner. They are entitled to limited representation from a contract attorney at this appearance. The commissioner decides whether to release the person until trial, hold without bail, or impose a financial condition of release.

5.      People who remain detained after their initial appearance appear before a judge on the next business day for an initial bail review hearing. Bail review hearings are the first point in a criminal case when people who qualify as indigent receive the assistance of an OPD attorney such as myself.

6.      For the last two years, during the COVID-19 pandemic, we have been conducting interviews for bail review hearings by phone. I typically receive the list of clients that I am representing around 9 A.M., and their bail review hearings are scheduled for 1:15 P.M. I am

1

DocuSign Envelope ID: D2A7F1B5-0882-4B26-8C82-73212864D265

supposed to receive a phone call from each client at the jail before their bail review hearing. However, I do not always receive those calls.

7.      The Population Management Division of the Prince George's County Department of Corrections ("the Pretrial Division") prepares a "pretrial intake fact sheet" for each defendant. This fact sheet is supposed to be provided to the Court, counsel, and the prosecution in advance of the defendant's bail review hearing.

8.      I typically receive these sheets fifteen to thirty minutes before hearings begin—if not after they have already begun. Because the sheets are provided after I have interviewed my clients and just before court, I usually do not have an opportunity to talk to my client about the information on the sheet or otherwise verify its correctness. This makes it difficult to meaningfully respond to the information on the sheets at bail review hearings.

9.      The sheets list the client's raw number of prior failures to appear ("FTAs") in court. This aggregate format of reporting FTAs means I do not know how long ago each alleged FTA was, whether any alleged FTA was excused, or what the source of information was. This makes it difficult for me to contest the listed FTAs—for example, by informing the court if they were a long time ago or otherwise excused afterward.

10.      The fact sheets for my non-English-speaking clients are often less complete than those for my English-speaking clients. For example, fact sheets for my non-English speaking clients often state that the Pretrial Division was "unable to interview" my client about their residence or employment, and thus provide no information about these parts of my client's life. One of the factors the Judge is supposed to consider at a bail review is the defendant's willingness and ability to return for future court hearings. This means that when my non-English speaking clients appear at their bail review hearings, the court is less likely to have an address verified by

DocuSign Envelope ID: D2A7F1B5-0882-4B26-8C82-73212864D265

Pretrial than they would for a similarly situated English-speaking client. A verified address shows the court that my client has a stable residence, can be reached, and will come back to court. My clients who do not have listed addresses—disproportionately non-English speakers—are at a disadvantage in this regard.

11.     At the bail review hearing, defense counsel is usually required to speak first and to make an affirmative argument for our client's release. That is, the burden is effectively placed on defense counsel to argue for our client's release—not on the State to argue for my client's detention.

12.     The Assistant State's Attorney ("ASA") usually gives only a brief, generic response, focusing almost exclusively on the perceived seriousness of the statement of charges.

13.     In my experience, bail review hearings typically last about five minutes.

14.     At the conclusion of the bail review hearing, the judge decides whether to release on recognizance, set an unsecured or secured bond (payable at 10% or 100%), impose non-financial release conditions, or hold without bond. In my experience, the most common outcomes are hold without bond, or an unaffordable secured money bond.

15.     In addition to whatever bond is imposed, judges will often issue a "pretrial order" or "pretrial option." Pretrial orders and options authorize the person to be released pretrial, but delegate the judge's discretion regarding whether, when, and on what conditions to actually release the arrested person to the Pretrial Division. The Division is in turn given unlimited time, discretion, and decision-making authority over the matter.

16.     The practice of giving pretrial orders and options, and thus effectively delegating pretrial release and detention decisions to the Pretrial Division, has been ongoing for the more than a decade that I have been at OPD. It does seem that it is becoming more common for the court to

hold people without bond, but give them a pretrial option, than it used to be. This may be, in part, because the State's Attorney's official position has become never to recommend financial conditions of release, leaving fewer options for bail, and the ASA assigned to bail review hearings rarely recommends release without supervision through the Pretrial Division.

17.     The Pretrial Division has come up with four "levels" of release. Each level has certain eligibility and supervision criteria. In my experience, the Pretrial Division determines what the criteria are for each level and whether they have been met in each case without consulting the court. I have never been informed what the Division's criteria are.

18.     Judges sometimes specify a level when granting a pretrial order or option. When the judge has specified a level, the Pretrial Division will sometimes refuse to release my client because they are "ineligible" for that level of release under the Division's self-determined criteria.

19.     For example, the Division has decided that in order to be released on Level 4, *i.e.*, home detention, the person must reside in Prince George's County. So if a person who only has a place to live in the District of Columbia or Montgomery County is authorized or ordered for release at Level 4, they will remain detained.

20.     If any of my clients are given a pretrial option or order, I email the Division's Gmail address (copying Tanya Law, Kenneth Gray, and Jeffrey Logan) after the bail review hearing. I include the Statement of Charges, the address at which my client can reside if released, contact information for a person who can confirm that address, and my contact information.

21.     While Mr. Logan and Ms. Law often reply that they have received my email, I rarely receive substantive responses.

22.     If I do hear back from the Pretrial Division, it is typically to ask me for documents, usually the Statement of Charges, which is a public document found in the court file. I have also usually already provided the Statement of Charges to the Division, often several times before.

23.     I usually follow up my emails with phone calls every few days. I call the various numbers that I have for the Pretrial Division. Rarely does anybody pick up. If someone does pick up, it is usually the same few people each time. They usually inform me that they have not looked at my client's case yet, that they cannot find my client's file or information, or that someone else is handling my client's case.

24.     In my experience, for my clients who are charged with felonies, the Pretrial Division does not even look at their file to begin to process a pretrial order or option until after their preliminary hearing, which typically occurs just shy of 30 days after their bail review hearing.

25.     This pattern continues—I follow up with the Pretrial Division via phone or email, but my client remains detained—for weeks or months on end.

26.     Sometimes my clients' family members will reach out to the Division to inquire about their release. They rarely get substantive responses from the Division.

27.     The majority of my clients given a pretrial order or option are never released on pretrial supervision.

28.     The vast majority of my clients given a pretrial order or option are never told definitively by the Pretrial Division that they will not be released, or why they are not being released.

29.     Not having an answer either way from the Division makes it difficult to convince a court to reconsider bail. Judges want to know why the person has not been released so far, and seem to place the burden on defense counsel to explain why. When I do not have that information,

judges will often refuse to reconsider bail. Meanwhile, my clients remain jailed, with no idea if or when they will be released.

30.     In many cases, I have been following up with the Pretrial Division for so long with no response that I have essentially given up on my client being released.

31.     As of late, in roughly one of every eight cases, the Pretrial Division sends the court a notice that it will not release a person who has been given a pretrial order or option. The Office of the Public is copied. As for the rest, a lucky few of my clients are released; the vast majority remain in indefinite detention.

32.     For example, I represented 16-year-old D.P. at his preliminary hearing. At D.P.'s bail review hearing on June 21, 2022, another public defender noted that D.P. had no criminal history, no prior FTAs, and could reside with his mother in Prince George's County if released. Judge Ada Clark-Edwards authorized pretrial release at level 4. Nevertheless, D.P. remained detained.

33.     At D.P.'s preliminary hearing on June 28, Judge Brian Denton reiterated that D.P. had been given a pretrial option. The next day, I emailed the Pretrial Division D.P.'s statement of charges, his mother's contact information, and a copy of their lease. I received no substantive response. His mother and I both followed up with several phone calls to the Division. To this date, no one has returned any of our calls. D.P. has no idea if or when he will be released or why he remains detained.

34.     In my experience, people given pretrial orders are slightly more likely to be released than people given pretrial options. More people used to get pretrial orders. But more recently, judges refuse to give orders because they say it is unfair for people to "jump the line."

35.     The Pretrial Division's delays and refusals to release people result in court backlog, as defense attorneys are forced to file repeated motions for bond reconsideration on behalf of their clients who have been authorized or ordered released but remain in indefinite detention.

36.     In June 2021, I attended a presentation by Jeffrey Logan, at which he explained the differences between pretrial release in Prince George's County ("PGC") and in other local jurisdictions. Mr. Logan explained that the lengthy process that PGC's Pretrial Division engages in is intentionally a fundamentally different approach to pretrial release than that taken by other local jurisdictions such as Montgomery County or the District of Columbia. These other jurisdictions, he noted, rapidly release people on supervised release as soon as they have been judicially authorized to do so. After release, they then conduct further investigation and follow-up, such as address verification. In PGC by contrast, Mr. Logan said, the policy is reversed: investigate and follow-up first, before deciding whether and when to allow a person's judicially authorized release. Listening to Mr. Logan, I was left with the impression that he was proud that PGC detains people longer than other jurisdictions before releasing them pretrial.

I declare under penalty of perjury that this declaration is true and correct to the best of my ability.

Executed on _7/14/2022_____.

Christina Meiring

# EXHIBIT 7

## DECLARATION OF MARIA HUGHES

I, Maria Hughes, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am an Assistant Public Defender for the Maryland Office of the Public Defender ("OPD"). I have worked for OPD since 2014.

2.      As an Assistant Public Defender, I primarily represent indigent juvenile clients, including juveniles charged as adults in the District and Circuit Courts. I have also represented adult clients in District and Circuit Courts. Through my work, I am familiar with the pretrial detention and release policies and practices of Prince George's County District Court, Prince George's County Circuit Court, and Prince George's County Department of Corrections.

**Pretrial Detention and Release of Children**

3.      Children age 16 or older who are charged with particular crimes in Prince George's County are automatically charged as adults in District Court. These children, just like adults charged in District Court, appear for a bail review hearing in front of a judge at which it is determined whether the child will be detained prior to trial. Many of my child clients are held without bond at their bail review hearings. The majority of these children also receive a "pretrial order" or "pretrial option." As such, a significant proportion of my clients have pretrial orders or options.

4.      Pretrial orders and options authorize the Population Management Division of the Prince George's County Department of Corrections ("the Pretrial Division") to release the child, but  delegate the judge's discretion regarding pretrial release and detention to the Pretrial Division. The Division is subsequently given indefinite time and discretion to decide whether, when, and on what conditions to release the child.

1

5.      Giving pretrial orders and options, including to children charged as adults, has been a standard practice for as long as I have been at OPD.

6.      In my experience, the Pretrial Division does not treat children who are given pretrial options and orders any differently than adults who are given pretrial options and orders. Children are not released more quickly, processed using different criteria, or otherwise prioritized or treated differently on account of their age. Many are not released at all until their case is resolved.

7.      Attorneys who contact the Pretrial Division on behalf of child clients receive the same responses—or lack of responses, more commonly—as attorneys who contact the Division on behalf of adult clients. My emails and calls to the Division inquiring into my clients' release status are typically ignored. The Division usually takes weeks or months after the bail review hearing to release my clients, if they are released at all. During this time, neither I nor my client is provided any notice of why they remain detained, or if or when they will be released.

**The Case of D.P.**

8.      For example, I recently took over the case of D.P. from an OPD colleague who represented him at a prior hearing. D.P. was automatically charged as an adult because he is 16 years old and given a pretrial option at his bail review hearing on June 21, 2022. However, to this date, he has not been released. No one from the Pretrial Division has even spoken with D.P., his mother, or his attorneys—despite our several attempts to contact the Division. No one has informed any of us why D.P. remains detained, or if or when he might be released.

9.      The Department of Juvenile Services has various juvenile detention facilities in Maryland. Youth charged in Prince George's County Courts are most often held at the Cheltenham Youth Detention Center located in Cheltenham, Maryland. I almost always seek an order for my

child clients such as D.P. to be transferred to a juvenile facility. It has recently been difficult to get such motions granted as the juvenile jail is often capacity.

10.     If a child who has a pretrial order or option is transferred to the juvenile jail, they retain their order/option. If the Pretrial Division decides to release the child after they have been transferred to the juvenile facility, they are transferred back to the adult jail and processed for release by the Division. The transfer-and-release process usually takes a few days.

11.     D.P. was until yesterday July 11, 2022 being held in the adult medical unit on a 23-hour lockdown. He was on suicide watch. He was only allowed out of his cell for 1 hour per day, usually between midnight and 1 A.M., which is the only time he could call his mother.

12.     Given that the Cheltenham Youth Detention Center was at capacity, D.P. was moved to the juvenile facility in Baltimore City, which is about 1.5 hours away from his family's home.


I declare under penalty of perjury that this declaration is true and correct.


Executed on July 12, 2022.

_____

Maria Hughes

# EXHIBIT 8

## DECLARATION OF CHRISTOPHER BUTLER

I, Christopher Butler, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I provided the information below in response to a standard set of questions by Plaintiffs' counsel during a visit to the Prince George's County Jail on June 3, 2022, and during follow up conversations on June 15, June 30, and July 8, 2022.

2.      My name is Christopher Daniel Butler. I am 32 years old.

3.      I was born in the District of Columbia and raised in Prince George's County, Maryland. I attended high school in Capitol Heights, Maryland. I have lived in the Prince George's County area for my entire life.

4.      I was arrested on October 26, 2021 and brought to the Prince George's County Jail, where I have been detained ever since.

5.      When I was arrested, I was living with my mother, sister, and nephew at my mother's house in Capitol Heights, Maryland.

6.      I have a 10-year-old daughter who lives nearby. Before I was arrested, I used to see my daughter every day.

7.      When I was arrested, I was working at FedEx field. I was about to start working a second job with Amazon; in fact, I received that job offer on the same day that I was arrested.

8.      I have been working ever since I was 17 years old. I have worked at George Washington Hospital, Dulles International and Reagan National Airports, and the Maryland Department of Veterans Affairs, among other jobs.

9.      At a bail hearing on February 18, 2022, the judge ordered that I be released pretrial "if eligible." The judge also set specific conditions of release: that I could not work, and would only be allowed to leave my house for medical reasons.

1

10. I understood "if eligible" to mean that I could be released as long as there was a verifiable address in Prince George's County at which I could reside if released. Such an address exists: if I were released, I could go back to living at my mother's house in Capitol Heights.

11. I was told that the process for being released pretrial would be explained to me when the pretrial services agency[1] interviewed me. But to this day, no one from the agency has ever spoken to me.

12. The court ordered my release on February 18, 2022. 144 days since the court ordered my release, I remain detained at the jail.

13. I understand that pretrial services told my attorney they will not release me because of the "nature of the offense" with which I am charged. At my bail hearing, the judge stated the charges against me, and that they are serious offenses. But, after acknowledging the seriousness of my charges, the judge nevertheless ordered me released pretrial. I therefore do not understand how the pretrial services agency can refuse to release me based on the charges against me.

14. I have asked my family to call pretrial services on my behalf and explain why I am still in jail even though a judge ordered me released pretrial. When my family has called, they have been given inconsistent explanations.

15. I had another hearing in my case on June 29, 2022. At that hearing, the judge confirmed that when she ordered the pretrial services agency to release me "if eligible," she did in fact intend for me to be released. She set another hearing on my bail for July 25, 2022.

16. I need to stay in touch with my lawyer in order to prepare for my criminal trial. I have had a harder time doing that while I am detained than I think I would if I were released.

---

[1] Plaintiffs' counsel has informed me that the formal name for the pretrial services agency is the Prince George's County Department of Corrections Population Management Division.

2

17.     The conditions at this jail are harmful to my health and wellbeing.

18.     They do not feed us enough food at this jail.

19.     Sometimes they do not use the heat in the winter. It gets too cold. Other times they blast the heat. It gets too hot.

20.     When I first came to the jail, about nine months ago now, I submitted a request to see a doctor for a physical. I have been submitting such requests as long as I have been here. To this date, I have not seen a doctor.

21.     The jail has not permitted children to visit for as long as I have been here. Therefore, I have not seen my 10-year-old daughter since I have been here, for about nine months. In that time, I have missed her 10th birthday.

22.     My trial is set for January 16, 2023. If pretrial services continues to disobey the release order until my trial, I will have spent nearly one year in the jail *after* a judge ordered me released.

23.     I have spoken with my lawyer about what it means to be a plaintiff in a class action lawsuit. I want to serve in this role so that the injustices that are happening to me stop and do not happen to anyone else.


I declare under penalty of perjury that this declaration is true and correct to the best of my knowledge.


07/12/2022

DATE

Christopher Daniel Butler

# EXHIBIT 9

## DECLARATION OF ALLISON HELDRETH

I, Allison Heldreth, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am an Assistant Public Defender for the Maryland Office of the Public Defender ("OPD"). I have worked for OPD since August 2014.

2. As an Assistant Public Defender, among other duties, I represent indigent clients at bail review hearings in District and Circuit Courts. Over the nearly eight years that I have worked at OPD, I have represented hundreds of clients at initial and follow-up bail review hearings.

3. Through my work, I am familiar with the pretrial detention and release policies and practices of Prince George's County District Court, Prince George's County Circuit Court, and Prince George's County Department of Corrections.

**Initial Proceedings**

4. In Prince George's County, the first post-arrest stage in a criminal prosecution is called the "Initial Appearance." Initial appearances take place before an official known as a "District Court Commissioner" in one of the Commissioner's Offices (which are located in the jail and in the courthouses).

5. OPD attorneys do not represent arrested people at their initial appearances. Arrested people are offered pro bono representation from private contract attorneys who pick up shifts at the Commissioner's Office, or they can elect to proceed *pro se*.

6. If a person remains detained after their initial appearance, a bail review hearing in District Court is set for the next business day. This means that people arrested on a Friday regularly wait more than 48 hours until they appear in front of a judge. If there is a holiday, they may have to wait even longer.

7. Bail review hearings happen at the same time each business day, around 1:15 PM.

8. Bail review hearings are the first point in a criminal case when people who qualify as indigent receive the assistance of an OPD attorney such as myself.

**Pretrial Intake Fact Sheets**

9. Before the bail review hearing, the Population Management Division of the Prince George's County Department of Corrections ("the Pretrial Division") prepares a "pretrial intake fact sheet," which is supposed to be provided to the prosecutor, defense counsel, and the judge in advance of the bail review hearing.

10. However, in my experience, public defenders do not always receive the pretrial intake fact sheets in advance, and sometimes receive them only a few minutes before the hearing, leaving hardly any time to review them. The judge and prosecutor always seem to receive the sheets in advance.

11. The pretrial intake fact sheet is supposed to include information about the arrested person's criminal history, failure-to-appear history, attempts to contact the alleged victim, and sometimes verification of employment or residence.

12. The pretrial intake fact sheets for my non-English-speaking clients are usually less complete than those for my English-speaking clients.

13. Public defenders are not told what the source of the information on the pretrial intake fact sheet is. This, along with the limited time I have before the bail review hearings, makes it difficult to verify or challenge the information on the sheets, even though the information is frequently misleading or incorrect.

**Bail Review Hearings**

14. At the bail review hearing, defense counsel is asked to speak first and to make an affirmative argument for their client's release.

15. The prosecutor usually only gives a brief, generic response. The prosecutor focuses almost exclusively on the perceived seriousness of the statement of charges.

16. In my experience, the statement of charges is taken as fact for purposes of setting bail, even though the charges are only allegations at this point. The burden is put on me, as defense counsel, to rebut those allegations and make an affirmative argument for my client's release.

17. In my experience, bail review hearings typically last about five minutes at most.

18. At the conclusion of the bail review hearing, the judge decides whether to leave the Commissioner's order in place or modify it. In my experience, the judge more often than not leaves the Commissioner's order in place.

**Pretrial Options and Orders**

19. In addition to whatever bail order is in place, judges sometimes grant "pretrial orders" and "pretrial options."

20. Pretrial orders and options authorize the Pretrial Division to release the arrested person, but do not cause the arrested person to be released that day. Instead, pretrial orders and options delegate the judge's discretion regarding whether, when, and on what conditions to release the arrested person to the Pretrial Division, which in turn retains ultimate discretion and decision-making authority over the matter.

21. People who receive a pretrial order or option are regularly detained in a holding pattern for weeks or months after their bail review hearing, while the Pretrial Division "processes" their cases.

22. During this time, the Pretrial Division rarely provides me or my clients with proactive updates on the status of my clients' cases. Instead, I have to repeatedly email and call the Pretrial Division in order to receive any progress updates on my clients' cases. The Pretrial Division's "processing" is opaque and takes place behind closed doors.

23. At the conclusion of its "processing," the Pretrial Division frequently declines outright to release people whose release has been authorized or ordered by the court.

24. Sometimes, my clients who receive pretrial options are detained for months, with no explanation, and then released out of the blue, also with no explanation.

25. But in my experience, it is exceedingly rare for a person given a pretrial option to actually be released.

26. In my experience, people given pretrial orders are released more often than people given pretrial options—but sometimes, people with pretrial orders are still not released. Sometimes, ensuring release for someone with a pretrial order requires weeks or months of waiting and extensive following up on my part.

27. Pretrial Division officials—specifically, Kenneth Gray and Tanya Law—have told me directly that they do not consider pretrial orders to be binding on them. They interpret pretrial orders merely to put the person at the front of the Pretrial Division's processing queue. The Pretrial Division still exercises ultimate decision-making authority and discretion over whether, when, and on what conditions people who have been given pretrial orders will be released pretrial.

**Levels of Release**

DocuSign Envelope ID: D3149857-B855-4ED4-BD7B-462F5FF346A7

28. The Pretrial Division has adopted four "levels" of release. Each level has certain eligibility and supervision criteria. Judges sometimes, but not always, specify a Level when granting a pretrial order or option.

29. In my experience, the Pretrial Division determines what the criteria for each level are and whether they have been met in each case without consulting the court.

30. Levels One and Two, which entail minimal supervision, are functionally non-existent. To my recollection, I have never had a case where the Pretrial Division released my client on Level One or Level Two supervision.

**Pretrial's Reasons for Refusal to Release**

31. The Pretrial Division often denies release to my clients given a pretrial order or option because of the "nature of the case," *i.e.*, the crimes with which my client is charged. This is despite the fact that the judge knew about the criminal charges and allegations when issuing a pretrial order or option.

32. Another common reason the Pretrial Division gives for denying release to my clients given a pretrial order or option is a purported lack of a "verified" address in Prince George's County. People who are released on Level Four, *i.e.*, home detention, must have such an address. Because I mainly handle felony cases, most of my clients are only eligible to be released on Level Four under the Pretrial Division's self-determined criteria. But many of my clients reside in neighboring jurisdictions, for example, in the District of Columbia. In these cases, I have to call around to my client's friends and family to see if anyone lives in Prince George's County and is willing to have my client released to their home. On top of that, to "verify" the address, the Pretrial Division requires a copy of the friend or family

member's lease or mortgage. This is not documentation that most people have readily accessible.

33. A third reason that the Pretrial Division regularly declines to release my clients given a pretrial order or option is if the alleged victim claims to be "in fear" of my client. In such cases, the Pretrial Division will categorically deny release. In my experience, the Pretrial Division appears to only listen to the alleged victim when that person supports denial of release; when the alleged victim states that they do not fear my client, the Pretrial Division still sometimes does not release the person.

34. The Pretrial Division will also categorically deny release if they claim they cannot reach the alleged victim. The Pretrial Division often declines to release someone on this basis even if the State's Attorney has represented that they have already spoken to the alleged victim about my client's release.

35. The Pretrial Division has taken inconsistent positions regarding its own release eligibility criteria.

36. For example, the Pretrial Division has released some of my clients who have other pending cases. Other times, the Pretrial Division has insisted that my client cannot be released because of another pending case—even if there is no detainer in the other case.

37. Kenneth Gray and Tanya Law are the two Pretrial Division officials with whom I primarily discuss my clients. In my experience, Mr. Gray and Ms. Law exercise ultimate decision-making power over whether, when, and under what conditions to release people pretrial.

**Lack of Notice Provided**

38. Pretrial Division officials rarely, if ever, directly inform my clients about their pretrial release progress or decisions. Clients have to find out whether they will be detained or

released from their defense attorney or by filing an inmate request and awaiting a response, which often never comes. I have had many clients wait months for responses that never came.

39. I rarely learn that the Pretrial Division is declining to release my clients directly from the Pretrial Division or at the time the decision is made. Sometimes, I find out by looking at the case docket and seeing an entry informing me that the Pretrial Division has sent a letter to the court stating my client is "not eligible" to be released pretrial. Other times, an OPD supervisor receives a weekly list of all OPD clients the Pretrial Division believes are not eligible for pretrial release. I then then have to manually search the list for any of my clients. In any case, I usually do not find out that the Pretrial Division is declining to release my client until days or weeks after the decision has been made, unless I am affirmatively calling or emailing the Pretrial Division each day.

40. Pretrial Division officials have told me that they typically send a letter to the court if they are declining to release someone who was given a pretrial order or option. I am not aware of any written policy that requires the Pretrial Division to send these letters. In my experience, these letters are often not sent.

41. The reason(s) why the Pretrial Division claims people are ineligible for release are rarely provided in the letters it sends to the court and OPD supervisors. For example, the Pretrial Division often effectively writes in the letter: "If you want to know the reason, call us."

42. In my experience, District Court judges rarely issue pretrial orders (as opposed to pretrial options) at the first bail review hearing.  If judges issue a pretrial order in a case, they typically only do so at a subsequent bail hearing after my client has been detained for weeks or months.

DocuSign Envelope ID: D3149857-B855-4ED4-BD7B-462F5FF346A7

**Follow-Up Bail Review Hearings**

43. When my clients are detained after receiving a pretrial order or option, I often petition the court for another bail review hearing. It is not uncommon for me to have to do this several times, over weeks or months, before a client is finally released.

44. In some of my cases, judges have denied my request for bail review without holding a hearing. In my experience, certain judges—particularly Judge Carrington—summarily deny almost every request for a bail hearing.

45. Some judges, in issuing their denials, have indicated that they share the Pretrial Division's understanding of what "pretrial order" means, *i.e.*, that the Pretrial Division retains the ultimate discretion regarding whether, when, and on what conditions my clients will be released.

46. When I file a motion for a bail review judges frequently require that I demonstrate a "change in circumstances" to justify holding a bail review hearing. I am not aware of any law that requires a "change in circumstances" in order to have one's bail reconsidered. But at least one judge, Judge Heffron, has recently informed OPD that he will not consider motions for bond reconsideration without a demonstrated "change in circumstance."

47. Not only is there no law requiring a change in circumstances, but judges usually do not accept the Pretrial Division's delay in processing my client, or outright refusal to release my client, as a "change in circumstances."

48. Instead, the judge and the prosecutor typically treat the fact that the Pretrial Division has not yet released my client as evidence cutting against releasing my client.

49. The Pretrial Division's delay in releasing people is regularly discussed in court, in front of District and Circuit Court Judges. But in my experience, neither this discussion, nor the

DocuSign Envelope ID: D3149857-B855-4ED4-BD7B-462F5FF346A7

large volume of repeated bail review motions that defense attorneys file, has resulted in any of the District or Circuit Court Judges inquiring into whether something is going wrong at the Pretrial Division to lead to this situation.

50. I have rarely seen judges criticize or object to Pretrial Division officials' defiance of a pretrial order or option or otherwise insist that the Pretrial Division follow a pretrial order or option.

## Client Examples

51. I have seen the same policies and practices that I have described above, on behalf of the judges and the Pretrial Division, manifest in hundreds of cases, including numerous recent cases, in District and Circuit Court.

52. For example, one of my Circuit Court clients was given a Level Four pretrial order in mid-March 2022. He has a verified address in Prince George's County, and no prior convictions or failures to appear, but the Pretrial Division informed me that nevertheless it would not release him unless I obtained a pretrial *order* from the Court. I do not know why the Division imposed this additional, arbitrary requirement on this particular client.

53. I filed an emergency habeas petition for this client. At a hearing on my petition at the end of May, I argued that my client was being detained in violation of the Maryland Rules governing pretrial release, as well as the federal and state Constitutions. The judge refused to engage with my arguments, but did order my client released on Level Four.

54. Nevertheless, my client remained detained. When I called the judge's chambers, the employee who answered told me that chambers gets calls like this all the time, and the judge is aware of the problems with the Pretrial Division, but that the Court could not do anything about these problems.

DocuSign Envelope ID: D3149857-B855-4ED4-BD7B-462F5FF346A7

55. In mid-June, I filed a motion seeking to require the Pretrial Division to explain why it had not followed the court's release order. At a hearing on my motion at the end of June, I found out that the Division had sent the judge a letter, stating that it had called the complaining witness twice but had not reached them, and asking if the court wanted the Division nonetheless to comply with its release order. The judge reiterated, orally at the hearing and in writing after, that the pretrial order was in fact an order, and that my client should be released on Level Four.

56. After three hearings on essentially the same facts, my client was finally released on July 1, 2022—3.5 months after the court gave him a pretrial option, and 1 month after the court gave him a pretrial order.

57. In another recent example, Circuit Judge Cathy Serrette gave my client Christopher Butler a pretrial order at Level Four "if eligible" at a bail review hearing on February 18, 2022. Judge Serrette also specified that Mr. Butler would not be allowed to work if released and would only be allowed to leave the house for medical reasons.

58. I understand the Pretrial Division to have its own rules about Level 4 "eligibility" requiring a person to reside in Prince George's County with a verified address and nothing else preventing immediate release, like a detainer or sentence in a different case. Mr. Butler has a verified Prince George's County address, of which the Pretrial Division is aware. I do not see any other impediments to his release.

59. The Pretrial Division, and in particular Mr. Gray, has now informed me that they refuse to release Mr. Butler due to the "nature of the offense" with which he has been charged.

60. Before issuing Mr. Butler's pretrial order, Judge Serrette heard extensive discussion about the nature of the alleged offense. When I asked Mr. Gray if there was a categorical rule

10

precluding the release of people charged with certain crimes, Mr. Gray said there is not. I asked Mr. Gray to reconcile those two statements: on the one hand, his justification of the Pretrial Division's denial of release due to charges the judge already knew about, and on the other, his denial of there being any rule requiring that decision. Mr. Gray was unable to do so. Our conversation continued in unproductive circles on the same point after that. The circumstances appear to indicate that the Pretrial Division simply disagrees with Judge Serrette's decision and is choosing not to follow it. At the time of this declaration the pretrial order for Mr. Butler has not been followed, and he remains detained in jail.

I declare under penalty of perjury that this declaration is true and correct.

Executed on _____7/12/2022_____.

Allison Heldreth

# EXHIBIT 10

## Declaration of Miramba Williams

I, Miramba Kinte Williams, Jr., solemnly affirm under penalty of perjury and upon personal knowledge that the contents of the foregoing paper are true:

1. I provided the information below in response to a standard set of questions read to me in person by my attorneys on July 7, 2022. On that same day, I read my declaration and confirmed its accuracy based on my own knowledge and observations. I swore under the penalty of perjury as to the accuracy of that information.

2. My name is Miramba Kinte Williams, Jr. I am 27 years old.

3. I live in Suitland, Maryland, and spent most of my life in Takoma Park, Maryland.

4. For the past year and a half, I have been taking HVAC classes online at the University of the District of Columbia. I plan to work in the HVAC business when I complete those classes.

5. I was arrested on June 30, 2022, on charges of marijuana possession and possession of a handgun.

6. At the time of my arrest, I was living with my father in Suitland, Maryland.

7. On July 5, 2022, I had a bail review hearing before Judge Gregory Powell. Judge Powell gave me a pretrial option at any level.

8. I understood that "pretrial option" to mean that I would be released shortly after the bail review hearing. However, as of the signing of this declaration, I remain in jail.

9.  I have asked correctional officers at the Jail when I will be released and I was told that it will be a couple weeks or months.

10. I am currently in the intake unit and am on a 23 and 1 lockdown.  I was told that I was supposed to be moved out of the intake unit after five or seven days, but someone on the unit has COVID-19.  So, we are all stuck on this unit, including the person who has COVID-19.

11. My parents have called pretrial for me, but they were not told any information about when I will be released.

12. I have three kids: two girls and one boy, who are ages 11, 5, and 1. I have not been able to see or speak to them since I was arrested.  One of my children lives with me and my father.

13. In my free time, I enjoy spending time with my kids and look forward to doing that when I am released.


7/7/22
DATE

Miramba Kinte Williams, Jr.

# EXHIBIT 11

DocuSign Envelope ID: 223C383C-12A1-450C-84E4-AFB42CD27C69

## Declaration of Donnell Davis

I, Donnell Dajuan Davis, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I provided the information below in response to a standard set of questions read to me over the telephone by my attorneys on June 7, 2022, and then in response to follow-up questions on June 16, 2022, and July 12, 2022.

2. My name is Donnell Dajuan Davis.  I am 28 years old.

3. I live in the District of Columbia.  I have lived in the District of Columbia area, including Prince George's County, for my entire life.

4. I live with my aunt and grandfather.  I also have a sister who lives nearby in Capitol Heights in Prince George's County.

5. I currently work at the Federalist Pig, a barbecue restaurant in the District of Columbia. I have worked there every week, from Wednesday to Sunday, for the last nine months. At the Federalist Pig, I started as a dishwasher and now I also work as a cashier and cook.  Before working at the Federalist Pig, I was working at a trash company in Gaithersburg, Maryland.

6. At the time I was arrested, I was staying with a friend in Prince George's County.

7. Until just before I was arrested, I was working at District Photos in Beltsville, Maryland.

8. I was arrested on October 8, 2020, on charges of first- and second-degree assault.

9. On October 9, 2020, I had a bail review hearing in front of a judge.  I explained my situation to the judge.  During this hearing, the judge said I was a danger to society, even though I had never previously been convicted of a crime.  I had also never failed to appear for a court date.  The judge ordered that I be held without bond but granted me a "pretrial option."

1

DocuSign Envelope ID: 223C383C-12A1-450E-84E4-AFB42CD27C69

10. I thought "pretrial option" meant that I would be released pretrial under supervision. But after my hearing, I was processed into the Prince George's County Jail.

11. I tried calling the pretrial services agency[1] from the jail, but I was unable to reach them directly. So I called my aunt, friend, and sister to see if they could get in touch with pretrial services and get any updates about my case.

12. The pretrial services agency gave my family inconsistent information about whether I would be released and why I was not being released. I did not understand why I was still in jail.

13. After my next court date, the State dropped the first-degree assault charge. After that, I only had a second-degree assault charge, which is just a misdemeanor. I was confused as to why I was still in jail on a misdemeanor charge.

14. I kept writing letters to the pretrial services agency and asking my family and friends to call on my behalf, but no one would give us any answers.

15. On top of this, I was confused as to who my attorney was. I was not in touch with any attorney while I was sitting in jail. I was lost throughout the whole process.

16. One of my cellmates told me that I could write a letter to the court myself to ask for a court date. So I handwrote a letter to the judge from my cell in the jail. They gave me another hearing after I wrote that letter, but the court still did not release me.

17. During the months I was jailed pretrial, I fell sick multiple times. I told the jail that I was allergic to tomatoes, but I still was given meals with tomatoes. One day, I had baked beans for lunch with tomatoes in the sauce. I was told by a Correctional Officer

---

[1] My attorneys have informed me that the formal name for the pretrial services agency in Prince George's County is the Department of Corrections Population Management Division.

that there were no tomatoes in the dish.  After eating it, the roof of my mouth became itchy, I grew dizzy and nauseous, and I vomited for several minutes.  There were times that I had to skip meals because the jail did not make available any food without tomatoes.  Even when they did accommodate my allergy, I was left hungry because they did not give me enough food.

18. At one point, I was also worried I had a hernia because I had immense pain in my groin. I requested medical attention, but I was not seen by the clinic for two to three days. Even then, the clinic said nothing was wrong with me even though I was clearly still in pain.  The nurse gave me some medication and made me return to my cell.

19. I was incarcerated in the jail during the COVID-19 pandemic.  There was one week where two to three people in my housing unit had COVID-19, and I had no choice but to be in close contact with them.  While I never tested positive for COVID-19, I was constantly concerned about being infected.

20. While I was in the jail, we were under "lockdown" to minimize the spread of COVID-19.  We were locked in our cells for 23 hours per day.  Because of the lockdown, I remember not being able to take a shower for a whole 24 hours.  We also were not allowed visitors.

21. While I was in the jail, the phones were malfunctioning.  We could only use the phones during the one hour each day we were out of our cells.  But because so many of the phones were broken, I remember not being able to call my family or friends for a whole week.

22. While I was in the jail, I kept questioning if I should plead guilty to get released.  I did not understand why I was still in the jail, and every time I went to court they would not

let me out even though they reduced the charges against me.  I had no idea when I would get out.  I was so unfamiliar with the court system that I thought pleading guilty would be the easier route.

23. On January 7, 2021, my case finally went to trial and I was found not guilty.

24. Ultimately, I spent about 3 months in jail.  I was only released when I was found not guilty of all the charges against me.

25. When I was released from the jail, it took me a while to find a job because it was winter, the pandemic was ongoing, and no one was hiring.

26. While I was jailed, I could not pay my phone bill and, as a result, my phone service was shut off.  I accrued debt in the form of outstanding phone bill payments.

27. I have spoken with my lawyer about what it means to be a plaintiff in a class action lawsuit. I want to serve in this role so that people who suffered the same injustices that I did are compensated for their harms, and so that these injustices do not happen to anyone else.

I declare under penalty of perjury that this declaration is true and correct.

7/13/2022
_____

DATE

DocuSigned by:

15FB7069FABB4ED...
_____

Donnell Davis

# EXHIBIT 12

DocuSign Envelope ID: 2844B041-7BC0-45EF-AA54-B0652A56F1EB

## DECLARATION OF PETER IM

I, Peter Im, pursuant to 28 U.S.C. § 1746 declare as follows:

1. I am a former Assistant Public Defender for the Maryland Office of the Public Defender ("OPD"). I worked primarily in the District Court of Prince George's County. I worked for OPD from September 9, 2020 to July 1, 2022.

2. As an Assistant Public Defender, among other duties, I represented indigent clients at bond review hearings in District Court.

3. Through my work, I am familiar with the pretrial detention and release policies and practices of the Prince George's County District Court and the Prince George's County Department of Corrections.

**Initial Appearances**

4. In Prince George's County District Court, the first stage of a criminal prosecution after an arrest is called the "Initial Appearance," which takes place before a magistrate official called the "District Court Commissioner." Commissioners are not necessarily attorneys.

5. At least one Commissioner is on duty twenty-four hours a day, seven days a week, and the Initial Appearance typically takes place on the day that the person is charged or the arrest warrant is served. The Initial Appearance occurs at one of the Commissioner's Offices, which are located at the Prince George's County Jail and the Hyattsville and Upper Marlboro Courthouses.

6. At the Initial Appearance, the Commissioner determines the bond status of the person charged. The Commissioner orders one of the following: release on personal recognizance; release on unsecured bond; release on cash bond, payable at 100% or 10% of the total amount; and detention without bond.

1

DocuSign Envelope ID: 2844B041-7BC0-45EF-AA54-B0652A56F1EB

7.  In addition, if the person was arrested without a warrant, the Commissioner determines whether the statement of probable cause prepared by the charging officer sets forth facts sufficient to support probable cause to believe the person committed the crime charged.

8.  People are not represented by attorneys from OPD at their initial appearances. They may be represented by court-appointed attorneys who do not work for OPD.

**Bail Review Hearings**

9.  If the person is detained, the Commissioner sets a bond review hearing in District Court for the next business day. Accordingly, people arrested on a Friday may wait more than 48 hours until they have a bail review hearing. They may wait even longer if there is a holiday.

10. The District Court holds bond review hearings at approximately 1:15 p.m. The hearings have been held remotely using video conferencing software since the start of the COVID pandemic.

11. In my experience, the hearings for each person take anywhere from less than one minute to approximately fifteen to twenty minutes.

12. OPD represents people who have been qualified as indigent at their bail review hearings. I have conducted many bail review hearings for OPD clients.

13. The hearings begin with, and primarily consist of, oral arguments made by defense counsel. The prosecutor may participate after defense counsel makes an argument. In my experience, the prosecutor often makes no argument beyond stating that they believe no bond should be set.

14. Defense counsel are often permitted to call witnesses at bail review hearings, but in some circumstances, judges do not allow witnesses to be called, particularly when the defense calls an alleged victim as a witness.

## Pretrial Intake Fact Sheets

15. Before the bail review hearing, the Population Management Division of the Prince George's County Department of Corrections ("the Pretrial Division") prepares a "pretrial intake fact sheet" which is supposed to be provided to the prosecutor, defense counsel, and the judge before the bail review hearing.

16. The pretrial fact sheet is prepared based on an interview with the accused person at the jail and computer searches of various record databases. The pretrial intake fact sheet includes, *inter alia*, information about the person's address, employment situation, criminal history, previous failures to appear for court, and status on parole or probation.

17. The pretrial intake fact sheets are emailed in a batch as a PDF attachment to the Office of the Public Defender, typically less than thirty minutes before bond hearings begin at 1:15 p.m. As a result, I do not have time to review the pretrial fact sheets with my clients to ensure their accuracy before they are used to determine whether my clients are detained or released.

18. In my experience, the pretrial intake fact sheets often contain incorrect or misleading information. For example, I have had clients whose pretrial intake fact sheets indicated that they previously failed to appear for court, but further investigation revealed that the failure to appear occurred due to my client being incarcerated on the date in question. I have also seen pretrial fact sheets with errors in criminal history information.

## Pretrial Orders and Options

19. At the conclusion of the hearing, the judge may order any of the following: release on personal recognizance; release on unsecured bond; release on cash bond, payable at 100% or 10% of the total amount; and detention without bond. Judges sometimes also impose

special conditions, such as requiring that the individual avoid contact with the complaining witness or not possess firearms.

20. If the judge decides to detain the person, the judge will recite that he or she has found by clear and convincing evidence that no condition of release or combination of conditions of release can reasonably ensure the public safety or the appearance of the individual in court. The judge recites this finding, even when the prosecutor has not presented any evidence regarding public safety or likelihood to appear in court or when the prosecutor has made no argument at all.

21. In addition to the detention and release decisions I mentioned previously, judges may also grant a "pretrial option" or a "pretrial order." Sometimes judges state that they are "authorizing" pretrial release, which in my experience means the same thing as giving a "pretrial option."

22. Jeffrey Logan, the Chief of the Pretrial Division, stated in a conversation about a year ago that approximately one-third of the people detained at the Prince George's County Jail at any given time have a pretrial option or order.

23. Both the pretrial option and the pretrial order authorize the Department of Corrections to release the detained person, but they do not cause the person to be released that day. Rather, they effectively delegate to the Pretrial Division the judge's discretion about when to release the person. In the case of a pretrial option, the judge delegates discretion about whether to release the person at all. In the case of a pretrial order, even though it appears that the judge is ordering release, as explained further below, the Pretrial Division may still refuse to release the individual. For pretrial options and orders, when and under what conditions a person is released is left to the discretion of the Pretrial Division.

DocuSign Envelope ID: 2844B041-7BC0-45EF-AA54-B0652A56F1EB

**The Pretrial Division's Process**

24. In the case of a pretrial option, the Pretrial Division typically takes weeks or months to make a decision about whether to release the person. The Division generally does not communicate anything about the timing or substance of its decision-making process to my clients.

25. In past cases where my clients were given pretrial options, I had to place repeated phone calls to the Pretrial Division to determine if or when my clients would be released and to speed up the process. I have been told many times that my client was still in detention because the Division had not yet had time to review my client's file, or because it has not yet assigned a case manager to my client.

26. The Pretrial Division does not hold a hearing to determine whether, when, and under what conditions to release a person.

27. When the Pretrial Division decides *not* to release someone whom a judge has given a pretrial option, the Division does not notify the detained person, their family, or counsel. It instead files a standard form with the court; the Pretrial Division checks a box on the form indicating the reason for its decision. The form often includes no facts specific to a case; sometimes it merely states that the Pretrial Division should be contacted for details about why the person was denied release. The Public Defender's Office typically receives a batch of these forms as a PDF attachment by email once a week. Sometimes these forms are sent to the court days or weeks after a decision was made to detain the person despite a pretrial option/order.

**Levels of Release**

DocuSign Envelope ID: 2844B041-7BC0-45EF-AA54-B0652A56F1EB

28. The County uses four "levels" of release. At times judges specify an authorized level for pretrial release on its bail order granting a pretrial option or order.

29. Release on Levels One and Two entails minimal supervision of the individual; in my experience, these levels are rarely used. Upon release on Level Three, an individual is assigned a case manager with whom he or she must check in multiple times a week, similar to being on probation. Release on Level Four requires an individual to be confined to home detention with an ankle monitor.

30. In my experience, when a judge issues a pretrial option, the Pretrial Division limits its consideration about whether to release the person to Level Three or Level Four. Even when a judge "authorizes pretrial at Level Three," the Pretrial Division will make the ultimate decision about whether to release on Level Three or Level Four based on its independent assessment of the case.

31. Each Level of pretrial release has its own criteria. The Pretrial Division determines in its sole discretion, without consulting the court or the arrested person, whether those criteria have been met. In fact, in my experience the Pretrial Division typically has no contact with my client after the initial interview when it creates the pretrial intake fact sheet.

**The Pretrial Division's Refusals to Release**

32. The criteria that the Pretrial Division uses to determine whether to release a person are often not specifically related to public safety or likelihood to return to court. For example, the Pretrial Division routinely declines to release individuals on Level Four who are unable to identify an address within Prince George's County where they can reside, even if they have an address in an adjoining jurisdiction (for example, in the District of Columbia or Montgomery County), and have means to travel to court.

33. The Pretrial Division requires that the address where a person will stay upon release to be "verified." I routinely must obtain from a client's friend or family member a copy of a lease or mortgage within Prince George's County to attempt to secure my client's release on Level Four. I also must provide a form of identification for the person the client will live with. The Pretrial Division has continued to detain my clients given pretrial options because the Pretrial Division did not have these documents or found the documents provided unsatisfactory.

34. For example, my client Leslie Sharp was given a pretrial order at Level Four. Even after the court ordered Mr. Sharp's release, I had to make at least four phone calls and do three bail review hearings to secure his release. I also had to provide the Pretrial Division with a lease and a form of identification for the person he would live with. When the Pretrial Division informed me that it was refusing to release Mr. Sharp in part because it could not contact the complaining witness, I provided her contact information. This was after I had filed a bail review motion with the court, explaining that the complaining witness had contacted me and told me that she did not fear for their safety or think Mr. Sharp needed to be in jail. Ultimately, Mr. Sharp spent 29 days in jail *after* a judge ordered his release. All charges against him were ultimately dropped.

35. Another client, Adrienne Worthington, was given a pretrial option at Level Four. The same day as Ms. Worthington's bail review hearing, I emailed the Pretrial Division the address where she could reside if released. Jeffrey Logan responded to me and asked that I provide the necessary information to "verify" the address. The Pretrial Division required me to find a friend who could verify an address for Ms. Worthington, to obtain that friend's lease and identification, and to provide that information to the Pretrial Division before they would

release Ms. Worthington as authorized by the court. Ms. Worthington spent 10 days in jail *after* a judge authorized her release. The Pretrial Division provided no notice to the court when Ms. Worthington was finally released. All of her charges were later dropped.

36. The Pretrial Division used to accept utility bills at a means of address verification, but recently have begun requiring that my clients submit a copy of a lease or a mortgage. No explanation for the change has been given.

37. My understanding is that the Pretrial Division has refused to release people who had a Prince George's County address if the home did not have a land line telephone. Accordingly, some defense attorneys have asked judges to specify on orders authorizing pretrial release that a cell phone is permissible, but it is not clear to me whether the Pretrial Division complies even where such a specification is made.

38. The Pretrial Division also detains clients given pretrial options because the alleged victim would prefer that they not be released. When someone is detained on this basis, the Pretrial Division typically does not tell the court why it has decided not to release the person. Rather, on the form it submits to the court, the Division checks a box marked "other." In such situations, the Pretrial Division has explained to me over the phone that it was detaining a client based on the alleged victim's wishes.

39. In some cases, the Pretrial Division has told me that clients with a pretrial option could not be released because the complaining witness could not be reached. The Pretrial Division has also told me that it has requested contact information from the complaining witness from the State's Attorney's Office, but the State's Attorney's Office has not provided it.

40. Some individuals are charged by civilian complaint, meaning that they are arrested as the result of a complaint filed by a private individual, not a police report. In such cases, the

DocuSign Envelope ID: 2844B041-7BC0-45EF-AA54-B0652A56F1EB

Pretrial Division may refuse to release a person because the alleged victim—the same person whose report was the sole basis for the charges—says that they do not want the person released, or the Pretrial Division cannot contact the alleged victim.

41. For example, I reviewed the file of Donnell Davis, whom another OPD attorney represented in a recent matter. From my review of his case file, I learned the following: Mr. Davis was charged by civilian complaint. No police report was ever filed in his case. His Intake Fact Sheet, prepared by the Pretrial Division, stated that he had no prior convictions or failures to appear in court. At his bail review hearing on October 9, 2020, the court gave him a pretrial option at Level Four. On October 28, 2020, the Pretrial Division filed a notice with the Court stating that it would not be releasing Mr. Davis pretrial. The notice did not give any reason for this decision, and instead stated that the Pretrial Division should be contacted for an explanation. In my experience, this often means the complaining witness does not want the person released pretrial, but the Division does not want to say so explicitly on the notice. On December 3, 2020, after the felony charge against Mr. Davis was dropped, the Division filed an identical copy of the notice— not even bothering to change the October 28 date—again refusing to release him pretrial without explanation. Mr. Davis was ultimately acquitted of all charges against him, but not before he had spent 90 days in jail *after* a judge had authorized his release.

42. The Pretrial Division has refused to release individuals for whom a judge has authorized pretrial release based on information that the judge possessed at the time the pretrial option was issued.

43. For example, in a recent case a judge issued a pretrial option to my client. The complaining witness in the case lived on the same street as my client. Because of that, the judge imposed

DocuSign Envelope ID: 2844B041-7BC0-45EF-AA54-B0652A56F1EB

as a condition of release that my client stay away from the complaining witness. However, the Pretrial Division decided two weeks later that my client could not be released because he lived too close to the victim.

44. The Pretrial Division regularly refuses to release individuals given a pretrial option or order based on their criminal history or the charges against them, even though the judge knew these facts at the time they ordered or authorized pretrial release.

## Pretrial Orders

45. Instead of issuing a pretrial option, judges sometimes issue "pretrial orders."

46. County officials have told me that the Pretrial Division prioritizes the processing of pretrial orders. However, the Pretrial Division often refuses to release individuals issued a pretrial order based on the Pretrial Division's own criteria, just as with the pretrial option.

47. For example, if an individual is given a pretrial order at Level Four, the Pretrial Division still refuses to release individuals who cannot provide the lease or mortgage for an address within Prince George's County where they can stay, as well as a form of identification for a person they can live with.

## Pretrial Division Notices

48. The Pretrial Division does not provide me or my clients affirmative notice of where in the release process they are. The only way for me to find out this information is to call the Pretrial Division.

49. For example, my client Elmer Laguan-Salinas was given a pretrial option at Level Four on March 17, 2022. The Pretrial Division informed me over the phone that it would not even consider his pretrial option until he paid the money bail set in another case against him. At no point did the Pretrial Division inform the court that the Division was not even evaluating

10

DocuSign Envelope ID: 2844B041-7BC0-45EF-AA54-B0652A56F1EB

Mr. Laguan-Salinas for release. At no point did it provide Mr. Laguan-Salinas a hearing, nor could it point to any policy stating that individuals with a money bond set in another case are ineligible for release. Mr. Laguan-Salinas was finally released on an unsecured bond on June 17, 2022, after three months of inaction by the Pretrial Division, and only after I filed a motion for a subsequent bail review hearing.

50. When the Pretrial Division provides written notice to the court and myself of its decision to detain a person despite a pretrial option or order, that notice is not delivered until days, weeks, or months after the decision has been made.

51. When my clients are detained, there is no mechanism to appeal the bail determination. I must instead petition the court for a *de novo* bond review hearing, which I have done many times. Some judges require a demonstration of a "change in circumstances" from the first hearing before granting a new hearing. Often, judges do not accept a delay by the Pretrial Division in processing pretrial options as a change in circumstances justifying a review of the prior bail determination.

52. I have had judges deny a request for a bond review without a hearing and without an explanation, or with a one-sentence written explanation on the papers I filed (for example, that a person has had too many bond review hearings).

I declare under penalty of perjury that this declaration is true and correct.

Executed on __7/6/2022_____.

DocuSigned by:

*Peter Im*

96D378879E2D4DB...

Peter Im

11

# EXHIBIT 13

DocuSign Envelope ID: E6EF4697-F72C-4D38-A4AA-4A7F123CAA36

**<u>Declaration of Leslie Sharp Jr.</u>**

I, Leslie Sharp Jr., pursuant to 28 U.S.C. § 1746 declare as follows:

1. I provided the information below in response to a standard set of questions read to me over the telephone by my attorneys on June 14, 2022, and then in response to follow-up questions on June 23, 2022.  On July 9, 2022, my declaration was read to me, and I confirmed its accuracy based on my own knowledge and observations.

2. My name is Leslie Sharp Jr.  I am 35 years old.

3. I live in the Prince George's County/District of Columbia area.  I have lived in this area for my entire life.  I went to public schools in the District of Columbia.

4. I have many family members in the area, including my wife, newborn son, thirteen-year-old daughter, father, grandmother, and cousins.

5. I currently work as a line cook at the Old Ebbitt Grill in the District of Columbia.

6. On June 11, 2021, I was arrested and charged with second-degree assault in Prince George's County.  At that time, I was also on supervised release in the District of Columbia for an old case.  The judicial commissioner held me without bond.

7. My first bail review hearing in front of a judge took place on June 14, 2021.  At that hearing, the judge held me without bond.

8. After that, my public defender filed a motion to have my bail status reconsidered.

9. At a follow-up hearing, which took place about 10 days after the first, the judge ordered me released pretrial on home confinement. I believe that the judge whom I appeared before knew I was on D.C. supervised release.

10. My understanding after that hearing was that I would be released from jail as soon as I could provide an address in Prince George's County at which I could live.  I provided such an address to my aunt and my attorney.

1

11. Nevertheless, I was not released.  I remained detained at the Prince George's County Jail after a judge had ordered me released.

12. My understanding is that the pretrial services agency in Prince George's County would not release me because of something my D.C. probation agent said, and because the agency could not contact the complaining witness in the case.  But I knew the complaining witness had contacted my attorney, and told him that she did not fear me or want to press charges, and that my attorney had given that information to the court.

13. My public defender then filed another motion, asking the court to enforce its own order to release me pretrial.

14. But at a hearing on that motion, the judge refused to enforce the order.  She said that the pretrial services agency could decide whether to release me.

15. No one at the pretrial services agency ever contacted me directly.

16. Except for my attorney, no one ever explained to me why I was still in the jail.

17. At no time did the pretrial services agency give me a hearing or any other opportunity to be heard regarding my release.

18. At my trial date on July 22, 2021, the State dropped all the charges against me.  This was after my attorney had been telling the State for weeks that the complaining witness did not intend to press charges against me.

19. After I was released from the Prince George's County Jail, I was transported to the District of Columbia jail, for D.C. to decide whether my Maryland arrest was a violation of my D.C. supervised release. D.C. decided that it was not, and released me a few days later.

20. I was ultimately detained at the Prince George's County Jail for 29 days after the pretrial services agency was ordered to release me, on charges that the State dismissed.

21. While I was in the Jail, we were under "lockdown" to minimize the spread of COVID-19.  We were locked in our cells for 23 hours per day.  I was only allowed to shower and exercise during one hour each day.

22. While I was in the jail, the phones were malfunctioning.  We could only use the phones during the one hour each day we were out of our cells.  But because so many of the phones were broken, it was difficult to call my family and friends.  My family and friends were not allowed to visit me in jail.

23. As a result of being arrested, I lost my job at the Old Ebbitt Grill.  I was hired as a prep cook and was going to train to be a sous chef.  I was supposed to start that job on the day that I was arrested.  Now I am a line cook instead, which pays less than a sous chef.

24. My property—including my wallet containing cash, a food stamp card, and a Social Security card—was confiscated at the Jail.  Only the Social Security card was returned to me.  I am missing the other items to this day.

25. While I was in jail, I was separated from my then-12-year-old daughter.

26. While I was in jail, I missed my wife's birthday.

27. While I was in jail, I missed my best friend's funeral. He was killed while I was in jail.

28. While I was in jail, no one was available to take care of my elderly grandmother.

29. I have spoken with my lawyer about what it means to be a plaintiff in a class action lawsuit.  I want to serve in this role so that people who suffered the same injustices that I did are compensated for their harms, and so that these injustices do not happen to anyone else.

I declare under penalty of perjury that this declaration is true and correct.

7/9/2022

_____

DATE

_____

Leslie Sharp Jr.

# EXHIBIT 14

## Declaración de Elmer Laguan-Salinas

Yo, Elmer Laguan-Salinas, solemnemente juro bajo pena de perjurio y por mi conocimiento personal que los contenidos de esta declaración son verdades:

1. Yo proveí la información que sigue a mis abogados en respuesta a algunas preguntas estandartes que mis abogados me leyeron durante una reunión en el 15 de Junio 2022.  Yo di mis respuestas en Español.  En una reunión siguiente el día 15 de Julio, yo leí mi declaración y confirmé que es correcto y basado en mi conocimiento y observaciones.  Al fin de la reunión siguiente, yo jure que la información contenido es correcto bajo pena de perjurio.

2. Mi nombre es Elmer Uriel Laguan-Salinas.  Tengo 32 años.[1]

3. Yo vivo en Hyattsville, Maryland con amigos.

4. Yo he vivido en el condado de Prince George's desde 2010 cuando yo me mudé de El Salvador a los Estados Unidos.

5. Yo trabajo en construcción y remodelo de casas.  Yo he trabajado en construcción para más o menos ocho años.  Anteriormente, yo hice un aprendizaje en construcción.

6. Miembros de mi familia viven en el área del condado de Prince Georges: mi hija que tiene 14 meses, mi hermano, mi hermana, mi padre, y dos sobrinos.

7. Mi esposa y yo estamos separados, pero nos llevamos bien, y ella vive en el condado de Montgomery con sus tres hijos, quien yo veo como míos.

8. Yo voy a iglesia cada Domingo.

9. Me gusta jugar futbol con mis amigos e ir al gimnasio después de trabajo.

---

[1] Los papeles del corte dicen que tengo 30 anos, pero eso es incorrecto.  No se porque están incorrectos los papeles.

10. Yo fui arrestado el 15 de Marzo, 2022 por cargos incluyendo asalto, y transportado allá cárcel de condado de Prince George's.

11. En mi primera audiencia sobre fianza en el 17 de Marzo 2022, la juez me detuvo sin fianza, pero me dio un "pretrial option."[2]

12. Porque yo no hablo Ingles, hubo un intérprete de Español en la audiencia con migo. El intérprete habló muy rápido. Yo no entendí completamente el proceso para el pretrial option, pero pensaba que yo estaré libertado.

13. Pero hasta después de que la juez ordenó que yo fuera libertado, yo seguí en la cárcel. Yo entiendo que fue porque la agencia de servicios previo juicio empezó a poner obstáculos acerca de mi libertad que no fueron ordenado por el corte.

14. Por ejemplo, la agencia de servicios previo juicio pidió una dirección dentro el condado de Prince George's donde yo pudiera vivir si fuera libertado. Pero yo perdí mi hogar cuando fui arrestado y tuve que encontrar otro lugar para vivir. Finalmente, yo encontré a una amiga en el condado de Prince George's quien estaba dispuesto a dejarme vivir allá. Yo le di su dirección a mi abogado para que lo pase a la agencia de servicios previo juicio. Pero después de todo eso, la agencia de servicios previo juicio no me permitió salir.

15. Hasta hoy en día, yo nunca he hablado directamente con nadie de la agencia. Tampoco he recibido ninguna noticia de la agencia.

16. Todo lo que se sobre mi proceso de salida previo juicio es por mi abogado, quien yo se ha estado pidiendo mi libertad de la agencia.

---

[2] Cuando yo fui arrestado, yo tuve otro caso abierto. En este caso, la juez me dio una fianza. Yo no pague esa fianza porque todavía seguiré encarcelado por el otro caso. Ese caso fue despedido el 25 de Mayo 2022. Seguí encarcelado para un mes después de ese día.

17. Por fin, yo fui liberado de la cárcel el 17 dc Junio en una fianza sin garantía, exactamente tres meses después del día cuando la juez me dio el pretrial option.

18. Yo solo fui liberado después de que mi abogado presentó otra petición y le pidió a la juez que reconsidere su decisión como que había sido casi tres meses desde que ella autorizó mi salida, y yo seguía encarcelado. En la audiencia acerca de esta petición, la juez le preguntó a la agencia porque yo seguía encarcelado. Después de oír la respuesta, la juez decidió a liberarme en una fianza sin garantía.

19. Para los tres meses que yo estuve encarcelado, yo no vi mi familia ni mis amigos. No pudieron visitar la cárcel por sus horarios. También no vi mi hija de 14 meses porque la cárcel no permitió visita con niños.

20. Las condiciones en la cárcel fueron dañosas para mi salud y bienestar.

21. El área donde estuve era muy viejo y no fue mantenido bien. A veces, no funcionaba el agua o no tiraban las cadenas. Había muy poca agua caliente.

22. Cuando llegue a esa área, la cárcel me puso en una celda donde la cadena tenia agua negra y gusanos que salían desde adentro. Yo le conté esto a los guardes, pero todavía había otra gente en esa celda cuando yo salí de la cárcel.

23. Los colchones eran tan delgados que se sentía como que yo dormía en el piso. Alguna gente amontaba varios colchones, si los podían conseguir, para poder dormir.

24. No había suficientes teléfonos en mi área, así que hubo competencia para poder usarlos. Per esta razón, fue difícil mantener contacto con mi familia y mi abogado.

25. Yo pedí ver una dentista en medio de Mayo porque mi diente me dolía y yo pensaba que estaba sangrando. Hasta el día que salí de la cárcel, nunca vi una dentista.

26. Yo he hablado con mi abogado acerca de que es ser demandante en una demanda colectiva. Yo quiero estar en este rol para asegurar que nadie sufre por las mismas injusticias que me hicieron daño a mí.

07/15/22

FECHA

Elmer Uriel Laguan-Salinas

# EXHIBIT A

## <u>Declaration of Ayana Williams</u>

I, Ayana Williams, solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true:

1. My name is Ayana Delores Williams.  I am a Senior Associate at WilmerHale.

2. I am fluent in Spanish.

3. I translated the declaration of Elmer Laguan-Salinas from Spanish to English.  My translation is attached this declaration.

4. The attached English translation is an accurate translation of the declaration signed by Mr. Laguan-Salinas in Spanish.

7/17/2022

DocuSigned by:

*Ayana D Williams*

89B7E55472304CC...

_____          _____

DATE                                                Ayana Delores Williams

1

DocuSign Envelope ID: 7B745A52-2B0D-4B9F-A8DC-534EA8BDB863

## <u>Declaration of Elmer Laguan-Salinas</u>

I, Elmer Laguan-Salinas, solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true:

1. I provided the information below in response to a standard set of questions read to me in Spanish at a meeting with my attorneys on June 15, 2022.  I provided my responses in Spanish. At a follow up meeting on July 15, 2022, I read my declaration and confirmed its accuracy based on my own knowledge and observations. At the conclusion of the follow-up conversation, I swore under the penalty of perjury as to the accuracy of that information.

2. My name is Elmer Uriel Laguan-Salinas. I am 32 years old.[1]

3. I live in Hyattsville, Maryland with friends.

4. I have lived in the Prince George's County area since 2010, when I moved to the United States from El Salvador.

5. I work in construction and house remodeling. I have worked in construction for approximately eight years. Before that, I did a construction apprenticeship.

6. I have many family members in the Prince George's County area: a 14-month-old daughter, brother, sister, and two nephews.

7. While my wife and I are separated, we are on good terms, and she lives in Montgomery County with her three children whom I think of as my own.

8. I attend church every Sunday.

9. I like to play soccer with friends and go to the gym after work.

---

[1] Court records say that I am 30 years old, but that is incorrect. I do not know why the records are incurred.

1

DocuSign Envelope ID: 7B745A52-2B0D-4B9F-A8DC-534EA8BDB863

10. I was arrested on March 15, 2022 on charges including assault, and brought to the Prince George's County Jail.

11. At my first bail hearing in this case on March 17, 2022, the judge held me without bond, but gave me a "pretrial option."[2]

12. Because I do not speak English, there was a Spanish translator in court with me at the bail hearing. The translator was speaking fast. I did not completely understand the process for a pretrial option, but I thought it meant that I was going to be released.

13. But even after the judge authorized my release, I remained in jail. To my understanding, this is because the pretrial services agency started adding restrictions regarding my release that were not ordered by the court.

14. For example, the pretrial services agency asked for an address in Prince George's County that I could live at if released. But I lost my housing as a result of being arrested, so I had to find a new place to live. I finally found a friend in Prince George's County who was willing to let me stay with her, and gave her address to my attorney to give to pretrial services. But even after all that, the pretrial services agency did not release me.

15. To this date, I have never directly spoken to anyone at the pretrial services agency. Nor have I ever received any official notices from the agency.

16. Everything I know about my pretrial release process is through my attorney, who I know has been advocating for my release with the agency.

17. I was finally released from the Jail on June 17, 2022 on an unsecured bond, three months to the day after a judge authorized my released.

---

[2] At the time I was arrested, I had another open case. On that other case, the judge set a money bond. I did not pay the bond because I was still going to be detained on this case regardless. That case was dismissed on May 25, 2022. I was detained for an additional month after that.

DocuSign Envelope ID: 7B745A52-2B0D-4B9F-A8DC-534EA8BDB863

18. I was only released after my attorney filed another motion with the court and asked the judge to reconsider her decision, given that it had been nearly three months since she authorized my release and I was still in jail. At the hearing on this motion, the judge asked the pretrial services agency why I was still in jail. After hearing their explanation, the judge decided to just release me on an unsecured bond instead.

19. For the three months that I was in jail, I did not see any of my family members or friends. They were not able to visit the Jail because of their own schedules. I also did not see my 14-month-old baby daughter, as the jail did not allow children to visit.

20. The conditions at the jail were harmful to my health and wellbeing.

21. The unit that I was in is very old and poorly maintained. The water will sometimes stop working, or the toilets will not flush. The hot water is very limited.

22. When I was first put in this unit, the Jail put me in a cell where the toilet had black water and worms flowing out of it. I informed the guards about this, but they still had other people living in that cell as of the date of my release.

23. The mattresses were so thin that I felt like I was sleeping on the floor. Some people in my unit stacked multiple mattresses on top of each other, if they could get them, to be able to sleep.

24. There were not enough phones in my unit, so there was competition to be able to use them. This made it hard to stay in touch with my family and attorney.

25. I submitted a sick call request to see a dentist in mid-May, because my tooth was hurting and I thought it was bleeding. I never saw a dentist through the day that I was released, approximately one month later.

26. I have spoken with my lawyer about what it means to be a plaintiff in a class action
lawsuit. I want to serve in this role so that nobody suffers from the same injustices that
I suffered from ever again.

_____        _____

DATE                                             Elmer Uriel Laguan-Salinas

4

# EXHIBIT 15

DocuSign Envelope ID: 829A0744-6BB2-48BE-9AB6-48E3D0FFB8A7

## Declaration of Adrienne Michelle Worthington

I, Adrienne Michelle Worthington, solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true:

1. I provided the information below in response to a standard set of questions read to me over the telephone by my attorneys on June 6, 2022 and then in response to follow-up questions on June 17, 2022.  On July 16, 2022, this declaration was read to me. I confirmed its accuracy based on my own knowledge and observations.

2. My name is Adrienne Michelle Worthington.  I am 54 years old.

3. I am a resident of Prince George's County.  I have lived in the area for about 20 years.

4. I moved to Maryland from California for work. I previously lived in Ohio.  I still have a lot of family in Ohio, including three children and fifteen grandchildren.

5. Although my family lives a few states away, we have a strong connection. I speak to my children and grandchildren on an almost daily basis.

6. I have several friends in the Prince George's County area who I have known for the entire two decades I have lived here.  We are very close. I know their children and parents.  They are the kind of friends I can call in the middle of the night, and I know they will pick up.

7. When I first moved to the Prince George's County area, I worked for about six years as an assistant for a procurement officer at Farm Credit Bank until he passed away.

8. Since then, I have worked various other jobs, including as a concrete mixer and commercial driver.  I have a Commercial Driver's License.  I was a member of the Local 77 union.

9. In more recent years, I have performed research jobs, which I get through referrals.

1

10. I have depression with psychotic features. I was diagnosed about 10 years ago, but I have experienced symptoms over the past 30 years.

11. I have been prescribed psychiatric medication, and I take it regularly to manage my symptoms.

12. These symptoms have impacted my ability to stay in a job for long periods of time, since they can make it difficult for me to leave home and interact with people.  But I have worked as much as I can for my entire adult life.

13. I also have also struggled with substance abuse, particularly with alcohol.  I have a sponsor and go to meetings weekly to manage this issue.

14. I was arrested on December 23, 2021, in Prince George's County on charges of first- and second-degree assault.

15. At my first appearance on Christmas Eve, I was held without bond.  I spent Christmas in jail, instead of with my children and grandchildren as I had planned.

16. My bond hearing was originally scheduled for December 27, but it was pushed to December 28.  This was the first time I saw a judge, five days after my arrest.

17. At the hearing, the judge ordered that I be detained without bond even though I had no prior convictions for violent crimes and my last prior conviction of any kind was more than 10 years old.  The judge also gave me the pretrial level 4 "option."

18. I understood pretrial "option" to mean that I was probably going to be released pretrial. But I remained incarcerated after my hearing.

19. A few days later, I learned from a pretrial services employee that the pretrial services agency[1] would not release me until I was able to provide an address where I could live.

20. I was told the address had to be in Prince George's County.

21. I was told I could not be released to my own address, because there was no one else living at that address who could "verify" it. I offered to show my lease agreement but was told that I instead needed to provide the address of a residence of a relative, friend, or neighbor who I could stay with so that this person could "verify" the address.

22. I would have preferred to be released to a halfway house or some sort of transitional living, to get some support for my mental health and substance abuse issues.  But I was told that was not an option because I was level 4.

23. I had difficulty contacting anyone, including my attorney, while in jail because of the difficulty of using the jail's phones—they were always in use and I could only access the phones during one hour each day.

24. I was finally able to get into contact with a neighbor who agreed to take me in after my release, and I gave that information to my attorney who gave it to pretrial services.

25. I am not certain of the exact day I was released, but I know that I was detained for over a week, into the New Year.

26. As far as I could see, all the work to facilitate my release was done by myself, my relatives and friends, and my attorney—not pretrial services.

27. For nearly the entire time that I was incarcerated, other than one very brief interaction, no one in pretrial services ever spoke to me about the status of my pretrial processing,

---

[1] My attorneys have informed me that the formal name for the pretrial services agency in Prince George's County is the Department of Corrections Population Management Division.

if or when I was going to be released, or anything else.  The only reason I knew what was going on is that my attorney called pretrial services and relayed what they said to me.  I still do not fully understand the process by which I was released or why I was incarcerated for so long after a judge said I could be released.

28. I was released into home detention. I was on home detention for about a month.

29. The State ultimately dropped all of the charges against me.  I was never convicted of any crime related to this arrest.

30. The time I spent in jail harmed me in numerous ways.

31. I was detained right before the winter holidays. I had plans to spend the holidays with my mother, my three adult sons, my grandchildren, and my newly born grandniece.  I had to spend Christmas and New Years in jail instead of being with loved ones.

32. I contracted COVID-19 in the jail.  I had several symptoms of the virus and felt ill for several days.

33. My mental health seriously suffered because of medication issues caused by the jail.  I told the jail as soon as I was arrested that I needed to see a doctor. The jail took many days to have me seen by a psychiatrist and give me medication for my diagnosed depression.  The jail gave me Prozac, which is not my usual, prescribed medication that I am supposed to take every day. They refused to give me my usual medication because they said they did not have it in stock.  Prozac made me feel very groggy and made me feel very off mentally—including because it gave me suicidal thoughts, delusions and I could not sleep. That feeling lasted until after I was released and able to get back onto my normal medication.

34. Due to the stress of being arrested, and because I could not be released to a treatment facilities, I relapsed in my first month after being released from jail.

35. While at the jail, I had only an hour a day outside of my cell. That meant I only had one hour a day to shower and use the phones, among other things. This made it more difficult for me to stay in touch with my attorney and others and facilitate my release.

36. I lost my car as a result of being detained. When I was arrested, I asked the officers if they would allow me to move my car, which was at the scene, to a legal parking spot nearby. They refused. As a result, my car was towed. I could not pick up my car from the towing company because the fees, which were more than a thousand dollars, were more than I can afford. I've searched for my car since and it appears that it has been sold to someone else.

37. I lost all of my money while I was detained. Someone emptied my bank account while I was jailed, and I could do nothing to prevent this.

38. I was evicted because of my arrest and detention. At the time I was arrested, I was behind on my rent and had scheduled an appointment with the Emergency Rental Assistance Program. But I missed that appointment because I was incarcerated and could not schedule a new one until March. I have become homeless as a result of my arrest and eviction.

39. I have spoken with my counsel about what being a plaintiff in a class action lawsuit means. I want to serve in this role so that people who suffered the same injustices that I did are compensated for their harms, and so that these injustices do not happen to anyone else, ever again.

7/17/2022
_____

DATE

DocuSigned by:

_____
A893E9FA57C04FD...

Adrienne Michelle Worthington

5

# EXHIBIT 16

 **Gmail**

Ben Perelmuter <ben@civilrightscorps.org>

---

## Jail Inmate Population Question
4 messages

---

**Ben Perelmuter** <ben@civilrightscorps.org>                    Wed, Jul 13, 2022 at 12:41 PM
To: Arcephas@co.pg.md.us

Dear Andrew,

I am the legal assistant who called you earlier today to ask for the number of people in the Prince George's County Jail.  Thank you for passing on that today there are 920 people incarcerated in the jail, and that yesterday there were 927.

On our call, you asked if I wanted a document with the demographic information of people in the jail. If possible, I would like that information. Are you able to send that to me as well?

Again, thanks for your help.


All the Best,
Ben Perelmuter

---

**Ben Perelmuter** <ben@civilrightscorps.org>                    Fri, Jul 15, 2022 at 9:18 AM
To: Arcephas@co.pg.md.us

Hi Andrew,

I'm following up on our call from a moment ago. Can you please just confirm that the information you gave me regarding the County Jail (listed below) are accurate?

Today's jail population: 926 people
79% Black, 5% white, 16% other.
43 women, 883 men.

Thanks again!

Best,
Ben
[Quoted text hidden]
--
**Ben Perelmuter** | *Investigative Fellow*

**Civil Rights Corps**

  

---

**Cephas, Andrew R.** <ARCephas@co.pg.md.us>
To: Ben Perelmuter <ben@civilrightscorps.org>

Fri, Jul 15, 2022 at 1:47 PM

Sorry Ben. I'm checking the numbers now.

---

**From:** Ben Perelmuter <ben@civilrightscorps.org>
**Sent:** Friday, July 15, 2022 12:18 PM
**To:** Cephas, Andrew R. <ARCephas@co.pg.md.us>
**Subject:** Re: Jail Inmate Population Question

> **CAUTION:** This email originated from an external email domain which carries the additional risk that it may be a phishing email and/or contain malware.

[Quoted text hidden]

---

This E-mail and any of its attachments may contain Prince George's County Government or Prince George's County 7th Judicial Circuit Court proprietary information or Protected Health Information, which is privileged and confidential. This E-mail is intended solely for the use of the individual or entity to which it is addressed. If you are not the intended recipient of this E-mail, you are hereby notified that any dissemination, distribution, copying, or action taken in relation to the contents of and attachments to this E-mail is strictly prohibited by federal law and may expose you to civil and/or criminal penalties. If you have received this E-mail in error, please notify the sender immediately and permanently delete the original and any copy of this E-mail and any printout.

---

**Cephas, Andrew R.** <ARCephas@co.pg.md.us>
To: Ben Perelmuter <ben@civilrightscorps.org>

Fri, Jul 15, 2022 at 1:49 PM

Ben,

All the numbers are correct except the gender breakdown. There are 46 women at the jail and 880 men. We had three females in processing that weren't accounted for in the original numbers.



**Andrew Cephas**

**Public Information Officer**

Prince George's County Department of Corrections

Office of the Director

13400 Dille Drive, Upper Marlboro, MD 20772

**o:** (301) 952-7017

**c:** (240) 419-8803

**e:** arcephas@co.pg.md.us



*Social Media:* **Facebook.com/PGJail**|**Twitter. com/PGcorrections**|**Instagram.com/PGcorrections** | **Youtube: PGC Department of Corrections**

---

**From:** Ben Perelmuter <ben@civilrightscorps.org>
**Sent:** Friday, July 15, 2022 12:18 PM
**To:** Cephas, Andrew R. <ARCephas@co.pg.md.us>
**Subject:** Re: Jail Inmate Population Question

---

**CAUTION:** This email originated from an external email domain which carries the additional risk that it may be a phishing email and/or contain malware.

---

Hi Andrew,

[Quoted text hidden]
[Quoted text hidden]

---

[Quoted text hidden]

# EXHIBIT 17

## DECLARATION OF CLAIRE GLENN

I, Claire Glenn, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I work as a criminal defense attorney and now live in Minneapolis, Minnesota.

2. From September 2018 to May 2021, I worked as an Assistant Public Defender for the Maryland Office of the Public Defender ("OPD") in Prince George's County, Maryland.

3. In my role as Assistant Public Defender, I represented indigent clients at bail review hearings in both District Court and Circuit Court.

4. In Prince George's County, a handful of Assistant Public Defenders are assigned to handle bail review hearings each day, on a rotating basis. On average, I was assigned to handle bail review hearings approximately five days per month. Depending on the size of the daily docket, I would personally represent anywhere from one to a dozen clients for bail review hearings in a given day. I also regularly represented clients at subsequent bail review hearings in District Court, after filing motions to reconsider conditions of release for those who remained detained after their initial bail review hearing. I also periodically litigated pretrial conditions in Circuit Court, either because I was scheduled to handle Circuit Court arraignments or had filed a motion for bail review or petition for *habeas corpus*. During the time that I worked at OPD, I litigated pretrial conditions for hundreds of clients in initial and subsequent bail review hearings, arraignments, and *habeas* hearings.

5. Through my work at OPD, I became familiar with the pretrial detention and release policies and practices of the Prince George's County District Court, Prince George's County Circuit Court, and Prince George's County Department of Corrections.

6. This declaration is based on those policies and practices as of May 2021. I am not aware of any changes to these policies and practices since May 2021.

7. When someone is arrested in Prince George's County, they first have an initial appearance in front of a District Court Commissioner. At the initial appearance, the Commissioner determines whether probable cause exists for each charge and then either releases the person on their own recognizance, detains them without bond, or sets a financial condition for release. If the accused remains detained after the initial appearance, either detained without bond or on an unaffordable financial condition, they appear for a bail review hearing in the District Court on the next business day.

8. Most bail review hearings last only a few minutes. Although the State has the burden where it seeks pretrial detention, the District Court nonetheless requires defense counsel to proceed first during bail hearings by proffering evidence and presenting arguments as to why their client should not remain detained. Generally, the Assistant State's Attorney ("ASA") is given an opportunity to respond after defense counsel's arguments. The ASA often says very little, and sometimes makes no argument at all. To the extent the ASA

participates in the hearing, it is most often to provide a position as to bond and reiterate the allegations contained in the statement of probable cause.

9.  At the conclusion of the bail review hearing, the judge decides whether to leave the Commissioner's detention order in place or modify it.  In my experience, it is not uncommon for a judge to give little or no explanation for their ruling.

10. Despite legislative changes which have made it illegal to detain someone because they cannot afford to purchase their freedom, several judges have continued the practice of setting unaffordable money bail, often over the objection of defense counsel and their proffers regarding unaffordability, and often without stating any basis for a contrary belief that the financial condition can be met by the person detained.

11. In addition to setting a financial condition for release, or detaining without bond, judges also frequently authorize release under the supervision of the Population Management Division of the Prince George's County Department of Corrections, known as "Pretrial" or the "Pretrial Division" of the jail.  Such authorization can take one of two general forms: the "pretrial option" or the "pretrial order."  The pretrial option allows, but does not require, the Pretrial Division to release the person on conditions.  The pretrial order requires, at least in theory, that the Pretrial Division release the person on conditions.  Thus, when the Court grants a person the pretrial option, the Pretrial Division has the discretion to release a person or not.  When the Court orders the Pretrial Division to supervise a person, Pretrial Services ostensibly must do so.  In practice, however, Pretrial Services at times will still refuse to release people who have been given a pretrial "order" because they do not meet Pretrial's self-determined "criteria" for release.

12. If a person has been held without bond, or given an unaffordable financial condition of release, release by the Pretrial Division becomes the only avenue for release for someone granted a pretrial option or order.

13. The Pretrial Division has established four different "levels" at which the Division will supervise someone's pretrial release.  They range from least restrictive at Level 1, to the most restrictive at Level 4.  Levels 1 through 3 involve submitting to urinalysis and periodic check-ins, at differing intensities.  Level 4 is home detention.  The Court may specify that a defendant is to be released only at a certain level of supervision, or may defer and allow the Pretrial Division to determine the "level" at which a person may be released.

14. The Pretrial Division has established criteria that determine at what level someone will be supervised, which governs absent a court order to the contrary.  These criteria are not published or codified, and it is unclear how the Pretrial Division developed them.  I became familiar with the criteria based on my personal experience and conversations with jail staff, including those who work in the Pretrial Division.

15. Judges may override the Pretrial Division's criteria by "ordering" someone's release to Pretrial Services at a specific level.  This is very rare, and usually occurs only after someone has remained detained for several days or weeks with only the "pretrial option."  On the

DocuSign Envelope ID: BC5FE744-E48E-4CC0-838D-6AADBD190210

other hand, judges at times limit Pretrial's authorization to release someone, for example, by indicating the "pretrial option" is authorized at Level 4/home detention only.  For the most part, however, judges simply defer to the Pretrial Division by granting the "pretrial option" at any level/without specifying a level.

16. Very few people qualify for release at Levels 1 through 3.  This is because those whom the Pretrial Division would deem eligible for supervision at Levels 1 through 3 are almost always released by the Court at the bail review hearing, either on their own recognizance or on an unsecured money bond.  The vast majority of people who remain otherwise detained following a bail review hearing—whether on unaffordable financial conditions or on "no bond"—are almost always deemed eligible for release at Level 4/home detention only.  Because the Pretrial Division makes this determination based on its own internal criteria, this is so even where the court has authorized release at any level.  For example, if a judge grants someone the "pretrial option" at any level, the Pretrial Division may still determine, based on its criteria, that it will only release a person at Level 4/home detention.

17. People who do get released on Levels 1 through 3 must submit to urinalysis for drug and alcohol testing, without individualized consideration of whether that type of supervision is warranted by their particular circumstances. The testing requirement can pose significant hardships: many of my clients did not have ready access to cars to regularly travel to Upper Marlboro for testing, worked jobs with unpredictable hours or schedules, and/or had childcare or medical needs that posed barriers to travel.  The jail is difficult and time-consuming to access without private transportation.

18. Level 4/home detention can come in a more stringent variation, known as "Level 4/Administrative Review" or "Admin Review."  A person assigned for Level 4/Administrative Review is eligible for release on Level 4/home detention only after jail administration has personally reviewed their case and signed off on their release.  A judge may grant a person the pretrial option at "Level 4, Admin Review only" and thus limit the discretion of the Pretrial Division, or the Pretrial Division may determine based on its own criteria that a person given the pretrial option at any level by a judge will only be reviewed by the Pretrial Division following Administrative Review.  It is unclear to me what criteria, if any, is used to determine whether someone is eligible for release only following Administrative Review and what criteria jail administration uses to assess those who are deemed to fall in that category.

19. Separate from the criteria used to determine the level at which it will consider supervising a person, the Pretrial Division also maintains a long list of criteria that a person must meet in order to be released.

20. Again, these criteria are not published or codified, and it is unclear how the Pretrial Division developed them.  My understanding of these criteria is based on my personal experience and conversations with jail staff, including those who work in the Pretrial Division, in my efforts to get my clients released.

21. As an Assistant Public Defender, I spent a significant amount of time attempting to determine why the Pretrial Division had not released a client, despite a "pretrial option" or even "pretrial order," and working to facilitate their release.  In the process, Pretrial Division staff gave me numerous explanations as to why my client was deemed ineligible for release.  The most common reasons included:  (1) a third party has not verified the defendant's address; (2) a third party has verified the defendant's address, but that address is not within Prince George's County; (3) the defendant is also on active probation or parole; (4) the defendant has another pending case in any jurisdiction other than Prince George's County; (5) the defendant's charge is "too serious"; (6) the defendant has a "bad" record; (7) Pretrial Services has been unable to contact the complaining witness; (8) Pretrial Services contacted the complaining witness and they report fear if the defendant were released; (9) the defendant has been charged with felonies and Pretrial Services is waiting to see whether those felonies will be dismissed at the preliminary hearing; (10) the defendant has an unserved warrant/detainer (whether the warrant issued from Prince George's County or another jurisdiction); and (11) the defendant tested positive for COVID-19 and must remain isolated at the jail.

22. These explanations were consistently proffered to me and my colleagues as "policies" by Pretrial Division staff, though they often have perverse legal effects.  It was not uncommon, for example, for the Pretrial Division's "policies" to override the release decision of a judge based on jail staff's review of the very same information that, presumably, the judge had already reviewed, such as the defendant's charges or criminal history.

23. The "pretrial option" is a very common grant during bail review hearings.  In a given day, it is rare that at least one client is not granted the pretrial option, and frequently many more receive it.  The "pretrial order" is much rarer.  Judges frequently explain during bail review hearings that they will only grant the pretrial option, not a pretrial order, because the latter allows an individual to "jump the line" of people waiting for release and/or usurps the discretion of the Pretrial Division.  Some judges will only grant a "pretrial order" after a person has been detained on the "pretrial option" for a period of at least several days, while others categorically refuse to grant a "pretrial order."

24. As a result of the Pretrial Division's "policies" limiting release eligibility, numerous people remain detained who are authorized by the court for supervised pretrial release, but who fail to meet all of the Pretrial Division's criteria.  On May 7 and 8, 2020, I reviewed the cases of 503 people who were then detained at the Prince George's County Jail and determined that at least 121 people, approximately one in four inmates, had been authorized by the Court for release to the supervision of the Pretrial Division, but nonetheless remained incarcerated at the jail.  Of those 121 people, eighty had been authorized by the Court for release more than one month prior, and forty-eight had been authorized by the Court for release more than three months prior.

25. During my time as an Assistant Public Defender, I filed dozens of motions for my clients alone who had been given the pretrial option or pretrial order and nonetheless remained detained.  Upon review of my records, I would conservatively estimate that I filed approximately eighty such motions.  More than fifty of those motions were for clients who

were detained on unaffordable money bonds as well as a pretrial option or order, while the remainder involved clients who had only been granted the pretrial option or pretrial order. Numerous motions involved cases in which the Pretrial Division was denying release to my client based on criteria the court had already reviewed itself in determining release was appropriate, and several involved instances where the Pretrial Division refused to release my client despite a court order to do so.

26. This practice of judges granting "pretrial options" and "pretrial orders" was ongoing for as long as I worked at OPD.  I do not know how this practice originated, because it predates my time at OPD.

27. The practice of granting "pretrial options" and "pretrial orders" is one by which judges in Prince George's County delegate significant discretion to the Pretrial Division as to whether, when, and on what conditions a person may be released from the jail as they await trial.  In particular, when a person is granted the "pretrial option," the Pretrial Division holds complete discretion and decision-making authority over release decisions, unless and until defense counsel files a motion asking the Court to reconsider their client's conditions of release.

28. In practice, the "pretrial option" functions as a way to pass the buck.  Judges are able to claim that because they gave the option of release to the Pretrial Division, it is not their fault that a person remains detained.  And the Pretrial Division claims that its hands are tied by its own internal eligibility criteria, and so the Court must issue a pretrial order to override the criteria in order for a person to be released.  In the meantime, my clients remained detained as I scrambled to gain their release, by tracking the reasons for their ineligibility; attempting to remedy the barriers to eligibility by quashing warrants, tracking down witnesses, coordinating with other jurisdictions, gathering deed and lease information for home detention, etc.; and filing motions requesting new bond review hearings when I could not otherwise remedy barriers to release.

29. I am aware that Pretrial Division officials have claimed in affidavits that they "always" notify the court of a decisions to keep detained a person for whom the court has authorized release.  This is false.  In my experience, the burden of notifying the Court that my clients remained detained, and the reasons proffered by Pretrial, rested entirely on my shoulders. In my conversations with numerous District Court judges in Prince George's County, on and off the record, judges confirmed they relied on defense counsel to so notify them, and did not receive notice from Pretrial.

30. Unfortunately, many judges require defense counsel to file formal motions in order to give notice that a client remains detained. After such motions were filed, it often took several days, if not a week or more, before a hearing would be scheduled.  While several judges would routinely grant hearings to address issues with the Pretrial Division, or even invite me to email them directly with such information, other judges would summarily deny such motions without even an opportunity to be heard.

DocuSign Envelope ID: BC5FE744-E48E-4CC0-838D-6AADBD190210

31. The Pretrial Division's "process" is not transparent.  The Pretrial Division almost never provided me or my clients with proactive updates on the status of their cases or release decisions.  Instead, I emailed and called the Pretrial Division in order to receive any updates on my clients' cases.

32. Not every defense attorney has the time, energy, or caseload compatibility to follow up with the Pretrial Division as I did in my time as an Assistant Public Defender in Prince George's County.  If my caseload involved more felony cases, or if my personal or family obligations had prevented me from working such long hours, I would have found it very difficult, if not impossible, to have dedicated as much time as I did to following up with the Pretrial Division to gain my clients' release.

33. Immediately following bond review hearings, for a client who received the pretrial option, my first step was to appropriately advise them.  Although some clients were familiar with the local system, many were not and mistakenly believed they would be released within a matter of hours.  For these clients, my job included the heartbreaking work of recalibrating their expectations for what was often a long road ahead.

34. My next step would be to contact the Pretrial Division by sending an email to pghomedetention@gmail.com, including a copy of the client's statement of charges and the name and phone number of a person who could verify their address.  I do not know why the Pretrial Division uses a Gmail account, rather than a government account, but it is accessed by multiple staff of the Pretrial Division.

35. This email would generally go unanswered.  Within the next business day or two, I would call the Pretrial Division to follow-up.  At times I would be told that there was a processing backlog and they had not reviewed my client's case yet.  At times I would be told that they had not received a copy of the release order from the Court.  At times I would be told that they "never" received my email, and I would have to re-forward them the same information I had previously sent.  I would most often be directed to call back later.

36. If my client was not released, I would eventually be told a reason why over the phone.  I never received written explanations as to why my clients remained detained.  At that point, it would be up to me to attempt to remedy the barrier to release.  At times this would require me to try to obtain the complaining witness' contact information so that it could be provided to the Pretrial Division so they could ask whether the complainant agreed to my client's release.  Or I would need to work with my client's loved ones to identify a Prince George's County address where my client could reside, and then obtain a copy of the lease or deed and contact information for the leaseholder or deedholder to send to the Pretrial Division.  Or I would need to file a motion to quash a warrant or coordinate with a colleague in another jurisdiction to do so.  Or a client might be deemed ineligible for release solely because when Pretrial Division staff called to verify an address, the person missed the call, and I simply need to ask Pretrial Division staff to try calling again.

37. Frustratingly, a person might be ineligible for release under multiple criteria, but I might be notified of only one reason at a time.  Thus, after one basis for ineligibility was remedied,

I would then learn of another basis.  Or another basis for ineligibility might arise as we worked to remedy another.  For example, if a client were detained in Prince George's County while we tried to get them eligible for pretrial release, and missed court in another jurisdiction during that time and a warrant issued, that warrant would then make that client ineligible for pretrial release.

38. The Pretrial Division categorically refuses to release individuals who have a pretrial option or order when they have an open warrant or detainer from another county or state.  Even where an open warrant has been caused by the delay of the Pretrial Division itself in processing a person's application for release, the Pretrial Division does not release people to other jurisdictions to resolve warrants or detainers.

39. Another common barrier to release is a verified Prince George's County address.  The Pretrial Division, by its own criteria, will not release people on Level 4/home detention except to an address within the County.  Many of my clients lived in the District of Columbia, Northern Virginia, or in neighboring Maryland counties such as Montgomery County.  Unless a client has an address within Prince George's County where they can live on home detention, however, they remain detained.

40. Judges are well aware of this requirement.  Where I had a client with an address beyond the County's boundaries and the judge gave my client the option of Level 4, or gave the option at any level, but I knew that the Pretrial Division would only release at Level 4 under its self-determined criteria, I would tell the judge that my client would remain detained absent some other court order.  Most commonly, judges would respond that I should wait and file a motion for bail reconsideration if my client were still detained in a week.

41. The Pretrial Division has also created a barrier to release by granting veto power to complaining witnesses.  The Pretrial Division will not release someone if the complaining witness either cannot be reached or objects to release.  This is so even when the complainant has appeared at the bail review hearing and the judge has considered their credibility and objection to release, but nonetheless granted the pretrial option.  Particularly because Maryland is a state in which any civilian can swear out criminal charges against another, this gives a complainant massive personal power to have a person arrested and keep them detained.  Because of the Pretrial Division's absolute deference to complainants, this veto power is only checked by a court order overriding the Pretrial Division's eligibility criteria, which is difficult and time-consuming to obtain in Prince George's County.

42. Even where a complainant appears in a bond review hearing and indicates they do not object to release, the Pretrial Division will not release a person without independently notifying them and verifying their position.  In one case, the Pretrial Division staff told me that because the State's Attorney's Office had not provided them with a phone number for the complainant, they mailed her a letter at her last known address and deemed my client ineligible for release unless and until they received a response to the mailing.  If I had not been able to track down the complainant's phone number and share it with the Pretrial Division, my client would have remained detained.

43. In my experience, the Pretrial Division has the capacity to evaluate someone's case and release them with relative speed. For example, I have had clients who, on very rare occasions, the Pretrial Division released quickly. Generally, these cases involve clients with serious medical vulnerabilities. In such cases, I called the Pretrial Division to warn them that if my client remained detained, without access to urgently required medical care, they were likely to have a serious medical emergency in the jail or worse. I understood the Pretrial Division's speed in those rare situations to be prompted by a desire to avoid liability over inadequate medical treatment.

44. When I could not remedy the reasons that the Pretrial Division had deemed my clients ineligible for release, I filed motions asking the Court to reconsider bond and/or its delegation of authority to the Pretrial Division. Because Prince George's County operates on a paper filing system, it often took days before my motion was even reviewed by the court, and then days more before a hearing was held or I received a paper order in the mail notifying me that the motion was summarily denied. All in all, it was not uncommon for my client to wait one to three weeks for a hearing on a reconsideration motion after the Pretrial Division had deemed them ineligible for release (a process which itself often took days or weeks).

45. Some judges would hold a hearing in response to a motion to reconsider pretrial release. Others would summarily deny the motions, without any response or argument from the prosecutor. Not once did an ASA provide a written response to any of my motions for bail reconsideration filed in the District Court.

46. In my time at OPD, the Pretrial Division's delay in releasing people was regularly discussed in open court, in front of District and Circuit Court judges. But neither this discussion, nor the large volume of repeated bail review motions that defense counsel is compelled to file, resulted in any inquiry into the broader systemic problems causing so many people to remain detained.

47. Instead, the judicial system has accepted this "wait-and-see" custom, in which people remain detained while they hope their attorney and loved ones can help them jump through the hoops to make them eligible for pretrial release, and hope that, if not, their attorney will file a motion on their behalf to try to secure release in another way. The days that pass during this wait-and-see period are treated like the cost of doing business by the court system. But it is during this time that my clients lost their jobs, lost their homes, lost their children, lost the opportunities big and small that life beyond a jail's walls provides. Across my clients' cases, I am sure there are cumulative months if not years of life that have been lost.

I declare under penalty of perjury that this declaration is true and correct.

Executed on ___7/14/2022___, in the City of Minneapolis, County of Hennepin, State of Minnesota.

DocuSigned by:

C7058DEDA43A4B0...

Claire Glenn

8

# EXHIBIT 18

# COURTWATCH PG
*Injustice Happens In Empty Courtrooms*

July 18, 2022

The Honorable Lisa A. Hall Johnson
District Administrative Judge
District 5, District Court of Maryland
14735 Main Street
Suite 345B
Upper Marlboro, MD 20772

The Honorable Aisha N. Braveboy
State's Attorney
14735 Main Street
Suite M3403
Upper Marlboro, MD 20772

Ms. Corenne D. Labbé
Director
Prince George's County Dept. of Corrections
13400 Dille Drive
Upper Marlboro, MD 20772

Natasha Dartigue,
Public Defender for the State of Maryland
William Donald Schaefer Tower; Suite 1400
6 St. Paul Street
Baltimore, MD 21202

Mr. Jeffrey Logan
Pretrial Services
Prince George's County Dept. of Corrections
13400 Dille Drive
Upper Marlboro, MD 20772

Melissa Pryce, District Public Defender
Prince George's County Public Defender
14735 Main Street, Suite 272B, Courthouse
Upper Marlboro, Maryland 20772

**Re: Findings from Courtwatch PG's Analysis of Release Timelines from the Office of Pretrial Services**

Dear Administrative Judge Hall Johnson, Director Labbe, Mr. Logan, Attorney Braveboy, Ms. Dartigue and Ms. Pryce,

Over the last two years, we have written to your offices numerous times to share our serious and continued concerns about the failings of the Office of Pretrial Services (OPS) and the consequences of the Prince George's County District Court's continued reliance on it. These failings include wholly unacceptable timelines for processing of community members, the number of community members who are seemingly forgotten after referral to OPS, and administrative errors with serious consequences, including missing or incorrect pretrial sheets during hearings. These issues cannot be construed as mere mistakes or singular incidents; cumulatively, they present a department that continues to fail in its core responsibilities, regularly harming those in this court's care. Yet despite the concerns repeatedly raised by the Office of the Public Defender during hearings, and Courtwatch PG afterwards, the judges of Prince George's County have referred individuals to this office in an astounding quarter (27%) of all cases in bond hearings we observed from January through May of 2022. This abdication of responsibility is the court's failure, and the consequences for our community members are devastating. We demand your immediate attention and action to prevent the severe repercussions of this court's continued reliance on OPS.

**Findings from our independent analysis of pretrial processing timelines.** OPS is failing in its responsibility to assess and release community members in a timely manner once they have been referred during a bond hearing. Further, representatives of OPS are misrepresenting the timeline to court officials. On June 9, 2022, an OPS representative stated to a judge in open court that OPS processing "takes a couple of days" to "a week".[1] We have completed our own independent analysis of the timeline for OPS processing and release (Annex 1 presents the methodology), examining cases where a referral to OPS was the only option for release given during a bond hearing.[2] We found the claim by OPS to be grossly inaccurate. For the community members in our sample who *have been released* by OPS since January 1, 2022, it took 38 days on average for them to be released after their referral to OPS.[3] This average is more than five times the maximum time that OPS represented to the court. When we examined the pool of community members referred to OPS (regardless of whether they had been released), the average time spent waiting was a shocking 61 days.

Of all the community members whose release by OPS was either authorized or ordered by a judge in our sample, as observed by Courtwatch PG, 54% were released as of July 15, 2022. While the average wait time for this subgroup was 38 days after the judge's ruling, this average increased to 48 days for those who were released based on an authorization rather than an order. In 19% of cases where the community member was released by OPS, they were held over 60 days.

When we expanded the analysis to cover all community members referred only to OPS, whether or not they have yet been released, the average time spent waiting increased to 61 days. A shocking 44% of this group has been incarcerated for over 60 days. Even in instances where a community member was ordered released by OPS, they waited 41 days on average. One-third (33%) of those whose release by OPS was ordered by a judge in the first five months of 2022 remained in jail as of July 15, 2022.

Our analysis also suggests a concerning pattern around OPS processing in cases that are moved to Circuit Court following a bond review. This move has no legal bearing on bond rulings such as referrals to OPS; it does not cancel or suspend them. Nevertheless, we have heard anecdotally that OPS suspends their processing of an individual once the case has moved to Circuit Court. Our data are consistent with

---

**OPS Release by the Numbers**
*Referrals to OPS, Jan 1 – May 31, 2022*

Of those <u>released</u> by OPS by July 15 (n=31):
- Average time spent in jail since the referral: 38 days
- If release was ordered: 11 days
- If release was optional: 48 days

Of those <u>referred</u> to OPS, as of July 15 (n=57):
- Average time spent in jail since the judge's referral: 61 days
- Average time if release was ordered: 41 days
- 33% of people with release orders remain in jail
- Average time if the referral was an option: 67 days

---

[1] This statement was made during the bond hearing for Mr. Jaylinn Evans on case 6E00715154.
[2] The sample excludes cases where insufficient information was available for analysis (including those released on pretrial level 4), cases which were dismissed or sentenced before OPS processing was completed, and cases in which individuals received new conditions of release. See Annex 1 for greater details on sample creation.
[3] Due to the lack of publicly available information about when community members are released when the referral to OPS is specifically for OPS Level 4, such cases are not included in this analysis. But Courtwatchers have consistently heard that OPS Level 4 processing delays are significant as well.

@courtwatchpg | 410.793.7126 | courtwatchpg@gmail.com | P.O. Box 261, Clinton, MD 20735

these anecdotal reports. In the 25 cases in our sample where someone was referred to OPS and then the case was moved to Circuit Court, about a quarter (28%) have been subsequently released. Accordingly, the community members in these 25 cases have spent an average of 83 days in jail after their referral to OPS. We ask that you immediately look into this to ensure that judicial referrals to OPS are being respected.

Our findings are consistent with concerns raised by the Office of the Public Defender. Counsel have often detailed how even small delays in processing can be catastrophic in certain cases. For example, the person's family may lose their home or other crucial support if the person loses their job, or there may be an urgent medical condition currently being handled outside the jail. In such cases, counsel often urges the judge to give OPS an order rather than an option, or to authorize private home detention. We have heard judges declare a policy of never authorizing private home detention, but we have never heard a reason aside from a rare mention of general suspicion of such companies. We have often heard judges refuse to change an OPS option to an order in a case of special need, not because further investigation is needed, but rather because giving an order would cause the person to "jump the line." This reasoning would seem to ignore that fairness gives priority to dire need. Further, where release is judged appropriate, orders should reduce the overall processing time. These decisions are inconsistent with the values of justice and fairness that judges frequently cite, leading us to wonder whether the motivation might sometimes be to use pretrial detention as a punishment or deterrent, thus violating the constitutional right to trial. No pre-trial decisions should ever be made with a punitive goal in mind.

While some judges have begun inviting counsel to ask for a new hearing if their client is not released "in a few days" or "in a reasonable time," these ad hoc invitations by a few judges hardly address the basic problem: that our neighbors are regularly being caged for a month for no reason but administrative delay.

**Examples of community members failed by OPS.** For some people, the waiting period is significantly longer than the averages would suggest. Two of these examples were observed in just the last three weeks.
- Mr. Chase Gustava Jackson was heard on bond for case 4E00705835 on January 5, 2022, during which OPS was authorized to release him at their discretion. Mr. Jackson was not released from jail until March 22, 2022, a total of 76 days incarcerated after his bond review.
- Mr. Felix Lorenzo-Mateo was originally committed on April 4, 2022, in case 1E00732446. At his bond review the next day, OPS was ordered to release him at Level 4, and private home detention was authorized as well. Since then, Mr. Lorenzo-Mateo had an additional three bond hearings. Despite repeated judicial orders for OPS release, Mr. Lorenzo-Mateo was not released. As of his fourth bond hearing on June 29, 2022, where he received an unsecured bond, Mr. Lorenzo-Mateo had been incarcerated for 86 days.
- In Mr. Jermaine Cordell Brown's bond review for case 4E00726212, OPS was authorized to release Mr. Brown at Level 4 at the conclusion of his second bond review, on May 27, 2022. Mr. Brown was back before the court on July 1, 2022, for a third bond review because he had yet to be released by OPS. He was then released on an unsecured personal bond. As of July 1, Mr. Brown had been in jail for a total of 85 days on misdemeanor charges that would carry a maximum sentence of 60-90 days should he be tried and convicted.

**Continued concern over delegation of judicial authority.** We are concerned that the use of OPS by judicial officials represents an improper delegation of judicial authority to a non-judicial agency. The decision whether to detain or release someone before trial and under what conditions must be made by judicial officers and meet a specific set of standards spelled out in Maryland Rules 4-216 and 4-216.1. As

outlined in our correspondence ("Improper delegation of judicial authority", dated April 27, 2022, Annex 2), OPS does not meet the requirements related to authority and transparency to make these determinations, nor indeed the minimal transparency standards that should be expected of any significant government agency. The failings make the referral to OPS in a quarter of all cases even more troubling.

**The impact of inaction.** The failures of OPS have significant and lasting consequences for community members. A functioning OPS would allow community members to continue their work and education, support and be supported by their families, friends, and community, and prepare for trial with their counsel. Instead, the typical experience of someone referred to OPS is to be incarcerated for a month or longer. We beg you to consider the consequences for these individuals, their families, and the community – these people who are eligible for home release are instead languishing in an overcrowded jail awaiting trial. Every additional day a person spends in jail is damaging to their physical and mental health and has the potential to cost them their job or job opportunities, cause them or their family to lose their home, deprive their children of essential financial support, postpone or end their education, and in other ways cause permanent damage. OPS delays and other failings mean many such dangerous days for the quarter of cases referred to OPS by this court. That this is the norm within Prince George's County is completely unacceptable.

We implore you to seriously consider the ramifications of the continued failings of OPS referrals. Specifically, we ask for your attention and immediate action on the following:

1. **Administrative Judge Hall Johnson**, we urge you to instruct your judges to consider the timelines of OPS processing and individuals' eligibility when making determinations about referrals to OPS. We ask that judicial officers make every effort to explore other conditions of release, rather than OPS referrals, that will allow community members to be released as quickly as possible.

   Further, we ask that you secure from OPS their complete record of the dates of their receipt of options and orders from judges, and the dates of their decisions and releases on the respective cases, and then analyze the data for your judges, so that they can have a fuller understanding of the practical implications of the sorts of rulings they make every day.

2. **State's Attorney Braveboy**, we similarly ask that you instruct your prosecutors to consider the timelines of OPS processing and refrain from rote recommendations of referral to OPS or no-bond holds simply to meet your commitment of no cash bonds.

3. **Director Labbé and Mr. Logan**, we ask that you implement for OPS the standards of transparency that the law requires of qualified and legitimate judicial officers when they make these types of decisions. We also ask that you immediately look into the timelines for processing, identify those individuals that have been pending with OPS for extended periods, and make every effort to process these cases as soon as possible. This should include looking into cases that have moved to Circuit Court to ensure judicial referrals to OPS are being respected.  We demand that you make whatever changes may be necessary for you to live up to your own claim in court that OPS processing takes a few days to a week.

4. **Ms. Dartigue and Ms. Pryce,** we urge you to consistently communicate to public defenders the challenges with OPS delays during bond reviews and urge attorneys to continue to explore every

avenue for conditions of release that will enable community members to avoid these unacceptable periods of incarceration.

The Prince George's County judicial system has an obligation to provide equitable and fair treatment to ALL community members. As representatives of the public and advocates for Black and Brown community members, we are holding you to account.

Sincerely,

The Courtwatch PG Accountability Team

cc:     The Honorable Chief Judge John P. Morrissey
        Del. Alonzo Washington – alonzo.washington@house.state.md.us
        Del. Jazz M. Lewis – jazz.lewis@house.state.md.us
        Del. Luke Clippinger – luke.clippinger@house.state.md.us
        Del. Nicole A. Williams – nicole.williams@house.state.md.us
        Del. Wanika B. Fisher, Esq. - wanika.fisher@house.state.md.us
        Del. Rachel Jones – rachel.jones@house.state.md.us
        Del. Faye Martin Howell – fayemartin.howell@house.state.md.us
        Del. Karen R. Toles – karen.toles@house.state.md.us

        **The Prince George's County Council**:
        Calvin S. Hawkins II, Chair – At-LargeMemberHawkins@co.pg.md.us
        Sydney J. Harrison, Vice-Chair - CouncilDistrict9@co.pg.md.us
        Mel Franklin – At-LargeMemberFranklin@co.pg.md.us
        Thomas E. Dernoga – CouncilDistrict1@co.pg.md.us
        Deni Taveras – DLTaveras@co.pg.md.us
        Danielle M. Glaros – CouncilDistrict3@co.pg.md.us
        Todd M. Turner – CouncilDistrict4@co.pg.md.us
        Jolene Ivey – CouncilDistrict5@co.pg.md.us
        Jonathan M. Medlock – CouncilDistrict6@co.pg.md.us
        Rodney C. Streeter – CouncilDistrict7@co.pg.md.us
        Edward P. Burroughs III – councildistrict8@co.pg.md.us

**Annex 1. Methodology for Our Independent Data Analysis**

Goal: The goal of this analysis is to examine the time it takes for community members to be released from jail once they are referred to the Office of Pretrial Services within Prince George's County.

Data Sources: This data project combines publicly available data from Maryland Case Search and Prince George's County Inmate Lookup with Courtwatch PG's data from daily bond hearing observation. Courtwatchers observing bond reviews note bond determinations made by presiding judges, including whether a community member is referred to OPS, whether the referral is a recommendation or an order, and whether the judge specifies the pretrial level. Inmate Lookup provides the date of commitment and release from detention and the bond status of related cases. Because release dates are not available for community members released on OPS Level 4, these cases are excluded from this analysis.

Data Sample: The analysis was limited to bond reviews observed between January 1 and May 31, 2022. Data on each case was updated as of July 15, 2022. Because the goal of the analysis was to identify the timeline for OPS processing, the sample was limited to cases where a judge set OPS release as the only path to their release . From January 1 to May 31, rulings on 159 cases met this criterion. For each of these cases, additional data was collected from Maryland Case Search and Inmate Locator and only those with complete information were retained in the sample. Data was reviewed for accuracy and consistency across the three data sources. To ensure that the final sample was limited to individuals whose only option for pretrial release was through OPS, cases were excluded from the sample if they met any of the following conditions:

- Insufficient data was available from Inmate Lookup to determine release date
- Community member was released on OPS level 4 (no release date available)
- Case was dismissed before the community member was released by OPS
- Hearing was held before community member was released by OPS
- Community member received another bond hearing and was released under new conditions (e.g. bond, personal recognizance)

The final sample, excluding cases that met these conditions, included 57 individual bond reviews. Our analysis includes figures on: i) community members referred to OPS (n=57); and ii) community members that have been referred to and released by OPS as of July 15, 2022 (n=31).

**Annex 2. Letter – "Improper delegation of judicial authority", dated April 27, 2022**

# COURTWATCH PG
*Injustice Happens In Empty Courtrooms*

**CALL FOR ACCOUNTABILITY**

April 27, 2022

The Honorable Lisa A. Hall Johnson
District Administrative Judge
District 5, District Court of Maryland
14735 Main Street
Suite 345B
Upper Marlboro, MD 20772

Ms. Corenne D. Labbé
Director, Prince George's County Department of Corrections
13400 Dille Drive
Upper Marlboro, MD 20772

The Honorable Aisha N. Braveboy
State's Attorney
14735 Main Street
Suite M3403
Upper Marlboro, MD 20772

**RE: Improper delegation of judicial authority**

Dear Administrative Judge Hall Johnson, Director Labbé, and Attorney Braveboy:

Courtwatch PG is a community-based program with the goal of ensuring that all officials within the Prince George's County judicial system are aware of and acting in accordance with Maryland Rules 4-216 and 4-216.1, and the U.S. Constitution. Those facing charges, especially our Black and Brown community members, are frequently subject to unequal, unfair and inhumane treatment by actors within the criminal system. Courtwatch PG is observing and challenging this treatment and advocating for these members of the community.

We are writing this letter to express our concerns about the improper delegation of judicial authority to a shadowy non-judicial agency within the jail administration.

Maryland Rule 4-216(e)(1)(d) directs judicial officers, in deciding whether to release a person and under what conditions, to take into account (among many other considerations) "any recommendation of an agency that conducts pretrial release investigations." The law does not mention simply handing the whole decision over to such an agency.

The scope and limits of the authority of judicial officers in deciding whether someone is to be detained before trial or released, and under what conditions, are spelled out in great detail in Rule 4-216 and Rule 4-216.1 of the Maryland Code.  These rules specify which decisions must be made by judges and

which decisions may be made by other judicial officers. These rules also require that the decisions be made based on public hearings in which both sides are represented, with all communications being made on the record to all parties involved, and with public statements of reasons.

These legal requirements exist for morally compelling reasons. We all recognize that in practice these legal requirements are essential to the fair, decent, and legitimate treatment of our community members by the government that represents them.  However, these legal requirements are regularly violated in Prince George's County bond hearings, when judges delegate much or almost all of their judicial task to a shadowy non-judicial agency within the jail's administrative staff called "Pretrial Services."

Very often it is this agency that decides whether and when someone will be released or held and decides what conditions they must abide by while released.

But this agency **lacks the authority** that judicial officers have regarding pretrial release decisions, the authority spelled out in Maryland Rule 4-214: "Pretrial Release—Authority of Judicial Officers, Procedures."

There appears to be no comprehensive public information about the **personnel** of this agency, nor any public information about what relevant **training** they might or might not have, nor about whether there are any relevant **formal qualifications** for their positions. In fact we have not been able to discover whether the agency consists of certain definite people whose jobs fall entirely within the agency, or consists instead of an hour's work here and there by people who normally do some other jail work.

This agency does not **announce its policies or standards:** not to the public, not to the parties whose rights are at stake, and not to the attorneys representing those parties. We have been unable to determine how, or on what supposed authority, the agency has arrived at its standards—or to what extent it operates by standards or policies at all.

This agency has not to our knowledge released **definitions of its levels of release** (as the similar agency in Anne Arundel County has done). By contrast, when Maryland's qualified and legitimate judicial officers decide to release someone subject to various restrictions on their conduct, the judicial officers are required to announce the ruling and its specific conditions.

This agency does not **hold hearings**. Hence it does not hold public hearings in which both sides are represented, as Maryland strictly requires its qualified and legitimate judicial officers to do whenever they make similar decisions.

This agency does not, as a regular policy, **announce when or whether it has arrived at a decision** on a given case, as Maryland strictly requires qualified and legitimate judicial officers to do whenever they make similar decisions. Though Maryland's Case Search system records whether and when community members have been released by order of a judicial officer or by the posting of a bond, it does not record whether or when someone has been released by decision of Pretrial Services, nor therefore at what level.

This agency does not, as a rule, **put its specific rulings on the public record**, e.g. to say that such-and-such a person has been released at Level 4, nor even simply that she has been released by Pretrial Services, nor that she has been determined by them not to merit release.  By contrast, Maryland

strictly requires its qualified and legitimate judicial officers to put their own similar decisions on the public record.

This agency does not **publicly record its reasons** for particular decisions, as Maryland strictly requires its qualified and legitimate judicial officers to do whenever they make similar decisions.

The following is a limited selection of cases recently heard, involving rulings or recommendations of near-complete delegation of judicial responsibility to Pretrial Services.

On April 11, 2022, **David Michael Clarke** was heard on Case **1E00713854** before Judge Bryon S. Bereano. Mr. Clarke was represented by Jeff Campbell, and the assistant state's attorney was Elveta Martin. After Attorney Campbell pointed out some questionable features of the police report, Attorney Martin gave her recommendation: "We don't know if the allegations are true, so Pretrial is the option I'll go with," meaning Pretrial Services. This implies that despite the hearing lacking sufficient information for a responsible decision according to legally required standards, the recommendation was to allow an agency in the jail to make the decision behind closed doors, on grounds of their choosing, without a deadline. Judge Bereano gave Mr. Clarke a secured bond of $10,000 instead, which was paid on the same day.

On April 13, 2022, **Devaughn Markell Byrams-Riche** was heard on Case **3E00732581** before Judge Robert W. Heffron, Jr. Judge Heffron ordered Pretrial Services to release Mr. Byrams-Riche at any level from the lightest check-in to home detention—their choice, with no deadline or suggested date of decision. Until such a decision, Mr. Byrams-Riche would be held in jail. In an uncharacteristically quick turnaround, Mr. Byrams-Riche was released the next day.

On April 13, **Maleek Alize Thomas** was heard on Case **1E00731732** before Judge Robert W. Heffron, Jr. Judge Heffron gave Pretrial Services the option of releasing Mr. Thomas on that case, at any level from the lightest check-in to home detention—their choice, with no deadline or suggested date of decision. Unless and until the agency were to opt for such release, Mr. Thomas would be held in jail. He remains in jail as of the writing of this letter.

On April 15, **Dozier Vincent Haziel III** was heard on Case **4E00713955** before Judge Scott M. Carrington. Judge Carrington gave Pretrial Services the option of releasing Mr. Haziel on that case at any level from the lightest check-in to home detention—their choice, with no deadline or suggested date of decision. Unless and until the agency were to opt for such release, Mr. Haziel would be held in jail. Mr. Haziel was released on April 18.

On April 18, **Antonio Alante Morris** was heard on Case **0E00726173** before Judge Clayton Anthony Aarons. Judge Aarons gave Pretrial Services the option of releasing Mr. Morris at any level from the lightest check-in to home detention—their choice, with no deadline or suggested date of decision. Unless and until the agency were to opt for such release, Mr. Morris would be held in jail. He remains in jail as of the writing of this letter.

On April 18, **Nnanyereugo Onuoha** was heard on Cases **1E00663930** and **SD72040** before Judge Clayton Anthony Aarons. Judge Aarons gave Pretrial Services the option of releasing Mr. Onuoha at any level from the lightest check-in to home detention—their choice, with no deadline or suggested date of decision. Unless and until the agency were to opt for such release, Mr. Onuoha would be held in jail. He remains in jail as of the writing of this letter.

On April 18, **Robert Kahler** was heard on Case **2E00703460** before Judge Clayton Anthony Aarons. Judge Aarons gave Pretrial Services the option of releasing Mr. Kahler at any level from the lightest check-in to home detention—their choice, with no deadline or suggested date of decision. Unless and until the agency were to opt for such release, Mr. Kahler would be held in jail unless he posted a bond of $1,500, which he had not previously been able to afford. He remains in jail as of the writing of this letter.

On April 18, **Armod Jamel Battle** was heard on Case **3E00713933** before Judge Clayton Anthony Aarons. Judge Aarons gave Pretrial Services the option of releasing Mr. Battle at any level from the lightest check-in to home detention—their choice, with no deadline or suggested date of decision. Unless and until the agency were to opt for such release, Mr. Battle would be held in jail. He remains in jail as of the writing of this letter.

On April 18, **Naquawn N. Dickey** was heard on Case **0E00732263** before Judge Clayton Anthony Aarons. Judge Aarons gave Pretrial Services the option of releasing Mr. Dickey at any level from the lightest check-in to home detention—their choice, with no deadline or suggested date of decision. Unless and until the agency were to opt for such release, Mr. Dickey would be held in jail. He remains in jail as of the writing of this letter.

On April 18, **Dequan Derrel Irby** was heard on Cases **0E00732263** and **1E00713966** before Judge Clayton Anthony Aarons. Judge Aarons gave Pretrial Services the option of releasing Mr. Irby at any level from the lightest check-in to home detention—their choice, with no deadline or suggested date of decision. Unless and until the agency were to opt for such release, Mr. Irby would be held in jail. He remains in jail as of the writing of this letter.

On April 18, **Curtis Nathan Thompson** was heard on Case **1E00713889** before Judge Clayton Anthony Aarons. Judge Aarons gave Pretrial Services the option of releasing Mr. Thompson at any level from the lightest check-in to home detention—their choice, with no deadline or suggested date of decision. Unless and until the agency were to opt for such release, Mr. Thompson would be held in jail. He remains in jail as of the writing of this letter.

On April 19, **Nicholas Jameson Tucker** was heard on Case **5E00714005** before Judge Bregory C. Powell. Judge Powell gave Pretrial Services the option of releasing Mr. Tucker at any level from the lightest check-in to home detention—their choice, with no deadline or suggested date of decision. Unless and until the agency were to opt for such release, Mr. Tucker would be held on a $5000 bond secured at 10%. He paid the security and was released on the same day.

On April 22, **Damien Eugene Keys** was heard on Case **3E00714906** before Judge Brian C. Denton. Judge Denton gave Pretrial Services the option of releasing Mr. Keys at any level from the lightest check-in to home detention—their choice, with no deadline or suggested date of decision. Unless and until the agency were to opt for such release, Mr. Keys would be held in jail. He remains in jail as of the writing of this letter.

Administrative Judge Hall Johnson, we ask that you instruct your judges to accept the responsibilities of their office, and not delegate broad judicial responsibility to this agency unless and until it meets the standards of transparency that the law requires for such decisions when they are made by judicial officers. And we ask that you seek new hearings for Mr. Thomas, Mr. Morris, Mr. Onuoha,

Mr. Kahler, Mr. Battle, Mr. Dickey, Mr. Irby, Mr. Thompson, and Mr. Keys, at which the judicial consideration that is their right not be improperly delegated to non-judicial employees.

Director Labbé, we ask that you implement for the Pretrial Services agency the standards of transparency that the law requires of qualified and legitimate judicial officers when they make the same sorts of decisions about people's lives.

State's Attorney Braveboy, we ask that you instruct your prosecutors not to recommend the broad delegation of judicial responsibility to people who are not judicial officers and who do not to any approximation abide by the standards the law contemplates for judicial decisions.

The Prince George's County judicial system has an obligation to provide equitable and fair treatment to ALL community members. As representatives of the public, and advocates for Black and Brown community members, we are holding you to account, and would appreciate your prompt attention and response to this concerning issue.

Sincerely,

The Courtwatch PG Accountability Team


cc:     The Honorable Chief Judge John P. Morrissey
        Mr. Keith Lotridge, Esq. – keith.lotridge@maryland.gov
        Ms. Melissa Pryce, Esq. – melissa.pryce@maryland.gov
        Del. Alonzo Washington – alonzo.washington@house.state.md.us
        Del. Luke Clippinger – luke.clippinger@house.state.md.us
        Del. Nicole A. Williams – nicole.williams@house.state.md.us
        Del. Wanika B. Fisher, Esq. – wanika.fisher@house.state.md.us
        Del. Rachel Jones – rachel.jones@house.state.md.us
        Del. Faye Martin Howell – fayemartin.howell@house.state.md.us
        Del. Karen R. Toles – karen.toles@house.state.md.us

# EXHIBIT 19

**PRINCE GEORGE'S COUNTY**
**DEPARTMENT OF CORRECTIONS**
**BUREAU OF ADMINISTRATION**
**POPULATION MANAGEMENT DIVISION**

March 30, 2021

## <u>RESPONSE TO MPIA RECEIVED FROM COURTWATCH PG</u>

Please find below the answers submitted regarding your inquiry and request for information submitted on March 25, 202. The range used to comprise this statistical data was December 1, 2018 through February 28, 2021 because we have not completed the month of March 2021 yet. Please see the following answers:

1. Records sufficient to show the number of people recommended for and/or ordered to Pretrial Services by a judge since December 1, 2018;
   RESPONSE-The number given will differ from the total number of recommendations because the Prince George's County Department of Corrections (PGCDOC) can only account for defendants who were/are Committed to the PGCDOC. Judges do recommend defendants and Court-Order defendants, at times, who have not been Committed to the PGCDOC.

   Also, the number provided is also affected by pre COVID-19 recommendations and then COVID-19 recommendations/Court-Orders whereas there was a substantial increase in recommendations during and after March 2020 to current date.

   a) 1208 Recommendations/and or ordered pretrial release
   b) 242 of the 1208 were court orders

2. Records sufficient to show the number of people recommended for and/or ordered to Pretrial Services who were released from jail pending trial since December 1, 2018;

   a) 962 total amount of detainees released on level II, III, and IV combined
      464 released on Levels II & III
      498 released on Level IV

3. Records sufficient to show the number of people recommended for and/or ordered to Pretrial Services who were detained pending trial since December 1, 2018:

   a) 1208 total # of detainees recommended subtracted by 962 (pretrial releases) = 246 detainees that have/had been detained; however, that does not mean that some of that 242 were not released by other means, i.e.

1. Bond
2. private home detention
3. transfer to another facility for a pending case(s),
4. unsupervised personal recognizance after felony counts/charges were dropped

4. Pretrial Services' budget(s) for 2020 and 2021; (See Attachment 1)

5. Organization chart(s) for Pretrial Services; (See Attachment 2)

6. Policies governing (a) the timing and content of interviewing criminal defendants; (b) whether to accept or deny a request for pretrial services; and (c) what type of monitoring or tracking to require for an individual; (See Attachment 3)

7. Records containing definitions of, and eligibility requirements for, levels 1, 2, 3, and 4 of supervision.  (See Attachment 3)

Attachments

cc:    Corenne D. Labbe', Director
       Guy Merritt, Acting Deputy Director, Bureau of Administration
       Major Luke Dixon, OPRLA-for the PGCDOC
       Joseph Ruddy, Office of Law-Prince George's County

JL:jl

March 25, 2021

**VIA EMAIL**
Custodian of Records
Pretrial Services
14735 Main Street
Upper Marlboro, MD 20772

To the Custodian of Records:

Pursuant to the Maryland Public Information Act ("MPIA"), General Provisions Article, § 4-101, *et seq*, Life After Release and Courtwatch PG request the following records from Pretrial Services and/or its components the pretrial home detention unit, the case management unit, and the investigation unit (collectively, "Pretrial Services"):

1. Records sufficient to show the number of people recommended for and/or ordered to Pretrial Services by a judge since December 1, 2018[1];
2. Records sufficient to show the number of people recommended for and/or ordered to Pretrial Services who were released from jail pending trial since December 1, 2018;
3. Records sufficient to show the number of people recommended for and/or ordered to Pretrial Services who were detained pending trial since December 1, 2018;
4. Pretrial Services' budget(s) for 2020 and 2021;
5. Organizational chart(s) for Pretrial Services;
6. Policies governing (a) the timing and content of interviewing criminal defendants; (b) whether to accept or deny a request for pretrial services; and (c) what type of monitoring or tracking to require for an individual;
7. Records containing definitions of, and eligibility requirements for, levels 1, 2, 3, and 4 of supervision.

Courtwatch PG and Life After Release, non-profit organizations with limited financial resources, also request a waiver of all fees. The disclosure of the requested information is in the public interest and will contribute significantly to the public's understanding of the treatment of people presumed innocent and pending trial as well as efforts by Pretrial Services to ensure mass incarceration is

---

[1] By "records sufficient to show," Courtwatch PG means that it is willing to accept this information in either summary form or by production of individual case files. Courtwatch PG is not asking, here or in any other component of this request, for any new records to be created.

reduced.   Both Life After Release and Courtwatch PG are local non-profit organizations with significant membership and volunteer networks with whom this information will be shared.   The organizations also intend to communicate information gained from this request through public reports and social media outreach.  This information is not sought for commercial purposes.

The Maryland Public Information Act requires a response to this request within 30 days.  If access to the records will take longer, please provide an explanation why and an expected production date.  If you deny any this request, please cite each specific exemption you feel justifies the refusal to release the information.

Courtwatch PG and Life After Release request that you please deliver the records electronically to carmen@lifeafterrelease.org.  If they cannot be provided electronically, please contact us to arrange production at the same email address to discuss alternate arrangements.

Sincerely,

Dr. Carmen Johnson
*On behalf of*
Court Watch PG
Life After Release

*Attachment 2- MPIA Request 3/25/2021*

# POPULATION MANAGEMENT DIVISION

3/30/2021

**Jeffrey Logan, Division Chief** 952-7179

**LaNelle Sydnor-Pringle, Asst. Division Chief** 952-7188

---

## Kenny Gray, Section Chief CTC IV — Community Supervision 952-7174

- Darlene Witt, CTC II, Dispo. Court 952-7395
- Sylvia Brown, Adm. Aide III 952-7050

**Sean Neverson, Unit Chief CTC III, Case Management / Drug Lab 952-7180**

**Tanya Law, Unit Chief CTC III, Monitoring Services 952-7064**

- Lisa Lewis, Gen. Clerk IV
- Jacqueline Washington, Adm. Aide II
- Vacant, CTC II
- Oddis Colvin, CTC II
- Vacant, CTC II
- Gladys Flores, CTC II
- Patrick Okudoh, Lab Asst. II
- Jermaine Mills, CTC II
- Yazmine Mendoza, CTC II
- Cpl. Steven Talley, Jr. TDY Investigator
- Jody Pike, Lab Asst. II
- Cpl. David Dorian TDY Investigator
- Philip Stokes, Lab Asst. I
- Cpl. William Edwards TDY Investigator
- PFC. Latanya Lee TDY
- PFC. Kenneth Patrick TDY Investigator
- Devyn Kiszewski, CTC II
- Cpl. Quiana Dixon Investigator
- Danielle Harvey (11-30)
- Charles Downs Investigator
- Derek Clayton (11-30)
- Daniel Thompson (11-30)
- Curtis Knowles (11-30)
- Francis Kwarteng TDY (11-30)

---

## Latrice Gordon, Section Chief CTC IV — Inmate Records & Release 952-7305

**Theresa Baum, Unit Chief CTC III, Inmate Records 952-4968**

**Inmate Release Team 952-7278**

Inmate Records:
- Patricia Battle Robinson, Paralegal Asst. II
- Vacant, Paralegal Asst. II
- Estelle Lyons, Paralegal Asst. II
- Jennifer West, Paralegal Asst. II
- Dillon Tuck, Paralegal Asst. II
- Vacant, Paralegal Asst. II
- Cpl. Charlisa Randol TDY
- MCpl. Sarah Stevens TDY
- Cpl. Lauren Thomas TDY
- Sumita Peters, Paralegal Asst. I
- Sgt. Sierra Price (TDY)

Inmate Release Team:
- Sgt. J. Bransom (11-29-2020)
- Sgt. John Dewitt
- Sgt. Sandy Harper
- Sgt. Ashley Fowler
- Sgt. Stacy Lawrence
- Sgt. Kierra Reedy
- Sgt. S. Bryan (10-11-2020)
- MCpl. V. Durr (09-13-2020)
- Cpl. F. Caldwell (09-13-2020)
- Vacant, Diminution Coordinator

---

## Virgen Germosen, Acting Section Chief CTC IV — Investigative Profile 952-7309

**Denise Pinder, Unit Chief CTC III, Pre-Trial Investigations 952-7095**

**Vacant, Unit Chief CTC III, Classifications 952-8893**

Pre-Trial Investigations:
- Vacant, CTC II
- Damon Thompson, CTC I
- Breauna Townsend, CTC I
- Amy Boehmer, CTC I
- Kiyanna Brown, CTC I
- Deserae Pauls (11-30-2020)
- John Grady (11-30-2020)
- Anthony Grillo (11-30-2020)
- Kory Smith (11-30-2020)

Classifications:
- Sandra Robinson, Gen. Clerk
- Michael Govan, CTC II
- Melissa S. Hart, CTC II
- An-Jerletta Swann, CTC II
- Sarah Sweet, CTC II
- Sgt. Daisy Chicas TDY

---

NOTE: KEVIN EASTON REASSIGNED EFFECTIVE 11-08-2020 FROM SECTION CHIEF INVESTIGATIVE PROFILE POP MGT TO ACTING ASSISTANT DIVISION CHIEF CRC

*Attachment 3 MPMA Request*
*V 3/25/2021*

# Prince George's County Department of Corrections
## Population Management Division
### Levels of Supervision

The Prince George's County Department of Corrections (PGCDOC) Pretrial Release Program uses multiple factors to assist with setting the appropriate levels of supervision necessary to effectively monitor defendants based on the defendant's assessed risk. The Maryland Rule 4-216.2 states consideration of factors include the recommendation of Pretrial Release Services. In addition, the judicial officer shall consider the following factors:

(A) The nature and circumstances of the offense charged, the nature of the evidence against the defendant, and the potential sentence upon conviction;

(B) The defendant's prior record of appearance at court proceedings or flight to avoid prosecution or failure to appear at court proceedings;

(C) The defendant's family ties, employment status and history, financial resources, reputation, character and mental condition, length of residence in the community, and length of residence in the State; Note-PGCDOC uses county residency requirements for Level 4 and county-sentenced Home Detention defendants;

(D) Any request made under Code, Criminal Procedure Article. § 5-201 (a). for reasonable protections for the safety of an alleged victim;

(E) Any recommendation of an agency that conducts pretrial release investigations;

(F) Any information presented by the State's Attorney and any recommendation of the State's Attorney;

(G) Any information presented by the defendant or defendant's attorney;

(H) The danger of the defendant to an alleged victim, another person, or the community;

(I) The danger of the defendant to himself or herself; and

(J) Any other factor bearing on the risk of a willful failure to appear and the safety of each alleged victim, another person, or the community, including all prior convictions and any prior adjudications of delinquency that occurred within three years of the date the defendant is charged as an adult."

The following Pretrial Release information provides a brief synopsis of the levels of supervision currently utilized by The PGCDOC's alternative-to-incarceration programs, under the PGCDOC's legal authority provided in Maryland Rule 4-216.2 (a-j):

## Level I
1. Least restrictive level of supervision.
2. Granted only to those individuals who have been arrested and detained on a non-violent misdemeanor, i.e. (Fishing w/o a License, non-felony MVA case/fine, Trespassing/Vagrancy, etc.).
3. Must also have no criminal history, no failures to appear, and no pending cases.
4. Calls Case Manager weekly.

## Level II
1. Individuals assigned to this level are more likely to be in jail for the first or second time with a criminal past.
2. Their record must reflect no recent convictions involving felony/violent crimes and they may have up to but no more than three (3) Failures to Appear in court.
3. Contact Case Manager weekly and meet with Case Manager every two weeks.
4. Drug test weekly

## Level III
1. Individuals assigned to level three meet the same basic criteria as those placed on level two, except for the fact that their case(s) are more serious in nature.
2. Contact and meet with Case Manager weekly.
3. Drug test weekly

## Level IV
1. Individuals assigned to level four are charged with felonies that require the most restrictive form of an alternative to incarceration, i.e., an electronic device affixed their leg.
2. Global position satellite (GPS) technology is used when deemed necessary to monitor detainee.
3. Monitored by Case Managers and an Investigator daily.

**Process of Assigning an Appropriate Level**

1. Prior to all bail reviews (Bond Hearings), Pre-Trial Investigators interview and run full criminal histories from local and federal criminal justice information systems. The interview and criminal history are merged into a **Pre-Trial Intake Fact Sheet**.

2. An internal departmental board that consists of the Case Management Supervisor or designee, Pre-Trial Release Supervisor or designee, and a Pre-Trial Release Court Liaison then reviews current bail cases to assess the defendant's eligibility for pre-trial release consideration and the appropriate level of supervision.

3. Eligibility criteria is based on the following:

    1. Nature of current offense(s) (misdemeanor vs. felony and how many counts and or multiple charges),
    2. Detainers filed by other public safety law enforcement agencies (Federal, State, County, Local etc.) whereby the defendant is wanted,
    3. Is there a victim(s) and do or does the victim(s) fear for his/her safety if the defendant/detainee were to be released. **A signed victim waiver must be obtained.**
    4. Criminal history (no criminal history to an extensive criminal history is evaluated),
    5. Failures to Appear (FTA) with the courts,
    6. Community ties (how short or long has the defendant resided in Prince George's County, neighboring county, or the District of Columbia),
    7. Institutional behavior (if known for current intake or previous intake(s) and at other penal facilities),
    8. Any violation of pre-trial release within the last five (5) years and the nature of the violation(s),
    9. All Parole and or Probation violations.

4. The PGCDOC Pre-Trial Intake Fact Sheet includes all pertinent eligibility criteria issues. The form is in quadruplicate and distributed as follows:

    a. Original remains affixed alongside the detainee's interview in the Criminal History Report to be kept in Classification if the defendant does not get the option of pre-trial release.
    b. Bond Hearing Judge/Courtroom Clerk.
    c. Office of the Public Defender.
    d. State's Attorney's Office.

5. During Bond Hearing, the Pre-Trial Release Liaison states whether the PGCDOC elects to take the option of pre-trial release or not.

6. The Bond Hearing judge decides to approve or deny the pre-trial release option. This decision is then written on the original Pre-Trial Intake Fact Sheet. Most judges recommend pre-trial release and sometimes defendants are court-ordered pre-trial release.

7. At the conclusion of Bond Hearing, a Bond Hearing Summary list is submitted by the court clerk that denotes the judge's rulings regarding the option of pre-trial release.

8. The Pre-Trial Release Liaison submits a copy of the Bond Hearing Summary Report to the Case Management Unit, PGCDOC's Reception Officers, and the Pre-Trial Release Unit.

9. All cases with the option of pre-trial release levels I, II and III are submitted to the Case Management Unit. Level IV cases are submitted to the Monitoring Services Unit.

10. The Case Management Unit supervisor reviews the cases to determine if additional work is needed prior to release and separates the cases by unit, i.e. Case Management Unit and Monitoring Services Unit (Electronic Monitoring).

11. Cases that do not need additional work are distributed to Case Managers.

12. Case Managers and the Case Management supervisor attempt to resolve issues with the cases that have received the option of pre-trial release so these individuals can be released.

13. Cases that received the Level IV option are given to the Monitoring Services Unit supervisor who completes the same process denoted in steps 11-13. Defendants taken out on Electronic Monitoring must be accompanied and driven to their residences by a Monitoring Services Field Investigator.

14. Cases are submitted to Classification, for filing, if they do not receive the option.


**Supervisory Decision Tree Consideration**

The levels of supervision and the established criteria are guidelines to be used by Population Management staff, but they are not an absolute. Accurately assessing a defendant is a complex process that includes some of the following mitigating factors:

1. Extensive criminal history;
2. Determining risk to public based on charge(s);
3. Determining risk to victim(s);

4. Determining risk to defendant based on psychological and or chemical dependency issues;

5. Assessing defendant's medical health issue(s) which are sometimes acute;

6. Securing adequate housing for the defendant;

7. Weighing multiple factors and some combination of factors 1-6.

# PGCDOC Risk Assessment Instrument (RAI)

The PGCDOC's Risk Assessment Instrument (RAI) provides a numerical score and should be a guide of how defendants are assessed and qualified for a level of pretrial release and/or county-sentenced Home Detention. This RAI does not cover every set of circumstances that occur when attempting to accurately assess a defendant's eligibility. Additionally, research into the efficacy of risk assessment instruments does not appear to completely support or dismiss the value of the use of these instruments when making pretrial release decisions. However, the RAI does provide a numeric score that will easily identify what level, if any, the defendant might be categorized for a level of pretrial release. The use of the RAI should be seen as a starting point for making a release decision during the case review.

Levels of Pretrial Release:

**Level I**

**Level II**

**Level III**

**Level IV** (Electronic Monitoring-pretrial status)

**Level IV** (Home Detention-county sentenced status)

5

# EXHIBIT 20

**PRINCE GEORGE'S COUNTY
DEPARTMENT OF CORRECTIONS
BUREAU OF OPERATIONS
POPULATION MANAGEMENT DIVISION**

May 18, 2020

**AFFIDAVIT BY JEFF LOGAN, CHIEF OF POPULATION MANAGEMENT**

**Referencing Civil Action No. 8:20-cv-01028-PHX**

As the Division Chief of the Population Management Division for the Prince George's County Department of Corrections (PGCDOC) and having functioned in that capacity and position for over 10 years, I am responding with and from an abundance of knowledge regarding how the PGCDOC's Pretrial Release program intricately works.

Plaintiffs make several allegations and assumptions in their "Motion to Supplement the Record" and accompanying affidavit by Assistant Public Defender Claire Glenn. Subsequent to that filing, Plaintiffs provided a "List of Detainees Approved or Ordered Released" dated May 13, 2020 ("May 13th List") which my division has reviewed and researched. I will respond to how the Population Management Division researched and compiled responses to the May 13th List, which is attached herein as **Attachment A**.

**How Respondent Compiled its Responses to Plaintiffs' May 13th List:**

1. All criminal defendants listed by the Plaintiff ("Listed Defendants") were identified utilizing the PGCDOC's computer database known as the Offender Management System (OMS). Each defendant's name was checked to determine the following:

   a) Name
   b) Case Number(s)
   c) Charge(s)
   d) Bond Amount(s), if any
   e) Warrant(s)-open, pending, and or served
   f) "Comments" Field for status updates to include judge's comments, bond hearing or other court docket entries input by PGCDOC Records Paralegals, and Population Management supervisors' coded comments
   g) Mental Health and/or Medical Health information
   h) Pretrial release status (for all Prince George's County cases for which the defendant is currently committed to PGCDOC)
   i) Whether pretrial release was ordered or authorized by the presiding judge.

2. PGCDOC requires specific information that must be collected in a prescreening interview with a defendant and verified prior to any defendant's release on Pretrial Release Level IV:

   a. Non-violent offense (unless otherwise ordered or approved by PGCDOC)

1

    b. Inmate's identity, address and telephone number;
    c. Full criminal history check to ensure no open warrants, detainers or pending charges (other than the intake case, and that all pending cases allow pretrial release);
    d. Residence in Prince George's County, MD;
    e. Employment/school address and schedule;
    f. Have and maintain an operable telephone;
    g. Ability to reside with a cooperative family member willing to accept program rules;
    h. Be employed or willing to participate in full-time employment, education and/or training;
    i. References to establish community ties;
    j. Employment history;
    k. Past and present substance usage and abuse;
    l. Medical information (for any medication compliance requirements);
    m. Any other conditions ordered by the court, such as victim contacts, social media information, internet access, .etc.)

This process is outlined in PGCDOC Policy and Procedure 20.3 Pre-Trial Investigation Services.  **See Attachment B.**  Once PGCDOC determines that a defendant who has been ordered to pretrial release cannot satisfy one or more of these criteria, PGCDOC informs the court that issued the order for pretrial release ("the issuing court") and awaits further instructions. This information is required in order to determine the proper parameters of electronic monitoring for each individual defendant.  Without proper home address verification, for example, GPS monitoring of a defendant's location would be meaningless, especially if there are stay-away orders or restrictions on activity.  The time it takes to obtain this information can vary for each defendant, as it is based on the amount of time responses are received from external sources and involved individuals, such as employers and alleged victims.

3. All Listed Defendants were checked for all possible issues that needed to be investigated, mitigated, or reviewed prior to any status being recorded or defendant being released or coded that s/he can't be released at current time.  Some of the issues that may affect a defendant's release are:
    a. Contacting the victim(s);
    b. Verifying an address;
    c. Verifying a Prince George's County address of residency.   This is important because we have field investigators that check on clients (defendants) released on Level 4 Supervision, either on Electronic Monitoring ("EM") or Home Detention for County-sentenced defendants ("HD").  A home address is essential for both EM and HD.

The courts have entrusted the PGCDOC 's alternative to incarceration programs, as far as EM and HD are concerned, to check on these defendants at least three (3) times per week at their respective Prince George's County residence, school, and/or place of employment.

2

4. Criminal defense attorneys have often contacted PGCDOC in order to ask about the status of his/her client's pretrial release.  **See Attachment C - Typical Email Communication with Defense Attorney.**  Generally, in cases where there is confusion or disagreement with a defendant's criminal defense attorney about a defendant's pretrial release conditions, the attorney would contact the court for clarification or intervention.

5. As of the date of this Affidavit, PGCDOC has 151 defendants on EM and HD and 120 defendants being monitored on Levels II and III.  Currently, the aggregate is 271.

6. All Listed Defendants were also cross-referenced with the population list being maintained in the Monitoring Service Unit which records statuses for defendants being considered for either EM or HD.  It is important to note that the court status of any of these defendants can change from day to day or week to week, month-to month.  The Unit attempts to verify all information to work towards releasing a defendant, but there are circumstances the Unit cannot control, such as a victim's reactions to potential release, family members/friends who are hesitant or reluctant to allow a defendant to live with them, stipulations that can't be successfully implemented or monitored (for instance-"Release Defendant but s/he is to have no contact with anyone in the community under the age of 18" or "no access to any Internet device or the Internet," etc.).  While PGCDOC continuously works to obtain and verify information, screening any defendant for pretrial release can take anywhere from a few days to a few weeks, even with assistance from defense attorneys to find new friends or family to approach or alternate contact information when initial information is not successfully verified.

7. All Listed Defendants who had court statuses that needed updates were cross-referenced with information from OMS, the courts, CAPS (Court Applications Portal), and Maryland Case Search.

8. Only Listed Defendants who had open warrants had their Records Base File reviewed to determine if the warrant is valid, extraditable, and if the jurisdiction wants to have custody of the defendant once s/he finishes all pending Prince George's County charges.

9. No Listed Defendants were released due to the Plaintiff's lawsuit or May 13th list.  Any defendants that were released or held in custody were effectuated as a part of the PGCDOC's adherence to court orders, its routine operational policy and procedures governing custody, alternatives to incarceration, and release to either maintain custodial care of all defendants committed to the PCCDOC based on a court officer or other public safety agency, or conversely, a court officer or other public safety agency submitting a "Release" to the PGCDOC, resulting in the PGCDOC relinquishing custody of said defendant.

**Professional Observations about the Plaintiff's Complaint and May 13ᵗʰ List**

The Plaintiffs, by Ms. Claire Glenn's representations throughout her Affidavit (ECF 61-1), and the May 13ᵉ List, continues to use **misleading** phrases, such as "…approved for release…". The PGCDOC receives court status updates on defendants from each court hearing, where the judge has determined:

- the defendant will not be granted the "option" (or "authorization") of pretrial release;
- the defendant is granted the "option" of pretrial release (Supervision Level is sometimes established by the judge, but otherwise left to the discretion of the PGCDOC); or
- the judge has ordered the defendant released on [a pre-determined level of] pretrial supervision.

Even if a defendant is court-ordered for pretrial release, PGCDOC must ensure that its Electronic Monitoring criteria, as well as any additional criteria set by the court, are met prior to release in order to properly effectuate electronic monitoring. Pretrial release is conditional on meeting those criteria. This has been the practice for decades. The Courts are aware of this, as are criminal defense counsel. If defense counsel disagrees with the Unit's application of release criteria or contests its findings, they will seek court intervention. If an inmate ordered to pre-trial release does not qualify for it, the Court is notified and may then order the release anyway or revisit the inmate's bond status.

The PGCDOC Community Supervision staff work exhaustively, attempting to find reasonable ways to effectuate releasing defendants, not the opposite.

Countless human-resource allocation has gone into researching each of these defendants on the May 13ᵗʰ List. In most cases, it has impeded our staff's ability to actually work on cases to facilitate pretrial release (i.e. analysis, review, follow-up with other public safety agencies, defendant's victim(s), family members, trying to obtain a viable address, working with Mental Health Court and other external psychological services providers attempting to get these defendants critical care and assistance etc.).

**Warrants-Warrant Service Etc.**

The PGCDOC has not changed its procedures for serving and or servicing of warrants for defendants held in its custodial care. Ms. Glenn states that the PGCDOC's serving and or servicing of warrants has impeded defendants being released through pretrial services. There are times that open warrants and detainers do hold up a defendant's release because case managers have to ensure whether the warrant is still valid, and if the public safety agency that filed the warrant is willing to extradite the defendant to their jurisdiction, etc.

**Conclusion**

On its face, as stated in my first and current Affidavits, the Ms. Glenn's affidavit paints a picture that the PGCDOC is going out of its way not to release defendants, regardless of whether they have been granted the option of pretrial release and/or Home Detention, court-ordered or not. However, I can unequivocally state the PGCDOC's entire community supervision program is accomplishing the antithesis of what the Plaintiffs are alleging. PGCDOC follows all court orders and instructions in effectuating the pretrial release of inmates.

I SOLEMNLY AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE CONTENTS OF THE FOREGOING AFFIDAVIT ARE TRUE AND BASED UPON PERSONAL KNOWLEDGE.

5/8/20 @ 8:28pm

Jeffrey Logan
Chief, Population Management Division
Prince George's County Department of Corrections

6

# EXHIBIT 21



# DISTRICT COURT OF MARYLAND FOR PRINCE GEORGE'S COUNTY
Located at COURTHOUSE, 14735 MAIN ST., UPPER MARLBORO, MD  20772

Case No. 2E00715535

## STATE OF MARYLAND  VS.  WILLIAMS, MIRAMBA KINTE
2516 DAREL DR #102
SUITLAND MD 207460000

## BAIL REVIEW SUMMARY

Your bail review was held by Judge GREGORY C. POWELL on 07/05/2022.

THE COURT, ON THE DATE SHOWN ABOVE,

HELD YOU WITHOUT BAIL;

AND THE FOLLOWING CONDITIONS/RESTRICTIONS WERE IMPOSED:
    OR PR TO PTR
    DO NOT POSSESS ANY FIREARMS, WEAPONS OR
    AMMO.

YOU ARE SCHEDULED FOR PRELIMINARY HEARING
    on 08/02/2022 at 08:45 a.m. in Room 261 at the District Court of Maryland for PRINCE GEORGE'S COUNTY located at COURTHOUSE, 14735 MAIN ST., UPPER MARLBORO, MD  20772.

NOTICE: Unless a final determination of indigency has been made, representation at the Bail Review is provisional and terminates at the end of the Bail Review. If you have already applied for the Public Defender through the District Court Commissioner, there is no need to apply again. You will be notified in writing of your eligibility for representation at trial as soon as a final determination is made. Please allow at least one week before contacting the District Court Commissioner regarding the status of your Application.

07/05/2022   3:50 p.m.   Room: 5

_____          _____
Defendant Signature                                    Date

**Tracking No.   180001569952**



# DISTRICT COURT OF MARYLAND FOR PRINCE GEORGE'S COUNTY

Located at COURTHOUSE, 14735 MAIN ST., UPPER MARLBORO, MD 20772

Case No. 2E00715535

## STATE OF MARYLAND VS. WILLIAMS, MIRAMBA KINTE
2516 DAREL DR #102
SUITLAND MD 207460000

| | | | |
|---|---|---|---|
| CC #:220031773 | | State ID:0003884781 | LocID: |
| Eyes: BRN | Hair: BLK | Height: 6'03" | Weight: 180 lb. |
| Race:1 | Sex:M | DOB:10/03/1994 | DL #: |

**Charge | Statute | AR/Citation**
HANDGUN IN VEHICLE | 1 0175 CR4203 |
LOADED HANDGUN IN VEHICLE | 1 1454 CR4203(a)(1)(v) |

**Charge | Statute | AR/Citation**
REG FIREARM:ILLEGAL POSSESSION | 1 1106 PS5133(b) |
ILLEGAL POSS AMMO | 1 1285 PS5133.1 |

## COMMITMENT PENDING HEARING

TO:  PRINCE GEORGES COUNTY DETENTION CENTER
   13400 DILLE RD., RECORDS DEPT, UPPER MARLBORO, 20772

YOU ARE HEREBY COMMANDED to receive from any officer the body of the above-named Defendant
who is charged with the offense(s) listed above.

Bail review was held by Judge GREGORY C. POWELL and the Defendant is committed
Without Bail.

### SUBJECT TO THE FOLLOWING CONDITION(S)/RESTRICTION(S):
OR PR TO PTR
DO NOT POSSESS ANY FIREARMS, WEAPONS OR
AMMO.

### YOU ARE FURTHER COMMANDED to produce the Defendant for Trial/Hearing
on 08/02/2022 at 8:45 a.m. in Court Room 261 at the District Court of Maryland For PRINCE GEORGE'S COUNTY
located at COURTHOUSE, 14735 MAIN ST., UPPER MARLBORO, MD 20772

Date: 07/05/2022  Time: 3:50 p.m.    JUDGE/CLERK: _____

**Tracking No. 180001569952**

CC-DC-CR-028 (Rev. 07/2017)

Judge Gregory C. Powell